Clement S. Roberts (SBN 209203)
croberts@orrick.com
ORRICK HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105
Tel: 415-773-5700/Fax: 415-773-5759

Alyssa M. Caridis (SBN 260103)
acaridis@orrick.com
ORRICK HERRINGTON & SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA  90071
Tel: 213-629-2020/Fax: 213-612-2499

George I. Lee (Admitted *Pro Hac Vice*)
lee@ls3ip.com
Sean M. Sullivan (Admitted *Pro Hac Vice*)
sullivan@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W. Randolph Street, Floor 5W
Chicago, IL  60661
Tel: 312-754-0002/Fax: 312-754-0003

Attorneys for Plaintiff, Sonos, Inc.

Lance Yang (SBN 260705)
lanceyang@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: (213) 443-3000
Fax: (213) 443-3100

Attorneys for Defendant,
GOOGLE LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SONOS, INC.,<br><br>   *Plaintiff*,<br><br>v.<br><br>GOOGLE LLC,<br><br>   *Defendant*. | Case No. 2:20-cv-00169-JAK (DFMx)<br><br>**DISCOVERY MATTER**<br><br>**JOINT STIPULATION REGARDING PLAINTIFF SONOS INC.'S MOTION FOR ENTRY OF PROTECTIVE ORDER**<br><br>Hearing Date: Aug. 12, 2025<br>Time: 10:00 a.m.<br>Courtroom: 6B<br>Judge: Hon. Douglas F. McCormick<br><br>Complaint Filed: Jan. 7, 2020<br>Discovery Cut-Off: Jan. 12, 2026<br>Pretrial Conference: TBD<br>Trial Date: TBD |

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ....................................................................................2

    A.    Sonos's Introductory Statement .......................................2

    B.    Google's Introductory Statement ......................................4

II.   PROTECTIVE ORDER DISPUTES ......................................................5

    A.    Overview .........................................................................5

        1.    Sonos's Overview of Disputes ...............................5

        2.    Google's Overview of Disputes ..............................7

    B.    Disputed Source Code Provisions......................................7

        1.    *Dispute #1: Number of Review Sites – Sonos Position* ...........7

        2.    *Dispute #1: Number of Review Sites – Google Position* .........9

        3.    *Dispute #2: Source Code Printouts – Sonos Position* ...........12

        4.    *Dispute #2: Source Code Printouts – Google Position* .........13

    C.    Dispute #3: Prosecution & Acquisition Bar – Sonos Position ........15

    D.    Dispute #3: Prosecution & Acquisition Bar – Google Position ......18

    E.    Dispute #4: Breach Notice & Security – Sonos Position ................26

        1.    *Timing for Notice of Breach* ...................................27

        2.    *Paragraph 14.10*..................................................27

    F.    Dispute #4: Breach Notice & Security – Google Position .............28

III.  CONCLUSION.........................................................................................31

Case No. 2:20-cv-00169-JAK (DFMx)

Pursuant to Civil Local Rule 37-2, Plaintiff Sonos Inc. ("Sonos") and Defendant Google LLC ("Google") hereby submit this joint stipulation of issues in dispute regarding entry of a Protective Order that will govern this case. As set forth in the Declaration of Alyssa Caridis filed concurrently herewith, the parties met and conferred regarding the issues raised herein pursuant to Civil Local Rule 37-1 but were unable to resolve their disputes.

## I. INTRODUCTION

### A. Sonos's Introductory Statement

Despite the extended pendency of this case, the ongoing fact discovery, and the extensive prior litigations, the parties have yet to agree to the terms of a Protective Order. Notably, this is at least the fifth time the same parties have negotiated the terms of a protective order in patent disputes relating to these same types of products. In the prior four actions, the parties reached agreement without involving the respective court or agency.

First, the parties negotiated a protective order in ITC Inv. No. 337-TA-1191 (the "1191 Investigation"), where complainant (*i.e.*, patentee) Sonos and respondent Google agreed in April 2020 to a protective order with terms generally similar to the terms Sonos is proposing in this case. Ex. 1. This protective order included a prosecution bar with a two-year duration after the earlier of (i) an individual withdrawing their subscription to the protective order and (ii) final determination of the investigation. *Id.*, §19.

Second, in *Google LLC v. Sonos Inc.*, 3:20-CV-03845 EMC (N.D. Cal.) (the "Chen Google Case"), the same parties, this time with Google as patentee and plaintiff, agreed to a protective order in May 2021. Ex. 2. In addition to a prosecution bar like that of the 1191 Investigation, this protective order introduced an acquisition bar at Google's insistence with a two-year duration after final disposition of the case. *Id.*, §VIII.

Third, the parties reached agreement again on a protective order in *Sonos Inc. v. Google LLC*, 20-cv-06754 WHA (N.D. Cal.) (the "Alsup Sonos Case") with Sonos again as patentee in December 2021. Ex. 3. The terms of this protective order were similar to the terms of the protective order in the Chen Google Case.

Fourth and most recently, the parties agreed to protective orders in ITC Inv. Nos. 337-TA-1329 (the "1329 Investigation") and 337-TA-1330 (the "1330 Investigation"). The parties negotiated and agreed to similar protective orders in both matters, which were entered in October 2022 for the 1330 Investigation and November 2022 in the 1329 Investigation. Ex. 4 (1330 Investigation protective order); Ex. 5 (1329 Investigation protective order).

Plainly, the parties have the capability to negotiate protective orders with terms agreeable to both. Yet, in the present case, Google abandons terms previously agreed to by the parties with no legitimate justification or apparent willingness to achieve an acceptable compromise.

In this case, the parties began negotiating the terms of a protective order on April 1, 2025. *See* Ex. 6, p. 11. Sonos's original proposal followed the terms most recently agreed to by the parties in the 1329 and 1330 Investigations. *See id.*, p. 10. However, Google declined to accept Sonos's proposal, stating without explanation that the 1329 and 1330 Investigations are "fundamentally different from this district court litigation." *See id.*

Over the following months, despite extensive email communications and multiple meet-and-confers between counsel, Google rejected Sonos's attempts to establish terms reasonable under the circumstances of this case and consistent with those previously agreed to by the parties in prior actions. *See*, *e.g.*, Ex. 6. Finally, on June 4, 2025, to avoid burdening the Court with disagreements over terms to which the parties had, in prior cases, successfully agreed (and so Google would promptly produce discovery in this case not previously produced in the 1191 Investigation), Sonos proposed making use of Judge McCormick's informal

JOINT STIPULATION RE SONOS'S MOTION FOR ENTRY OF A PROTECTIVE ORDER

01980-00160/17127926.1

telephonic procedure for resolving disputes. *Id.*, p. 2. Google rejected Sonos's proposal, alleging that the "gravity" of the issues made them unsuited for Judge McCormick's informal telephonic process. *Id.*, pp. 1-2. Google instead proposed the parties move for entry of a protective order and submit the present joint stipulation under LR 37-2. *Id.*

The parties' agreed upon terms, and the terms which the parties still dispute, are reflected in the May 30, 2025 Protective Order draft attached as Exhibit 7. The disputes to be addressed are as follows.

First, the parties disagree with respect to two source code review issues. Given the locations of Sonos's counsel and testifying expert witnesses in the present action, Sonos proposes two source code review sites (one in Los Angeles and the other in Chicago), each with two review computers. Google proposes two computers at a single review site. The parties also disagree with respect to presumptive limits on the number of source code pages permitted to be printed: Sonos proposes presumptive limits of 50 consecutive and 750 aggregate pages, while Google seeks limits of 25 consecutive and 500 aggregate pages.

Second, the parties disagree with respect to the temporal and subject matter extent of the patent prosecution and acquisition bars: Sonos proposes 2 years, consistent with prior agreements by the parties, while Google seeks a 3-year duration and additional limitations.

Third, the parties disagree with respect to the timeframe for notice of an unauthorized breach of security concerning Protected Material and with respect to the inclusion of Google's proposed paragraph 14.10 relating to "data security." Sonos believes Google's 72-hour deadline for notice of breach is impractical and that Google's data security terms are ambiguous.

## B. Google's Introductory Statement

Sonos's unnecessary "Introductory Statement" mischaracterizes the parties' prior protective orders and ignores the particular circumstances of this case. Google

is the party that took the initiative and first sent Sonos a proposed protective order on April 1, 2025 – one modelled after the stipulated protective order from the parties' most recent district court case (the Sonos Alsup Case). *See* Ex. 6 at 11. Instead of working with this reasonable proposal, which would have resolved these issues **three months** ago, Sonos sought to introduce radical changes that the parties had never agreed to in any prior district court case (or, in some cases, had never agreed to in any prior case, even administrative proceedings). Google has compromised repeatedly to accommodate Sonos's demands, including by agreeing to increase the number of experts permitted to access Google's source code and number of sets of source code printouts. However, Sonos has refused to compromise on multiple, important provisions that directly implicate the security and protection of Google's highly confidential information. Sonos's arguments are based on cherry picking language from prior protective orders (which, to the extent relevant, support Google's positions) and ignore recent developments (such as the end of the COVID-19 health emergency and the district court's findings in the Sonos Alsup Case that Sonos has engaged in "clear abuse of the PTO's patent examination system"). For the reasons explained below, the Court should adopt Google's proposals in full.

## II. PROTECTIVE ORDER DISPUTES

### A. Overview

#### 1. Sonos's Overview of Disputes

Sonos's proposals for the disputed Protective Order provisions are consistent with the provisions in the parties' most recent protective orders in the 1329 and 1330 Investigations. Google has attempted to justify its burdensome new proposals as to source code review by alleging, without further explanation, that the present case is "fundamentally different" from the 1329 and 1330 Investigations. *See* Ex. 6, p. 10. Sonos disagrees that the 1329 and 1330 Investigations are "fundamentally different" from the present action at least from a source code review standpoint. But to the extent any such differences exist, such differences justify Sonos's proposals – not

1    Google's.

2        For example, the present action involves more asserted patents, more accused

3    products, and more relevant source code versions as compared to the 1329 and 1330

4    Investigations, combined.    Additionally, the present case has an accelerated

5    discovery schedule, with less than 6 months remaining before the fact discovery cut-

6    off.  Dkt. 77.  Based on these factors, the present case will require *more* source code

7    review by *more* reviewers and a greater expenditure of Sonos's resources to complete

8    as compared to the 1329 and 1330 Investigations.    Google's proposals appear

9    calculated to frustrate Sonos's efforts and are unjustified.

10        With respect to the prosecution and acquisition bars, Google has proposed

11    "heightened protections" for itself that are, again, inconsistent with prior agreements

12    between the parties.  Google's alleged justifications for these proposals are unrelated

13    to the terms at issue and are groundless.  For example, Google attempts to justify the

14    burdensome terms by accusing Sonos of "abuse" of the patent prosecution process.

15    But Sonos's patent prosecution activities objectively ethical, consistent with industry

16    practice, and in accord with Federal Circuit precedent.  Indeed, Google has not even

17    attempted to argue that Sonos or its counsel has misused protective-order information

18    – much less attempted to provide evidence or support for such a slur.  Moreover,

19    Google's complaints here are not related to use of confidential information and still

20    would not justify Google's proposed terms.

21        Finally, Google proposes two additional provisions that are not consistent with

22    the parties' prior agreements: a burdensome deadline in the notice of unauthorized

23    disclosure section, and a data security provision that is simply too vague for Sonos

24    to comply with.

25        For at least these reasons, Google's proposals are unjustified, and the Court

26    should enter a Protective Order with Sonos's proposed terms.

27

28

Case No. 2:20-cv-00169-JAK (DFMx)

## 2.    Google's Overview of Disputes

Sonos's "Overview of the Disputes" is just a re-hash of its "Introductory Statement." Google addresses the substance of the parties' specific disputes below.

### B.    Disputed Source Code Provisions

#### 1.    *Dispute #1: Number of Review Sites – Sonos Position*

Subsection (c) of Section IX sets forth provisions regarding how source code inspections are to occur. The parties dispute the number of source code review sites, as follows:

> The source code shall be made available for inspection **[Sonos's proposal:** on two secured computers at two locations (Google's source code made available for inspection shall initially be on two secured computers located at the Los Angeles office of Quinn Emanuel Urquhart & Sullivan, LLP and on two secured computers located at the Chicago office of Quinn Emanuel Urquhart & Sullivan, LLP)][**Google's proposal:** on two secured computers at a single location] (each, a "Source Code Computer") in a secured, locked room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device.

Sonos's proposal for two review sites is warranted for several reasons.

First, Google's proposal of a single review site in California, thousands of miles from one of Sonos's co-counsel, Lee Sullivan Shea & Smith LLP (LS3), and several testifying experts on infringement, unnecessarily burdens Sonos's review efforts. In this regard, Sonos's co-counsel are based in Chicago and California, and Sonos has three testifying experts on infringement based near the east coast.[1] Requiring regular travel for multiple experts and attorneys from the eastern US to

---

[1] An additional testifying expert on infringement and lawyers from Orrick representing Sonos are based in California.

California is inefficient and will prejudice Sonos's ability to prove its infringement case. A review site in Chicago would greatly reduce required travel time for Sonos's experts and counsel and ensure efficient use of Sonos's resources.

Second, the present case involves a significant number of accused products — including numerous hardware products and numerous software apps — and a significant number of source code versions for each of the accused products to review. With this case being filed in January 2020, the damages period stretches back to January 2014 and covers multiple versions of the accused products, including the purported "redesign" versions prompted by Google being found an infringer in the 1191 Investigation. So, for Sonos to prove its infringement case here for each accused product for the entire damages period, Sonos will have to review source code versions corresponding to at least five separate dates significant in the timeline of this case. Compounding this issue is this case's fast timeline to close of discovery. The fact discovery cut-off is January 12, 2026 – less than 6 months from now. Dkt. 77. Google's proposal of a single review site in California unnecessarily burdens Sonos's review efforts and is simply unworkable for Sonos given the volume of review to be done and the short timeframe for completion. Thus, the volume of source code required to be reviewed and fast timeline alone justifies a second review site so that Sonos can have multiple teams reviewing source code in parallel.

Finally, Google has actually provided and offered to provide two review sites in prior litigations between the parties, showing that it is not burdensome for Google to do so now. For example, in the 1329 and 1330 Investigations—where Google was the party with the burden of establishing infringement—Google and Sonos each agreed to provide two review sites. *See*, *e.g.*, Ex. 4, p. 15-16. In that action, Google provided review sites in Los Angeles and Boston, while Sonos provided review sites in Silicon Valley and Washington, D.C. *Id.* Further, in the Sonos Alsup Case, Google unilaterally offered to provide a second review site in Chicago (ultimately this review site was never realized). *See* Ex. 8, p. 1. In particular, Google explained

that "[i]f instead of San Francisco[,] Sonos prefers to inspect Google code in Chicago (where LS3 is located)…, please let us know" since Google "could be in a position to make a second review computer available in [Chicago] sooner than San Francisco." Here, Google is using the Sonos Alsup Case as a baseline for terms of the current Protective Order. *See* Ex. 6, p. 11. Yet, Google has not provided any reason that a second review site in Chicago was acceptable in the Sonos Alsup Case but unacceptable in the present case. Google has actually provided and/or offered to provide multiple review sites in the past, such an approach is reasonable here.

For these reasons, Sonos's proposal for two review sites is reasonable and does not pose an undue burden on Google.

### 2.    *Dispute #1: Number of Review Sites – Google Position*

The parties dispute whether Google should be required to make its highly confidential source code available for inspection at one location (presumably Los Angeles, California) or two (Los Angeles, California and Chicago, Illinois). Sonos's demand for a second source code review location is based solely on the convenience of Sonos's second set of outside counsel, would impose undue burdens on Google, and should be rejected.

As the Federal Circuit has recognized, "source code requires additional protections to prevent improper disclosure because it is often a company's most sensitive and most valuable property." *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1300 n.13 (Fed. Cir. 2016). That is certainly the case for Google, whose first product was its search engine and who has continued to develop products powered by proprietary source code (including the accused products in this litigation). Google's proprietary source code belongs at Google, where it is protected by some of the most advanced physical and electronic security systems in the world. Even with a strict, Court-ordered source code inspection protocol, there is inherent risk whenever Google's proprietary source code leaves its exclusive custody. *See id.* ("Despite the well-intentioned provisions of protective orders designed to guard

confidential information, 'there may be circumstances in which even the most rigorous efforts of the recipient of such [sensitive] information to preserve confidentiality in compliance with ... a protective order may not prevent inadvertent compromise.'") (quoting *In re Deutsche Bank Trust Co. Ams.*, 605 F.3d 1373, 1378 (Fed. Cir. 2010)).  Sonos's proposal, requiring Google to make and store copies of its highly confidential source code in two separate locations, would unduly burden Google by doubling that risk – for no legitimate reason.

Nor is that the only undue burden to Google from Sonos's proposal.  Unlike in some of Google's prior cases against Sonos, none of the Quinn Emanuel attorneys staffed on this case are based in Chicago.  Accordingly, in order to accommodate a second review site in Chicago, Google would be required to staff and pay for new attorneys and/or support staff from Quinn Emanuel's Chicago office – again, for no legitimate reason.

Sonos argues that Google's proposal of a single source code review site would "unnecessarily burden[] Sonos's review efforts," but its arguments boil down to the demand that Google accommodate the convenience of Sonos's outside counsel at Lee Sullivan Shea & Smith LLP (LS3), one of the **two** law firms representing Sonos in this litigation, who are based in Chicago and do not want to have to travel to California to inspect Google's source code.   However, attorney convenience – particularly of a second law firm that is based in a different state from where Sonos chose to file the case, and where Sonos's first law firm has multiple California offices including in Los Angeles – is not a valid consideration.[2]   Sonos tries to obscure this

---

[2] *C.f.*, *Gilberg v. California Check Cashing Stores, Inc.*, 2015 WL 13916207, at *5 n.3 (C.D. Cal. Nov. 6, 2014) ("While both parties' counsel argue to facilitate the convenience of their own required travel, the Court does not consider the convenience of counsel in determining proper venue.") (citing *Smith v. Aetna Life Ins. Co.*, 2011 WL 3904131, at *2 (N.D. Cal. Sept. 6, 2011)); *Desert Survivors v. US Dep't of the Interior*, 2016 WL 3844332, at *7 (N.D. Cal. July 15, 2016) ("As the location of counsel is not an appropriate factor, the Court does not give any weight to Plaintiffs' argument that requiring Plaintiffs' counsel to travel to the Eastern District to attend hearings poses a special inconvenience.") (internal quotations and citation omitted).

- 10 -                          Case No. 2:20-cv-00169-JAK (DFMx)

fact by, for example, asserting that it has "three testifying experts on infringement based near the east coast," but fails to provide **any** details such as who these experts are, where exactly they live, how much actual travel time would be avoided if they flew to Chicago instead of Los Angeles, or why Sonos cannot utilize West Coast-based experts if it is concerned about travel costs.[3]  In any event, as testifying experts, it is unlikely that they would be making frequent trips to inspect Google's highly confidential source code on site, and the burden of a slightly longer flight is marginal compared to the burdens and risks to Google from a second review location.  Sonos chose to file this instant lawsuit in Los Angeles and, accordingly, has already decided that this jurisdiction is convenient for the prosecution of its case.

Sonos also argues that "the volume of source code required to be reviewed and fast timeline alone justifies a second review site so that Sonos can have multiple teams reviewing source code in parallel" – but ignores the facts that Google (1) has already agreed to make multiple inspection computers available at the single location, (2) acceded to Sonos's request for up to five copies of each set of source code printouts, and (3) has stipulated to cross-use of materials, including source code printouts, from the 1191 Investigation.  Accordingly, this argument too is spurious.

Sonos further argues that Google should be required to offer two source code inspection locations because it previously offered to do so in prior cases during the COVID-19 global pandemic.  Even putting aside the fact that Sonos repeatedly agreed to protective orders with a single inspection location – in the 1191 Investigation, the Chen Google Case, and the Alsup Sonos Case,[4] which by Sonos's own logic is enough to demonstrate that Sonos would not be unduly burdened by the

---

[3]  The only expert that Sonos has disclosed to date, claim construction expert Kevin Almeroth, resides in Santa Barbara, California.

[4]  Sonos relies upon a May 2022 email thread from the Alsup Sonos Case in which Google offered to accommodate a second source code review location in Chicago (Ex. 8), but Sonos acknowledges that it never actually took Google up on this offer and that the single review site was adequate in that case (as in the 1191 Investigation and the Chen Google Case).

same provision here – Sonos's argument ignores the obvious differences between the circumstances in 2022 compared to 2025.[5]  In 2022, the United States (and world) were in the middle of a public health emergency in which accommodations that could reduce or eliminate air travel could literally save lives.  That public health emergency ended in 2023.  In 2025, with the widespread availability of vaccines (among other developments), there is no public safety-based justification to impose the burdens of a second source code review site on Google.

### 3.    *Dispute #2: Source Code Printouts – Sonos Position*

Subsection (d) of Section IX sets forth provisions regarding source code printouts.  The parties dispute the presumptive page limits on consecutive and aggregate printouts as follows:

> In no event may the Receiving Party print more than [**Sonos's proposal:** 50][**Google's proposal:** 25] consecutive pages or an aggregate total of more than [**Sonos's proposal:** 750][**Google's proposal:** 500] pages, of source code during the duration of the case without prior written approval by the Producing Party.

Given the extensive scope of source code review that will be conducted in this case, as discussed above, Google's proposed limits on consecutive and aggregate print pages are unworkable and would prejudice Sonos, as evidenced by the 1191 Investigation.  There, for two versions of source code, Google produced over 1,000 pages of printouts.[6]   The present case involves all the same features and products at issue in the 1191 Investigation, plus more, and involves multiple additional versions of source code as compared to the 1191 Investigation.

---

[5]   Sonos's reliance on the 1329 and 1330 Investigations also ignores the many differences between ITC investigations and district court litigation, which include differences in case schedules (the ITC is expedited) and discovery rules.

[6] There were 872 pages of printouts for a first version of code corresponding to the date of Sonos's complaint and another 147 pages of printouts for a "redesign" version of code.

As noted above, Sonos's proposal is in line with printout limits Google agreed to in the 1329 and 1330 Investigations.  Yet, those actions involved a total of only 6 patents between the two actions implicating a narrower set of accused features and products, while there are 10 patents asserted in the present case spanning a much larger number of accused features and products.

Sonos's proposal for a 750-page presumptive aggregate limit is also consistent with agreements Google has made with other parties in cases far less complex than the present case.  For example, in a recent case in which Google is defendant and a single patent is at issue, Google agreed to a 750-page aggregate limit.  *Withrow Networks, Inc. v. Google LLC*, Case No. 24-cv-03203-PCP 2025 WL 948120, at *2 (N.D. Cal. Mar. 28, 2025).  Considering the significantly greater complexity of the present case, Sonos's proposal of 750 pages in total is entirely reasonable.

Google's proposal for page limits is unreasonable given this case's additional complexity over the 1191, 1329, and 1330 Investigations, where Google agreed to 750 total pages.  *See* Ex. 1, p. 14; Ex. 4, p. 23; Ex. 5, p. 26.  Moreover, Google has refused to agree that the source code version from the 1191 Investigation corresponding to the date of Sonos's complaint is representative of the source code for the entire pre-suit damages window applicable here.  Sonos is thus unable to rely on prior productions to mitigate the printout page limits as to older products and code, and regardless, all code versions later than the 1191 Investigation will require review and printing.  Given Google's 1,000+ page production in the 1191 Investigation, and this case's additional complexity compared to prior cases, Google's proposed limit of 500 aggregate pages is unreasonable.

### 4.   *Dispute #2: Source Code Printouts – Google Position*

The parties dispute two provisions for source code printouts: the presumptive limit on consecutive pages (25 versus 50), and the presumptive limit of aggregate pages (500 versus 750).

Number of Consecutive Pages.  **Sonos does not even attempt to justify its demand for a presumptive limit of 50 consecutive pages**.  That is because it is unreasonable and would subject Google's highly confidential source code to undue risk.  While Sonos repeatedly cites prior protective orders between the parties, **every prior protective order agreed to between the parties included the 25 page presumptive limit proposed by Google**.  *See generally* Exs. 1-5. Moreover, Sonos ignores the fact that Google's proposal is a presumptive limit, not an absolute one, and that if there is a legitimate need to print more than 25 pages Google will engage with Sonos to resolve the issue in good faith (as it has done repeatedly in prior cases on source code printout issues).

Number of Aggregate Pages.  Sonos's demand for a presumptive limit of 750 pages ignores several relevant facts.

First, the parties have agreed to a broad cross-use provision for discovery produced in the 1191 Investigation – **including source code printouts**.  *See* Dkt. 78 at Section 16 ("Cross-Use of Discovery Materials").  As Sonos acknowledges, that includes over 1000 pages of printouts covering both the accused original and "redesign" versions of source code.  Accordingly, Sonos is effectively demanding a presumptive limit of over **1,750 pages** of printouts.  That is facially unreasonable, even for a case involving five families of patents, and far beyond any provisions previously agreed to by the parties.  Google's proposal is effectively 1,500 pages of printouts, which is more than adequate as a presumptive limit.

Second, the 500 page limit is again a **presumptive** limit, not an absolute one.  As Sonos itself admits, in the 1191 Investigation the parties agreed to a presumptive limit of 750 pages, and Google considered requests for additional printouts in good faith and agreed to permit Sonos to print **over 250 additional pages** of source code (over 33% more than the presumptive limit).  If there is a legitimate need to print more than 500 additional pages of source code in this litigation, Google will – as it has in the past – engage with Sonos to resolve the issue in good faith.

Third, while there are (currently) five more patents in this case than in the 1191 Investigation, the subject matter of those patents overlaps significantly with the original five patents (which in turn overlap to varying degrees with each other). Therefore, while there may be additional relevant source code that has not already been covered by the cross-use provision, there is no basis to assume it will be anywhere near the volume of printouts from the 1191 Investigation. And Google is prepared to work within the presumptive 500 page limit with respect to its counterclaim patents.

## C.    Dispute #3: Prosecution & Acquisition Bar – Sonos Position

The parties disagree with respect to the terms of the prosecution and acquisition bars set out in Section VIII, Subsections (a) and (b).

First, the parties disagree with respect to the length of time and termination conditions of the prosecution and acquisition bars. For the prosecution bar:

[**Sonos's proposal:** two (2) years following the earlier of the date on which the person withdraws his Acknowledgement to be Bound by the Protective Order or the final disposition of this action][**Google's proposal:** three (3) years after final termination of this action].

For the acquisition bar:

[**Sonos's proposal:** two (2) years after the final disposition of this action][**Google's proposal:** three (3) years after final disposition of this action as provided herein].

Second, the parties disagree with respect to the scope of subject matter for which the prosecution and acquisition bars are operative:

[**Sonos's proposal:** networked media playback devices or technologies for controlling such devices] [**Google's proposal:** (a) networked media playback devices or technologies for controlling such devices, or (b) the particular information disclosed in a Producing Party's confidential business materials].

c  Here, Google has shown no such justification for its onerous proposals.

- 15 -    Case No. 2:20-cv-00169-JAK (DFMx)

In fact, Sonos's proposals here are consistent with the terms of the prosecution bar in the most recent protective orders negotiated by the parties (for the 1329 and 1330 Investigations), where Google was complainant/patentee. Ex. 4, pp. 31-32; Ex. 5, pp. 33-35. Further, in the 1329 and 1330 Investigations, Google did not insist on any acquisition bar at all—despite its source code being a key subject of the dispute.

Google provides two alleged justifications for its onerous prosecution and acquisition bar terms. In this regard, Google asserts: "[g]iven Sonos's ongoing patent prosecution activities… as well as the findings of the district court in Case No. 3:20-cv-06754 regarding Sonos's 'clear abuse of the PTO's patent examination system'… the heightened protections proposed by Google in the Prosecution Bar and Acquisition Bar are necessary and appropriate[.]" Ex. 6, p. 10. Sonos disagrees.

First, in both the Google Chen Case and in the 1329 and 1330 Investigations, Google was involved in ongoing patent prosecution activities in the families of the patents Google asserted, yet Google made no effort to impose the heightened terms it seeks to impose now. To the extent that Google was satisfied with the bar provisions at the time, given its own patent prosecution activities, Google has no justification for arguing that Sonos's current patent prosecution activities somehow support the proposed "heightened protections."

Second, with respect to Sonos's alleged "abuse" of the USPTO patent examination system, Sonos vehemently disagrees with the district court's conclusion in the Sonos Alsup Case. Indeed, Sonos's conduct in prosecuting patents is in accordance with relevant ethical standards, USPTO requirements, and Federal Circuit precedent, and none of the actions taken by Sonos in prosecuting the patents at issue in the Sonos Alsup Case can objectively be considered "abuse" to justify Google's proposed "heightened protections."

Further, the claim language of the patent the district court ruled subject to prosecution laches in the Sonos Alsup Case was prosecuted and allowed months before Google and Sonos were involved in any litigation (*i.e.*, January 7, 2020 when

this action and the parallel 1191 Investigation were filed) and thus, well before any confidential information was disclosed during litigation from one party's counsel to another party's counsel. In addition, the feature in Google's product that infringed the relevant patent in the Sonos Alsup Case is a user-facing, publicly discoverable feature. For these reasons, even if Google's allegations were true (they are not), the circumstances surrounding prosecuting that patent had no connection to confidential information obtained by litigation counsel and thus, have no relevance to the prosecution bar terms currently disputed.[7] Thus, Google's assertion that its proposal for "heightened requirements" is justified by Sonos's prosecution conduct is groundless.

Finally, with regard to the ***subject matter*** of the prosecution and acquisition bars, Google proposes including patents and applications "directed to… the particular information disclosed in a Producing Party's confidential business materials[.]" This clause effectively makes the bars unbounded and ever-expanding depending on what material a Producing Party decides to disclose. To the extent that Google believes Sonos's acceptance of this clause in prior cases represents Sonos's ongoing approval of such terms, Sonos's prior agreements represent, at best, strategic concessions based on Sonos's limited resources. Further, in prior cases, the prosecution (and acquisition, as applicable) bars were limited to 2 years after final determination ***or*** withdrawal of an individual from the protective order, as proposed by Sonos here. The 2-year waiting period, along with the ability for an individual to trigger the waiting period by withdrawing from the protective order rather than waiting until the action's termination, mitigated the impact of the wider subject matter scope proposed by Google here. Sonos believes that Google's 3-year proposal in combination with

---

[7] Google's other manufactured examples of "misconduct" are extensions of Google's attempted vilification. If Google actually believed that its confidential information had been misused, it no doubt would have filed a motion for relief in the appropriate forum. It has not. Instead, Google uses a discovery motion to baselessly impugn the integrity of Sonos's co-counsel and officers of the Court. Such baseless attacks should not be condoned.

the wide scope of subject matter is unwarranted and does not reflect the "reasonable risk" presented.[8]

### D.    Dispute #3: Prosecution & Acquisition Bar – Google Position

The parties dispute three provisions of the prosecution and acquisition bars: (1) the length of the prosecution bar (three years after final termination versus two years after termination or withdrawal from case), (2) the length of the acquisition bar (three years versus two), and (3) the scope of the subject matter bar (including the subject matter of any highly confidential documents produced in the case, in addition to the subject matter of the asserted patents versus limited to the subject matter of the asserted patents).

<u>Length of the Prosecution Bar</u>.  The parties agree that a prosecution bar is necessary and appropriate in this case.  The only dispute (beyond the subject matter scope, addressed below) is over the length of the bar.  Based on the circumstances of this case, Google proposes a prosecution bar that ends three years after the final termination of this action.

As an initial matter, multiple courts have entered protective orders with three-year prosecution bars.  *See, e.g.*, *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 2005 WL 146967, at *2 (N.D. Ill. Jan. 21, 2005) (entering protective order with three-year prosecution bar over plaintiff's proposal containing one-year prosecution bar); *Cherdak v. Koko Fitclub. LLC*, 2015 WL 1895992, at *3 (D. Mass. Apr. 27, 2015) (finding three-year patent prosecution bar appropriate).  Accordingly, while courts

---

[8] Google's manufactured "boogey-man" scenario—where counsel would review Google's confidential information, withdraw from the protective order, and then be free to use that confidential information after two years—is pure fiction.  The restriction on *using* another party's confidential information for purposes outside this litigation is enduring.  So regardless of the length of any prosecution bar, in Google's scenario, the attorney would not be able to use that information in any prosecution activities.  Instead, the prosecution bar bans counsel from engaging in any prosecution relating to specific subject matter, even when that prosecution work has nothing to do with the confidential information.  Google's proposal could result in a lawyer, who may have long-since left the employ of a law firm representing either party, being subject to a ban for close to a decade (depending on the length of any appeals that result from this case).

often find a two-year prosecution bar appropriate, there is nothing presumptively unreasonable about a three-year bar.

Here, a longer bar is not just appropriate but necessary based on Sonos's abusive patent prosecution strategies and the dual role of its lawyers as both litigation and prosecution counsel.

For well over a decade, Sonos has engaged in an ultra-aggressive patent harvesting campaign based on the controversial practice of "daisy-chaining" – filing a provisional application with an early priority date, filing serial continuations to keep the family alive, monitoring product developments at other speaker companies, and then trying to apply for patents that cover those developments and claiming priority to the original provisional.  That practice continues to this day with respect to at least one of the patent families Sonos is asserting in this case, i.e., U.S. Patent Nos. 9,219,959 (the '959 Patent) and 10,966,025  (the '025 Patent).  As explained by the district court in the Sonos Alsup Case (in the context of two Sonos patents that were held to be unenforceable):

> In order for a patent holder to claim priority to a provisional application, it must claim priority to an intermediate non-provisional continuing application that is copending, *i.e.*, not yet patented or abandoned. Although the April 2019 applications for the patents in suit were not themselves copending with the September 2006 provisional application, they were copending with the September 2007 non-provisional application that claimed priority to it through a daisy chain of continuation applications. A pattern developed. Just before a patent would issue, Sonos would file another continuation application to keep the daisy chain alive.[]

> In fact, it remains alive today. There is a pending application, filed one day before the parent application of the patents in suit issued as its own patent, sixteen years after the provisional application (*see* United States Patent Application No. 17/861,882).

Ex. 9 (Order Re Prosecution Laches and Post-Trial Motions) at 21-22.  While the tactic of "daisy-chaining" is not prohibited under current Patent Office regulations, a patentee is not allowed to do what Sonos has repeatedly done: leverage serial continuations to claim an early priority date, and then inject new subject matter – not found in the original provisional application – in order to get a patent that covers subsequent developments in the market.  That is exactly what Sonos did in the Sonos Alsup Case, in a "clear abuse of the PTO's patent examination system" (Ex. 9 at 48 (citation omitted)) that rendered Sonos's asserted patents unenforceable and invalid:

> The essence of this order is that the patents issued after an unreasonable, inexcusable, and prejudicial delay of *over thirteen years* by the patent holder, Sonos, Inc. Sonos filed the provisional application from which the patents in suit claim priority in 2006, but it did not file the applications for these patents and present the asserted claims for examination until 2019. By the time these patents issued in 2019 and 2020, the industry had already marched on and put the claimed invention into practice. …
>
> This was not a case of an inventor leading the industry to something new. This was a case of the industry leading with something new and, only then, an inventor coming out of the woodwork to say that he had come up with the idea first — wringing fresh claims to read on a competitor's products from an ancient application. Even if the provisional application Sonos filed in 2006 or the corresponding non-provisional application Sonos filed in 2007 had actually disclosed the invention, that would be all the more reason to hold Sonos waited too long to claim it, to the prejudice of Google, not to mention other companies and consumers. But, as will be shown below, those applications failed to disclose the invention. What's more, in 2019, during the prosecution of the applications for the patents in suit, Sonos amended the specification to insert new matter, despite telling the patent examiner the inserted matter was not new. Under black letter patent law, that new matter necessarily sunk any claim of priority.

*Id.* at 1-2 (emphasis in original); *see also id*. at 55 ("It is wrong that our patent system was used in this way. With its constitutional underpinnings, this system is intended to promote and protect innovation. Here, by contrast, it was used to punish an innovator and to enrich a pretender by delay and sleight of hand. It has taken a full trial to learn this sad fact, but, at long last, a measure of justice is done.").

Nor was this an isolated incident. Sonos has engaged **and continues to engage** in the same patent prosecution misconduct with respect to the patent families in this case (among many others in Sonos's convoluted patent portfolio). For example, as already briefed in connection with Google's Motion for Leave to Amend its Answer and Counterclaims, the '896 and '883 Sonos Setup Patents claim priority to a 2005 provisional application, but – through an endless series of daisy-chain applications – the applications were not filed until 2019 (14 years later), which was ***after*** Google first deployed and patented technology for adding a playback device to "a secure [WLAN] that is defined by an access point" in 2012/2013. *See, e.g.*, Dkt. 93 at 11.

Even more recently, in the 1191 Investigation, after Google disclosed its claim construction positions and confidential redesigns for the '896 Sonos Setup Patent that avoided Sonos's infringement allegations, **Sonos filed a prosecution amendment in an open Sonos Setup Patent continuation application specifically designed to cover Google's redesigns**. Moreover, the **patent prosecution counsel that filed the amendment is an attorney at the same law firm, LS3, as attorneys who are litigation counsel for Sonos in this case as well as in the 1191 Investigation**. *See* Ex. 10 (2020-07-23 ITC claim construction chart with 7 LS3 attorneys in signature block with competing constructions for "at least a second message"); Ex. 11 (2020-07-31 amendment to pending patent application signed by an LS3 attorney, replacing "at least a second message" with "a second set of one or more messages").

As another example, the asserted '959 and '025 Patents (related to stereo pairing), which claim priority to a 2006 provisional application, belong to a patent family that is still being actively prosecuted by Sonos. The application for the '025

01980-00160/17127926.1

Patent was filed in 2019 (after the introduction of Google's accused stereo pairing technology in the market), and during prosecution Sonos amended the claims in response to claim constructions in the 1191 Investigation in an attempt to read on Google's confidential redesigns. *See* Ex. 12 (2020-10-07 "Replacement Response") (extraneous "Replacement Response," after already responding to an office action, specifically to replace "perform[ing] a first equalization" with "perform[ing] a first processing."). And now the '025 Patent has a new, non-public continuation that allows Sonos to prosecute **yet more**, **new** patent claims.

These are just examples from the patent families asserted in this case. Sonos boasts that "the U.S. Patent & Trademark Office has granted Sonos more than 1,600 patents" (Dkt. 68 ¶ 2) and continues to employ its abusive and self-perpetuating "daisy-chaining' strategy with dozens of pending continuation applications. Moreover, as explained above, **one of the two law firms representing Sonos in this litigation is also prosecution counsel for Sonos**. The risk of disclosure – inadvertent or otherwise – absent a rigorous and durable prosecution bar is extraordinary, particularly because Sonos's prosecution campaign is measured in decades, not months or years. *Drone Techs*., 838 F.3d at 1300 n.13 ("Despite the well-intentioned provisions of protective orders designed to guard confidential information, 'there may be circumstances in which even the most rigorous efforts of the recipient of such [sensitive] information to preserve confidentiality in compliance with ... a protective order may not prevent inadvertent compromise.'") (citation omitted). Sonos's proposed prosecution bar would end "two (2) years following **the earlier of the date on which the person withdraws his Acknowledgement to be Bound by the Protective Order** or the final disposition of this action" (emphasis added). That would permit any of Sonos's attorneys or experts to access all of Google's highly confidential information, withdraw from the Protective Order the next day, and just two years later have free reign to advise Sonos on claim amendments for any of the dozens of daisy-chained continuation applications that

could potentially read on Google's products for assertion in yet another Sonos lawsuit. Given the timeline of these cases and appeals, that means that under Sonos's proposal, its attorneys at LS3 could be advising Sonos on patent prosecution **during the pendency of this litigation**. Based on the circumstances of this case, that is an unacceptable risk. Moreover, Sonos's proposal is difficult to track and will create uncertainty, as there could be different dates for different individuals who have accessed Google's confidential information, and at least with respect to attorneys, there is no requirement to file or serve the agreements to be bound (or withdrawals from the same). The Court should enter a prosecution bar that prohibits anyone who access Google's highly confidential information from patent prosecution in any related subject matter for no less than three years after final termination of this action.

Sonos's arguments against Google's proposed prosecution bar fail to address these key issues. The scope of Sonos's patent prosecution misconduct first fully came to light during the June 2023 trial in the Sonos Alsup Case. *See* Ex. 9 at 2 ("Trial brought to light what happened here"). Accordingly, the language of the prosecution bars that Google agreed to in 2021 and 2022 are not relevant, let alone controlling, and fail to account for the full circumstances presented here. And while the specific "abuse of the PTO's patent examination system" at issue in the Sonos Alsup Case predated the filing of this case, as explained above Sonos **continues** to engage in the same practices in dozens of open daisy-chain applications (including an active continuation for one of the patents-in-suit). Further, Sonos's argument that its attorneys and experts are already prohibited from willfully using Google's confidential information for any purpose outside of this litigation, and therefore the longer (and broader) prosecution bar is unnecessary, ignores two obvious problems: first, as recognized by the Federal Circuit, "even the most rigorous efforts of the recipient of such [sensitive] information to preserve confidentiality in compliance with ... a protective order may not prevent inadvertent compromise" (*Drone Techs*., 838 F.3d at 1300 n.13); second, it is extremely difficult, if not impossible, to

1    determine after the fact whether any impropriety has occurred – which is why courts

2    impose a bar to remove any doubt or possibility of misuse.  Under Sonos's reasoning,

3    there would never be a need or justification for a prosecution bar of any length or

4    scope in any case.  That is not the law.  Finally, Sonos's contention that it has never

5    violated any of the parties' prior protective orders is beside the point: the parties are

6    specifically arguing here about what should and should not be **permitted** under the

7    Protective Order.  The problem with Sonos's proposed prosecution bar is not that

8    Google anticipates future protective order violations, but that, as Google has shown,

9    it would allow prosecution activities that would result in undue risk of inadvertent

10   disclosure and prejudice to Google notwithstanding "rigorous efforts" to comply.  *Id.*

11          <u>Length of the Acquisition Bar</u>.  The parties agree that the acquisition bar

12   should extend from the date of the final disposition of this action.  The only dispute

13   is whether the duration should be two years or three years from that date.  The

14   acquisition bar should extend for three years for the same reasons as the prosecution

15   bar.  *See, e.g.*, *Wm. Wrigley Jr. Co.*, 2005 WL 146967, at *2; *Cherdak*, 2015 WL

16   1895992, at *3.

17          <u>Scope of Subject Matter of the Prosecution and Acquisition Bar</u>.  The parties

18   agree on the inclusion of prosecution and acquisition bars, and that the scope of both

19   bars should include activities relating to "networked media playback devices or

20   technologies for controlling such devices" – i.e., the subject matter of the asserted

21   patents (including Google's counterclaim patents).  The parties disagree, however,

22   on whether the scope of the bars should also include activities relating to "the

23   particular information disclosed in a Producing Party's confidential business

24   materials."

25          Google's proposal is reasonable and appropriate because it is based on the

26   scope of the confidential information that will be produced in this case – which is not

27   limited to "networked media playback devices or technologies for controlling such

28   devices."  Sonos has asked for (and, in the 1191 Investigation, which is subject to a

cross-use agreement in this case, already obtained), extremely broad discovery relating to products and technologies that go well beyond "networked media playback devices or technologies for controlling such devices." That includes, by way of example, "accused" apps such as YouTube Music and Google Home (the latter of which controls security cameras and smart thermostat, among other functionalities) and products such as Pixel tablets and smartphones that have literally thousands of uses beyond controlling networked media playback devices. *See*, *e.g.*, Ex. 13 (Sonos First Set of RFPs) at RFP No. 1 (seeking "The complete source code for the firmware and other software for the Cast-Enabled Media Players" including Pixel Tablet, Google TV Streamer, and Nest Wifi Point) and RFP No. 2 (seeking "The complete source code for the Accused Apps" including YouTube Music and Google Home apps). Under Sonos's proposal, its attorneys and experts – including outside counsel at LS3 who are also prosecution counsel for Sonos – would be permitted to access all of Google's highly confidential documents (including source code) relating to these and other technologies and then, later that same day, advise Sonos on patent prosecution or acquisition on that exact subject matter so long as it isn't the subject matter of the patents currently asserted in this case (i.e., "networked media playback devices or technologies for controlling such devices."). That is manifestly prejudicial, particularly in light of Sonos's controversial patent prosecution activities and the dual role of attorneys from LS3 as both litigation and patent prosecution counsel. Moreover, that prejudice and risk exists even if the particular attorneys or experts subject to the bars do not intentionally try to use the information. *Drone Techs.*, 838 F.3d at 1300, n.13 ("Despite the well-intentioned provisions of protective orders designed to guard confidential information, 'there may be circumstances in which even the most rigorous efforts of the recipient of such [sensitive] information to preserve confidentiality in compliance with ... a protective order may not prevent inadvertent compromise.'") (citation omitted).

Sonos's argument that Google's proposal is unworkable because it "effectively makes the bars unbounded and ever-expanding depending on what material a Producing Party decides to disclose" is specious, as demonstrated by the fact that Sonos agreed to these identical provisions in both the 1191 Investigation and both district court actions.[9]  The scope of the prosecution and acquisition bars **should** expand as the scope of highly confidential information requested and produced in the litigation expands.  Nor is there any basis to believe, as Sonos urges, that Google's proposal is unfair or "unbounded" when the length of the bar is three years starting upon final termination of the case, but fair and properly "bounded" when the length of the bar is two years and can also start when the attorney or expert withdraws from the case.

### E.    Dispute #4: Breach Notice & Security – Sonos Position

Finally, the parties disagree with respect to the timing of a notice of breach and the inclusion of two paragraphs setting forth general security terms.  Google's proposals are impractical and inconsistent with prior protective orders agreed to by the parties.

---

[9] *See, e.g.*, Ex. 1 ¶ 19 ("Any person who has subscribed to the Protective Order shall not engage in prosecution of patents or patent applications which are directed to **(a) networked media playback devices or technologies for controlling such devices, or (b) the particular information disclosed in a producing party's confidential business materials**") (emphasis added); Ex. 2 § VIII(a) ("Absent written consent from the Producing Party, any individual who receives access to 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' or 'HIGHLY CONFIDENTIAL – SOURCE CODE' information designated by the Producing Party shall not engage in the prosecution of patents or patent applications relating to **(a) networked media playback devices or technologies for controlling such devices, or (b) the particular information disclosed in a producing party's confidential business materials**") (emphasis added); Ex. 3 § VIII ("Absent written consent from the Producing Party, any individual who receives access to 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' or 'HIGHLY CONFIDENTIAL – SOURCE CODE' information designated by the Producing Party shall not engage in the prosecution of patents or patent applications relating to **(a) networked media playback devices or technologies for controlling such devices, or (b) the particular information disclosed in a producing party's confidential business materials**") (emphasis added).

## 1. *Timing for Notice of Breach*

Regarding the notice of breach provision in Section XII, **Sonos** proposes that, in event of a breach, "the Receiving Party or Authorized Recipient shall… provide written notice **within a reasonable time** to the Designating Party of such breach[.]" **Google** proposes "the Receiving Party or Authorized Recipient shall… **promptly (within 72 hours)** provide written notice to the Designating Party of such breach[.]"

Sonos opposes the imposition of a 72-hour deadline for notice of a breach as impractical. Under conditions that may trigger this provision of the Protective Order, *e.g.*, a large-scale data security breach, counsel may not be able to determine the scope of the breach, assess the impact on this and any other protective orders for all clients across all cases, and notify all impacted parties, all within a 72-hour timeframe. Given the unexpected nature of such breaches and the large number of parties potentially involved, Google's proposed, rigid, 72-hour deadline is impractical. Sonos does not oppose providing prompt written notice of a breach within a reasonable time. But given the unpredictable nature and scope of such events, Sonos cannot agree to Google's impractical proposal here.

## 2. *Paragraph 14.10*

Finally, Google proposes to include Paragraph 14.10, which has no counterpart in any of the parties' prior agreed-to protective orders. Google's proposed paragraph 14.10 is as follows:

**[Google's proposal:** 14.10   Data Security. Any person in possession of Protected Material will maintain appropriate administrative, technical, and organizational safeguards ("Safeguards") that protect the security and privacy of Protected Material. The Safeguards will meet or exceed relevant industry standards and limit the collection, storage, disclosure, use of, or access to Protected Material solely to personnel and purposes authorized by this Order. As part of these Safeguards, each person will use a secure transfer method for all

transfers or communication of Protected Material, and take reasonable measures to password protect and encrypt Protected Material. Each person will ensure that anyone acting on that person's behalf is subject to the Safeguards or otherwise provides equivalent or greater protections for the security and privacy of Protected Material.

If Protected Material is to be used during a deposition, the Designating Party shall be permitted to specify the technology to be used to conduct the deposition with respect to that Protected Material (e.g., for audio/video-conferencing and exhibits).]

Google's proposal is too ambiguous for Sonos to comprehend what the provision requires. For instance, Google's proposal does not fully explain the "safeguards" and includes no definition at all of the "relevant industry standards." While the proposed provision includes some general language relating the "safeguards" to password protection and use of a "secure transfer method," it is clear from the language that these are only "part" of the "safeguards" – and the remaining "safeguards," if any, are not listed. Additionally, none of the parties' other protective orders include such a provision, and Google has not justified the necessity of one here. Nor has Google been able to clarify its proposed terms in light of ambiguities noted above. Because of these issues, Sonos believes Google's proposal to be ambiguous and unsuitable for inclusion in the Protective Order. This Court has found it necessary to address ambiguities in protective orders, and, to conserve judicial resources, Sonos urges the Court to decline entry of such ambiguous terms at the outset. *See Lewis v. Heritage Auctions*, 2025 WL 1415339 at *2 (C.D. Cal. Feb. 18, 2025).

### F.    Dispute #4: Breach Notice & Security – Google Position

The parties dispute two related provisions regarding data breach and security: the timing of notification of any unauthorized disclosure or security breach ("promptly [within 72 hours]" versus "within a reasonable time") and the inclusion

of provisions specific to data security (Google proposes including, Sonos proposes omitting).

Timing of Notification of Any Security Breach.  Google proposes that the parties promptly – i.e., within 72 hours of discovery – provide notice of any security breach or any loss of another party's Protected Material.  This is consistent with language in protective orders entered by other courts in the context of unauthorized disclosure, which recognize the urgency and importance for purposes of mitigation and remediation of immediate notification.  *See, e.g.*, *Perkins v. Carlson*, 2023 WL 7523890, at *8 (C.D. Cal. Nov. 13, 2023) (requiring the receiving party to "***immediately*** [ ] notify in writing the Designating Party of the unauthorized disclosures") (emphasis added); *Columbia Pictures Industries, Inc. v. Galindo*, 2020 WL 4430447, at *9 (C.D. Cal. July 31, 2020) (same); *Novelty Textile, Inc. v. Rue 21, Inc.*, 2014 WL 2812496, at *7 (C.D. Cal. June 23, 2014) (same); *Paramount Restyling Automotive Inc. v. Galaxy Moto Inc.*, 2018 WL 566810, at *4 (C.D. Cal. Jan. 24, 2018) ("the party responsible for the unauthorized disclosure must ***immediately*** bring all pertinent facts relating to the unauthorized disclosure to the attention of the other parties") (emphasis added).  It is also consistent with the requirements of GDPR Article 33 (requiring notification of any personal data breach within 72 hours).

In contrast, Sonos's proposal is vague.  What one company considers a "reasonable time" to provide notification of a security breach may be very different from another's, and there are examples of companies waiting months (or longer) to disclose data breaches to affected parties.  Google's proposal resolves any ambiguity and ensures that the Designating Party can promptly investigate and implement procedures it deems necessary for the protection of its own information – based on the obvious fact that the longer threat actors have access to stolen data without the knowledge of those affected, the greater the potential for malicious exploitation. Simply put, prompt notification can help identify and contain the breach more

effectively, and – importantly – potentially prevent further data exfiltration. Finally, contrary to Sonos's arguments, Google's proposal would not require the parties to fully resolve all questions regarding the cause or scope of a data breach within 72 hours, simply to provide notice.

Data Security. Google proposes the inclusion of a Data Security provision requiring standard safeguards to protect the security and privacy of Protected Material. Despite the best intentions of a Receiving Party, the security of a Designating Party's Protected Material is only as secure as the systems (whether physical or electronic) on which it is stored. The safeguards set forth in Google's proposed Data Security provision are not unduly burdensome and require only the implementation of security measures that meet relevant industry standards, such as secure data transfer methods and password protection. Sonos has not and cannot show that "th[ese] commonplace security measures [are] unnecessary," such that they should be wholly excluded from the protective order. *Floyd v. Amazon.com Inc.*, 2023 WL 8701667, at *1-2 (W.D. Wash. Dec. 15, 2023) (adopting defendants' proposal requiring receiving parties to "implement data management systems complying with established data security frameworks" and "industry-standard[s]" and requiring the use of common security measures such as multi-factor authentication).

What is more, Sonos's refusal to provide these standard assurances – or even propose alternative language that it deems less "ambiguous" – raises serious concerns regarding the measures it has in place, if any, to adequately protect Google's Protected Material.

Finally, while a Data Security provision has not been included in prior protective orders entered into by the parties, the recent rise in data breach incidents – spurred in part by sophisticated (often state-sponsored) cyberattacks, and which have also affected law firms and their document management vendors – warrants

addressing this critical issue with the rest of the parties' agreements governing the protection and disclosure of Protected Material.

## III.    CONCLUSION

For the foregoing reasons, Sonos respectfully requests the Court enter a Protective Order in this case with Sonos's proposed terms.


Dated:  July 15, 2025                       ORRICK, HERRINGTON & SUTCLIFFE LLP
                                            *and*
                                            LEE SULLIVAN SHEA & SMITH LLP


                                            By:    _____*/s/ Alyssa Caridis*_____
                                                          Alyssa Caridis
                                                Attorneys for Plaintiff, Sonos, Inc.




Dated:  July 15, 2025                       QUINN EMANUEL URQUHART & SULLIVAN, LLP


                                            By:    _____*/s/ James D. Judah*_____
                                                          James D. Judah
                                                Attorneys for Defendant, GOOGLE LLC

1

## **FILER'S ATTESTATION**

2       I, Alyssa Caridis, pursuant to Civil Local Rule 5-4.3.4(2)(i), attest that all

3 other signatories listed, and on whose behalf the filing is submitted, concur in the

4 filing's content and have authorized the filing.

5

6 Dated:  July 15, 2025            */s/ Alyssa Caridis*

7                                 ALYSSA CARIDIS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 32 -