Clement S. Roberts (SBN 209203)
croberts@orrick.com
ORRICK HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700 / Fax: 415-773-5759

Alyssa M. Caridis (SBN 260103)
acaridis@orrick.com
ORRICK HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Tel: 213-629-2020 / Fax: 213-612-2499

George I. Lee (*Pro Hac Vice*)
lee@ls3ip.com
Sean M. Sullivan (*Pro Hac Vice*)
sullivan@ls3ip.com
Rory P. Shea (*Pro Hac Vice*)
shea@ls3ip.com
J. Dan Smith (*Pro Hac Vice*)
smith@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W. Randolph Street, Floor 5W
Chicago, IL 60661
Tel: 312-754-0002 / Fax: 312-754-0003

*Attorneys for Plaintiff, SONOS, INC.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONOS, INC., | CASE NO. 2:20-cv-00169-JAK (DFMx) |
| *Plaintiff-Counterclaim Defendant*, | **SONOS INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |
| vs. | |
| GOOGLE LLC, | Judge: Hon. John A. Kronstadt |
| *Defendant-Counterclaimant*. | Date: Dec. 15, 2025 |
| | Time: 8:30 a.m. |
| | Courtroom: 10C |
| | Complaint Filed: Jan. 7, 2020 |

# **Table of Contents**

Table of Authorities ........................................................................................................iii

A.    Introduction ........................................................................................................1

B.    '896 Patent: "user input indicating that a user wishes to set up a playback
      device to operate on the secure WLAN": ............................................................2

C.    '883 Patent, Cl. 13: "The computing device of claim 1…".............................6

D.    '001 Patent: "audio information that is representative of the audio content"...9

E.    '790/'608 Patents: "commissioning" / "commissioning process" .................14

F.    '790/'608 Patents: "short-range signal transmission path" / "establishing a/the
      short-range signal transmission path" ...........................................................17

G.    '790/'608 Patents: "independently of the WLAN" / "independently of a/the
      communication network" .................................................................................19

H.    '790 Patent, Cl. 9: "the transducer"................................................................20

I.    '790 Patent, Cls. 1, 16: "executing an application… to decode and process by
      the commissioning logic".................................................................................24

# Table of Authorities

CASES

*AK Steel Corp. v. Sollac & Ugine*,
    344 F.3d 1234 (Fed. Cir. 2003) .................................................................17

*Aptiv Techs. Ltd. v. Microchip Tech., Inc.*,
    No. 1:23-cv-00307-JDW, 2024 WL 3400109 (D. Del. July 12, 2024) ...........7

*Baxter Healthcare Corp. v. Mylan Lab'ys Ltd.*,
    346 F. Supp. 3d 643 (D.N.J. 2016) .................................................................17

*Bella Summit LLC v. Gamebreaker, Inc.*, No. 21-cv-06007-JAK,
    2022 WL 17882138 (C.D. Cal. Oct. 17, 2022) ....................................9, 19, 21

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) .................................................................16

*Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*,
    785 F. App'x 858 (Fed. Cir. 2019) .................................................................15

*BookIT Oy v. Bank of Am. Corp.*,
    817 F. App'x 990 (Fed. Cir. 2020) .................................................................15

*Bruce Clay, Inc. v. Surfer Spolka*,
    No. 23-cv-06591-JAK (C.D. Cal. July 29, 2024) .........................................10

*Cloud Farm Assocs. LP v. Volkswagen Grp. of Am., Inc.*,
    674 F. App'x 1000 (Fed. Cir. 2017) ...............................................................17

*Cont'l Cirs. LLC v. Intel Corp.*,
    915 F.3d 788 (Fed. Cir. 2019) .........................................................................19

*Exeltis USA, Inc. v. Lupin Ltd.*,
    No. CV 22-434-RGA, 2023 WL 2306736 (D. Del. Mar. 1, 2023)................15

*Finjan, Inc. v. Cisco Systems Inc.*,
    No. 17-cv-00072-BLF, 2019 WL 452038 (N.D.Cal. Feb. 5, 2019) ................7

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008) ........................................................16, 18, 20

*Icon Health & Fitness, Inc. v. Polar Electro Oy*,
    656 F. App'x 1008 (Fed. Cir. 2016)................................................................24

*In re Katz Interactive Call Processing Pat. Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) ....................................................................10

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ....................................................................16

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
    790 F.3d 1298 (Fed. Cir. 2015) ......................................................................4

*Nike Inc. v. Wolverine World Wide, Inc.*,
    43 F.3d 644 (Fed. Cir. 1994) ........................................................................18

*One-E-Way, Inc. v. Apple Inc.*,
    No. CV20-06339-JAK, 2022 WL 2189529 (C.D. Cal. Mar. 9, 2022) ..........14

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
    35 F.4th 1367 (Fed.Cir. 2022)....................................................................7, 21

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed.Cir. 2005)................................................................passim

*Promptu Sys. Corp. v. Comcast Corp.*,
    92 F.4th 1372 (Fed.Cir. 2024).........................................................................6

*Resonate Inc. v. Alteon Websystems, Inc.*,
    338 F.3d 1360 (Fed. Cir. 2003) ....................................................................20

*RetailMeNot, Inc. v. Honey Sci. Corp.*,
    No. CV 18-937-CFC-MPT, 2019 WL 6337719 (D. Del. Nov. 27, 2019)......23

*Signal IP v. Am. Honda Motor Co Inc.*,
    14-cv-02454 JAK, 2015 WL 5768344 (C.D. Cal. Apr. 17, 2015)..................13

*Sinorgchem Co., Shandong v. Int'l. Trade Comm'n*,
    511 F.3d 1132 (Fed. Cir. 2007) ....................................................................15

*Sonos, Inc. v. Int'l Trade Comm'n*,
    2024 WL 1507605 (Fed. Cir. 2024)..............................................................3, 5

*Tinnus Enters., LLC v. Telebrands Corp.*,

    733 F. App'x 1011 (Fed. Cir. 2018)...................................................................12

*Trusted Knight Corp. v. International Business Corp.*,

    681 Fed. Appx. 898 (Fed. Cir. 2017) .............................................................21

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,

    853 F.3d 1272 (Fed. Cir. 2017) .........................................................................6

## A.    Introduction

This patent dispute involves ten Sonos patents directed to fundamental aspects of the networked multiroom audio market that Sonos created over twenty years ago.[1] With respect to Sonos's patents, the parties dispute the proper construction of one term from each of Sonos's '896, '883, and '001 Patents.

Sonos's '896 and '883 Patents are siblings that share a common specification and generally relate to Sonos's technology for setting up a new zone player onto a secure wireless local area network (WLAN). These setup patents have a priority date in June 2004. The '896 Patent is from the perspective of a computing device (or controller) that facilitates setting up a zone player onto a secure WLAN. The parties litigated the '896 Patent in ITC Investigation No. 337-TA-1191 where the ITC found this patent valid and infringed. In turn, the '883 Patent is from the perspective of the zone player being set up onto the WLAN.

Next, Sonos's '001 Patent generally relates to Sonos's synchronization technology and has an April 2004 priority date. The '001 Patent is from the perspective of a zone player that is to operate as part of a group for synchronous audio playback and covers various modes that the zone player can operate in while it is part of such a group.

Recently, Google added two of its own patents[2] into this dispute that generally relate to setting up a "target device" onto a communication network and, according to Google, have subject matter that "substantially overlaps" with the subject matter of Sonos's setup patents. D.I. 79, p. 8. These patents originate from a patent family that Google acquired and that has an earliest possible priority date in April 2012 – nearly

---

[1] Sonos's asserted patents are U.S. Patents Nos. 7,571,014; 8,588,949; 9,195,258; 9,219,959; 10,031,715; 10,209,953; 10,439,896 ("'896 Patent"); 10,541,883 ("'883 Patent"); 10,966,025; and 11,080,001 ("'001 Patent").

[2] Google's asserted patents are U.S. Patents Nos. 9,485,790 ("'790 Patent") and 12,132,608 ("'608 Patent").

8 years after the priority date of Sonos's own setup patents.  The parties dispute the proper interpretation of five terms from Google's patents.

### B. '896 Patent: "user input indicating that a user wishes to set up a playback device to operate on the secure WLAN"[3,4]

| Sonos | Google |
|---|---|
| "an objectively verifiable indication that a user wishes to set up a playback device to operate on the secure WLAN, which does not require that the user select the secure WLAN" | "an objectively verifiable indication that a user wishes to set up a playback device to operate on the same secure WLAN used by the computing device"<br><br>Otherwise: Indefinite[5] |

This claim term has already been examined by the ITC and the Federal Circuit. Sonos's proposal tracks the findings in those proceedings and the intrinsic record. Google would have this Court ignore both.

There are three primary disputes with this term.  First, while both Sonos and Google agree that the claimed "user input" is an "objectively verifiable indication," Google incorrectly suggests that there must be two separate "objectively verifiable indications."  Second, while Sonos and Google agree that the claimed "user input" does not require a user selection of "the secure WLAN," as expressly recited in Sonos's construction, Google's construction omits this important clarification. Lastly, despite being clear on its face, Google asks the Court to rewrite the phrase "to operate on the secure WLAN" to improperly inject superfluous language into the claims.

By way of background, during the parties' prior 1191 ITC proceeding, Google

---

[3] Emphasis has been added herein unless stated otherwise.
[4] For Sonos's patents, the parties agree on the level of skill of a POSITA.  *See, e.g.*, Ex. D, ¶42-43; Ex. J, ¶40-41.
[5] Google only argues indefiniteness if the term doesn't require an "objectively verifiable indication," but since both parties have included such a requirement in their proposed constructions, Google's argument is moot.

argued that this term was indefinite. In opposition, Sonos explained that the term needs no construction and is definite because the claim language provides an "objectively verifiable indication," namely, the receipt by the claimed "computing device" of a particular type of "user input"—"user input indicating that a user wishes to set up a playback device to operate on the secure WLAN." Ex. A, p. 30. The ITC agreed with Sonos and ultimately found that Google's accused products included such an "objectively verifiable indication," which was affirmed by the Federal Circuit. *See* Ex. B, p. 33-36; Ex. C, p. 152-61; *Sonos, Inc. v. Int'l Trade Comm'n*, 2024 WL 1507605, *6-8 (Fed. Cir. 2024). Consistent with the parties', ITC's, and Federal Circuit's prior interpretation of the "user input" term, the parties here agree that the term means "an objectively verifiable indication that a user wishes to set up a playback device to operate on the secure WLAN."

As to the parties' first dispute, Sonos contends that "***an*** objectively verifiable indication," as recited in both parties' proposed constructions, is satisfiable by a ***single*** "objectively verifiable indication." This is consistent with the claim language, which recites the "user input" term as a unitary phrase without any numerical qualifier. Sonos's position is also supported by the '896 specification, which discloses an embodiment where a single "objectively verifiable indication" in the form of a user "press[ing] 'OK' in the displayed GUI" of the "controller" indicates that the user wishes to set up a "zone player" to operate on the secure WLAN that the "controller" is already operating on. '896 Patent, 16:16-20, FIG. 4A (step 414); *see also id*., FIG. 3B ("User triggers Activation UI"). In fact, Google's expert, Dr. Shoemake, acknowledged this embodiment in his Declaration and admitted that "pressing 'OK' or otherwise 'triggering Activation UI' (Figs. 3B, 4A) may be sufficient" to satisfy the claimed "objectively verifiable indication" requirement. Ex. D, ¶58 (cleaned up).

Despite this intrinsic evidence and his related admission, Dr. Shoemake appears to suggest that the claimed "user input" "must provide" ***two separate indications***: (1) "'an objectively verifiable indication that a user wishes to set up a playback device'

(as opposed to a different type of device)"; and (2) "'an objectively verifiable indication that a user wishes to set up [that] playback device on the same secure WLAN used by the computing device' (as opposed to a different secure WLAN or even an unsecured WLAN)." *Id.*, ¶45; *see also id.*, ¶¶49-57. To the extent this is Google's position, such an interpretation must be rejected because it is contrary to the intrinsic evidence and improperly excludes the above-described embodiment in the specification where the user "press[es] 'OK'". *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) ("A claim construction that excludes a preferred embodiment is rarely, if ever, correct.") (internal quotes omitted). Moreover, if Google wanted to assert such an interpretation it needed to propose a different construction that requires ***two*** (or more) "objectively verifiable indication***s***," as opposed to a construction that only requires "***an*** objectively verifiable indication."

The parties' next dispute regarding the final "which" clause in Sonos's construction (clarifying that the claimed "user input" "does not require that the user select the secure WLAN") is easily resolved in favor of Sonos. This "which" clause simply articulates the plain and ordinary meaning of the claim language, which is indisputably broad enough to cover "user input" without selection of "the secure WLAN." In fact, during the prior 1191 ITC proceeding, one of Google's experts, Dr. Jeffay, ***admitted*** that "the plain and ordinary meaning of the claimed user input ***does not actually require a user to select the secure wireless LAN***." Ex. E, 973:4-9. And the ITC adopted this interpretation. *See* Ex. C, p. 158 ("While the user does not explicitly indicate that he wants to use the same Wi-Fi network as his computing device, as the [ITC] Staff [Attorney] recognizes, 'the plain and ordinary meaning of the claimed 'user input' does not require that the user select the secure WLAN.'") (citations omitted; cleaned up). Likewise, Google's expert here, Dr. Shoemake, admits that the claimed "user input" "can take any form and is not limited to, for example, selecting a specific 'secure WLAN' from a list" as there is not "any sort of 'selection' requirement." Ex. D, ¶58 (cleaned up).

The "which" clause in Sonos's construction is also consistent with the above-described embodiment in the '896 specification where a user simply "press[es] 'OK'" without any selection of the secure WLAN that the "controller" is operating on. *See* '896 Patent, 16:16-20, FIG. 4A (step 414); *see also id.*, FIG. 3B ("User triggers Activation UI").

That the claimed "user input" does not require selection of "the secure WLAN" is also consistent with the ITC's infringement finding, as well as the Federal Circuit's affirmance. Specifically, the ITC and Federal Circuit found that a user selection of "Yes" in the Google Home app (see the image to the right) without any selection of a secure WLAN met the "user input" limitation of the '896 claims. *See* Ex. C, p. 158; *Sonos*, 2024 WL 1507605, *6-8.



In view of the above, Sonos submits that the construction of "user input" should make clear that the term "does not require that the user select the secure WLAN," which tracks the testimony of Google's ITC expert and the ITC's Initial Determination verbatim and is also consistent with the Federal Circuit's opinion affirming infringement.

Lastly, Google's request to rewrite the phrase "to operate on the secure WLAN" as "to operate on the <u>same</u> secure WLAN <u>used by the computing device</u>" should be rejected for at least two reasons. First, Google's expert acknowledged that claim 1 already uses antecedent basis to indicate that "***the*** secure WLAN" in the "user input" term is referring back to the previously recited secure WLAN that the claimed "computing device" is operating on. *See* Ex. D, ¶47-48; '896 Patent, cl. 1 ("while

operating on ***a secure wireless local area network (WLAN)***…, (a) receiving… user input indicating that a user wishes to set up a playback device to operate on ***the secure WLAN***…").  Thus, it would be improper for the Court to inject Google's superfluous verbiage because the claim language is already clear on this point.  *See, e.g.*, *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (noting that when the ordinary meaning of a term is "readily apparent even to lay judges," claim construction "involves little more than the application of the widely accepted meaning of commonly understood words.").

Second, Google's rewrite introduces new terminology to describe that the secure WLAN is "***used by*** the computing device," which may cause jury confusion in view of the preceding claim language reciting that the "computing device" is "***operating on***" the secure WLAN.  *See Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) ("Importantly, a claim construction, if needed at all, should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term.").  Worse yet, Google may be trying to improperly import some other limitation depending on how it intends to interpret "used by."

## C. '883 Patent, Cl. 13: "The computing device of claim 1…"

| Sonos | Google |
|---|---|
| "The playback device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the playback device to perform functions comprising:" | Plain and ordinary meaning. |

Dependent claim 13's preamble includes a clear typo—it inadvertently refers to "the computing device" of independent claim 1 twice (below in red) instead of correctly referring to "the playback device" that is the subject of claim 1 (below in green):

1. A playback device comprising:

…

program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the playback device to perform functions comprising:

…

transitioning from communicating with the computing device via the initial communication path to communicating with the computing device via the secure WLAN that is defined by the access point.

13. The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising:

after transitioning to communicating with computing device via the secure WLAN, receiving, from the computing device, a command to form a group with at least a first playback device of a networked audio system such that the playback device is configured to play back audio content in synchrony with at least the first playback device.

This typo is evident from the face of the patent and correctable by the Court because "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1373-75 (Fed. Cir. 2022) (citation omitted) (affirming correction of typo changing "pivoting the *case* with respect to the… main body" to "pivoting the *cover* with respect to the… main body," where surrounding language supports change and "language as written doesn't make sense."); *Aptiv Techs. Ltd. v. Microchip Tech., Inc.*, No. 1:23-cv-00307, 2024 WL 3400109, at *3 (D. Del. July 12, 2024) (correcting typo "USB *hub*" to "USB *host*" consistent with specification and other claims); *Finjan, Inc. v. Cisco Sys. Inc.*, No. 17-cv-00072, 2019 WL 452038, *4-5 (N.D. Cal. Feb. 5, 2019) (correcting typo in preamble to remove "the method" where claim clearly "sets forth not a method but 'a computer readable program code.'").

***First***, claim 13 depends from claim 1, which is indisputably directed to a "playback device"—not a "computing device." Conventional claim drafting says each claim depending from claim 1, including claim 13, should begin by referring back to "the playback device" of claim 1 (directly or indirectly via another intervening claim) and then further limit claim 1. Ex. F, 5 ("[A] dependent claim should have the preamble of the previous claim upon which it is dependent."); Ex. G, 3 ("[F]or dependent claims the preamble must match up with the preamble from the broadest independent claim in the chain."). This is precisely how each of dependent claims 2-12 is written. Claim 13's preamble should likewise refer to "the playback device" of

1  claim 1.[6]

2      **Second**, the claim language confirms that claim 13's preamble should refer

3  back to claim 1's "playback device."  Claim 1 requires the "playback device" (above

4  in green) to perform the "transitioning" function (above in blue).  Thus, when properly

5  read with claim 1, it is clear that claim 13 is intended to limit the "transitioning"

6  function of the "playback device" by requiring the "playback device"—not the

7  "computing device"—to, "after transitioning to communicating with the computing

8  device…" (above in blue), "receiv[e], from the computing device, a command to form

9  a group" (above in yellow).  This makes sense.

10     As written, however, claim 13 requires the "computing device" (above in red)

11 to somehow transition to communicating with itself (above in blue) and then receive,

12 from itself, a command to form a group (above in yellow).  Obviously, this is

13 incorrect.

14     **Third**, the '883 specification confirms claim 13's typo.  It discloses a

15 "controller" (claimed "computing device") sending and a "zone player" (claimed

16 "playback device") receiving a command to form a group.  *E.g.*, '883 Patent, 7:56-

17 8:50 (describing "controller" including "network interface… that facilitates wireless

18 communication" to "control one or more zone players," which "allow[s] a user to

19 group players… so that the players are synchronized to play an identical playlist or

20 tracks."), 6:21-25, 9:15-22; Ex. H, 11:9-12:15 (describing how a "controller" sends

21 "commands such as… audio playback synchronization" to a "zone player" and how

22 "the received signals in one zone player[] can cause other zone players in the group

23 to be synchronized so that all the zone players in the group playback an identical audio

24

25 [6] Google uses this same conventional claim drafting technique for its own patents.
26 *See, e.g.*, U.S. Patent No. 9,967,847 (dependent claims 9-14 referring back to the
27 "audio playback device" of independent claim 8); U.S. Patent No. 10,820,289
28 (dependent claims 12-14 referring back to the "master playback device" of
   independent claim 11).

source….").

***Fourth***, the '883 prosecution history confirms Sonos's construction is the only reasonable interpretation. Despite claim 13's typo, the Examiner correctly interpreted claim 13 as requiring the "playback device" of claim 1 to receive, from the "computing device," the command to form a group. Ex. I, p. 17-18. In this regard, the Examiner mapped Isely's "audio device" to the claimed "playback device" and Isely's "controller" to the claimed "computing device," and then alleged the "controller" tells the "audio devices" to "listen to the 'same channel'" and thereby "be 'grouped' together" (the claimed "command to form a group"). *Id.* In other words, according to the Examiner, the alleged command to form a group in Isely is sent by the "controller" (the alleged "computing device" of the '883 claims) and received by the "audio devices" (the alleged "playback device" of the '883 claims).

### D. '001 Patent: "audio information that is representative of the audio content"

| Sonos | Google |
|---|---|
| No construction necessary | Indefinite |

Independent claims 12 and 23 recite "obtain[ing] audio information that is representative of the audio content," and dependent claims 18 and 29 further recite "obtain[ing] audio information that is representative of [ ] particular audio content."

This claim language is basic English that jurors can readily understand and requires no construction. *E.g.*, *Phillips*, 415 F.3d at 1314; *Bella Summit LLC v. Gamebreaker, Inc.*, No. 21-cv-06007-JAK, 2022 WL 17882138, at *5 (C.D. Cal. Oct. 17, 2022). The claimed "audio information" must be "representative" of the claimed "audio content." That's all. In this regard, laypersons know that, when they listen to a particular song from their favorite Internet music service, the song is streamed to their devices as information in digital form (i.e., data). *See* Ex. J, ¶64, 73-74. That is one common example of what the term "audio information that is representative of the audio content" refers to, where the data is "audio information" and the song is

"audio content."

Yet, Google (through its expert[7]) tries to manufacture indefiniteness by contending "a POSITA would not have clarity on (a) the difference between 'audio information' and 'audio content,' and (b) what it means for one to 'represent' the other." Ex. D, ¶63.  The opposite is true; the '001 claims are clear on their face to a POSITA that "audio content" is the media (e.g., song) the "zone players" are to play and "audio information" is the digital form of such media (e.g., a WAV file) that enables it to be obtained, transmitted over a data network, and played back.  *See* Ex. J, ¶64, 73-74; *see also, e.g.*, '001 Patent, 1:48-57, 2:42-44, 10:14-31, 18:32-33, 20:23-29.  As such, Google falls well short of showing indefiniteness by clear and convincing evidence.  *See Bruce Clay, Inc. v. Surfer Spolka*, No. 23-cv-06591-JAK, Dkt. 53, p. 10-11 (C.D. Cal. July 29, 2024) (reasoning indefiniteness "does not apply whenever the patent could have been drafted more clearly or whenever a term presents some degree of ambiguity.").

In fact, at least 10 other Sonos patents[8] that are related to and share a specification with[9] the '001 Patent recite this language or substantially similar language of "audio information that is representative of given audio content."  Despite having over 10 occasions to examine this language, multiple USPTO Examiners never once raised any indefiniteness concerns.

This is for good reason, since the language is clear on its face and the context of the claims provides substantial certainty.  Ex. J, ¶65-70.  To start, the claims convey

---

[7] In view of Google's conclusory invalidity contentions (*see* Ex. K, p. 226-30), Sonos assumes that Google's indefiniteness theory for this term is coextensive with the opinions of its expert, Dr. Shoemake, found in his June 23, 2025 declaration (Ex. D).
[8] *E.g.*, U.S. Patent Nos. 10,545,723; 10,747,496; 10,754,612; 10,949,163; 10,956,119; 10,970,034; 11,106,424; 11,106,425; 11,556,305; and 11,625,221.
[9] *See, e.g.*, *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011) (Federal Circuit "ordinarily interpret[s] claims consistently across patents having the same specification").

to a POSITA an architecture where devices communicate with each other over a ***data network*** and so, reciting "audio information" (digital audio ***data*** in the context of the claims) makes sense. *Id.*, ¶64, 66. Further, the claims indicate that a "synchrony group" of zone players is to playback "audio content" (e.g., as opposed to video content) and the "audio information" is the digital representation of that content, which is what allows the audio content to be transferred over the data network and played back by the zone players. *Id.*, ¶64-70.

Beyond the claims themselves, as Sonos's expert, Dr. Almeroth, explained, the '001 specification is replete with guidance to a POSITA regarding this understanding of the "audio information that is representative of the audio content" term. *E.g.*, *id.*, ¶80-92; Ex. L, 121:23-124:15, 126:25-136:7; '001 Patent, 2:36-39 ("The invention provides [technology] for synchronizing operations among a number of digital data processing devices…."), 2:42-44 ("The invention is described in connection with a plurality of audio playback devices that receive digital audio information that is to be played back in synchrony…."), 10:26-31 ("[I]f the audio information is not in digital form, [the audio-master zone player] will convert it to digital form and provide the digitized audio information" over the data network to the members of the synchrony group), 22:61-23:3 (describing how "audio information" is processed and transformed "to sound thereby to provide the audio program to the listener.").

The testimony of Google's expert, Dr. Shoemake, also confirms the '001 specification provides ample guidance to a POSITA regarding the scope of this term. *E.g.*, *compare* '001 Patent, 10:14-31 (describing analog-to-digital (A/D) processing to output digital representation of audio content), *with* Ex. M, 90:8-91:5 (in an example where audio content is a song, testifying "the output of [an A/D] converter would be a digital representation of a song"); *compare* '001 Patent, 17:4-9, 20:23-29 (identifying WAV file as example form of audio information representing audio content), *with* Ex. M, 31:6-18 (testifying WAV file "stor[es] digital audio content" in form of "samples or data in uncompressed format," which in turn can be "played

1    back… to hear the sound that is stored in the WAV file….").

2    The prosecution histories of the '001 Patent and related patents also
3    demonstrate the certainty of this term's scope. For example, during the '001
4    prosecution, Isely was cited for "obtain[ing] audio information that is representative
5    of the audio content." Ex. N, p. 4, 6. Isely expressly uses the phrase "audio content"[10]
6    consistent with the '001 specification's teachings and, like the '001 Patent, describes
7    "audio content" represented by audio information, such as a "digital audio stream."
8    Ex. O, ¶38; Ex. J, ¶92. As another example, during prosecution of related U.S.
9    11,106,424 that recites "audio information that is representative of given audio
10   content," the Examiner introduced an amendment for purposes of allowance that
11   directly implicated this claim language,[11] thereby indicating it is not indefinite. Ex.
12   P, p. 3; *cf. Tinnus Enters., LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1020 (Fed.
13   Cir. 2018) ("[W]e presume that an examiner would not introduce an indefinite term
14   into a claim when he/she chooses to amend the claim for the very purpose of…
15   allowance.").

16   Thus, the intrinsic evidence leaves no doubt that the "audio information that is
17   representative of the audio content" terms are definite.

18   During his deposition, Dr. Shoemake conceded a POSITA would understand
19   what "audio information" and "representative of" refer to in the '001 context. *See* Ex.
20   M, 72:21-73:11, 102:12-19, 103:9-23. Thus, Google's defense reduces to (a) "audio
21   content" is not verbatim in the '001 specification, (b) that phrase allegedly does not
22   have a known meaning in the field, and so (c) the full "audio information that is
23   representative of the audio content" term is indefinite. *See, e.g.*, *id.*, 105:2-106:4.

24

25   [10] *See, e.g.*, Ex. O, ¶4 ("A whole house audio system generally includes a variety of
26   audio components… and the speakers that deliver audio content to various rooms in
27   a home."), ¶40.
     [11] The Examiner added the language "a series of frames comprising" before the phrase
28   "audio information that is representative of given audio content."

Google's feigned confusion over "audio content" fails for many reasons.

First, the phrase "audio content" was, and continues to be, widely used in the field with a clear meaning consistent with how that phrase is used in the '001 claims. For example, as noted above, the Isely reference cited during the '001 prosecution expressly uses that phrase. Other intrinsic and extrinsic evidence also routinely uses the phrase "audio content" in the same context as the '001 claims. *E.g.*, Ex. Q, SONOS-SVG1-00117252 ("Audio content includes all voice and vocal communication, as well as music… and any other content that can be carried and output as sound."), Ex. R, SONOS-SVG1-00117179 ("Audio content refers to any form of publishable material meant to be experienced through listening."). In fact, Google itself repeatedly uses this phrase in the same manner. *E.g.*, https://developers.google.com/cast ("[B]ring your ***audio content*** to Google Cast for Audio devices…."); D.I. 68-13, 135 (defining cast group as several "devices logically grouped via the Google Home app to play the same ***audio content*** simultaneously and in sync" and "[p]laying in sync" as "[s]ynchronous… [m]ulti-room playback of the same ***audio content*** on several devices.").

Second, "audio content" not expressly appearing in the '001 specification is of no moment,[12] especially in view of the claims' detail about what is required of "audio content" and the specification's express teachings regarding the similar phrases "audio program" and "audio work." *See Signal IP v. Am. Honda Motor Co Inc.*, 14-cv-02454 JAK, 2015 WL 5768344, at *72 (C.D. Cal. Apr. 17, 2015) (rejecting argument that term is indefinite "because it only appears in the claim and does not have a known meaning in the art" since the "claim itself describes in considerable detail what is required of the [claim term]"); Ex. J, ¶82-91.

---

[12] Under Google's logic, both its asserted patents would be indefinite since their specification does not expressly describe a "short-range transmission path," much less one that is established "independently of the [WLAN] / [communication network]," which are limitations found in all claims.

1    Third, Google's past defense demonstrates its present confusion over the phrase

2  "audio content" is a ruse.  For example, several '896 claims recite "audio content" in

3  a similar context as the '001 claims.  *See* '896 Patent, cl. 5 ("a command… related to

4  playback of audio content"), cl. 6 ("retrieve audio content for playback"), cl. 12

5  ("configured to play back audio content in synchrony").   Despite the '896

6  specification not expressly using the phrase "audio content," neither Google nor Dr.

7  Shoemake argued before the ITC that these '896 claims were indefinite (and Google

8  has not made that argument here either).   To the contrary, Dr. Shoemake used the

9  phrase's "plain and ordinary meaning" and applied numerous prior art references to

10  these '896 claims in reaching his opinions of prior art invalidity that the ITC rejected.

11  *See* Ex. M, 146:3-147:25.

12    Thus, Google cannot show with clear and convincing evidence that the scope

13  of the "audio information that is representative of the audio content" terms is not

14  reasonably certain.  *See, e.g.*, *One-E-Way, Inc. v. Apple Inc.*, No. CV20-06339-JAK,

15  2022 WL 2189529, at *14-16 (C.D. Cal. Mar. 9, 2022) (rejecting argument that "high

16  quality audio signal representation" was indefinite).

17    **E. '790/'608 Patents: "commissioning" / "commissioning process"**

| Sonos | Google |
|---|---|
| Lexicography, namely, "'commissioning' is construed to mean configuration of the other device 107 and the system 100 as a whole such that the other device 107 is enabled to function properly over the WLAN 104 including, if required, access to the Internet 102," which is indefinite. | Plain and ordinary meaning |

23    A patentee may act as its own lexicographer by clearly defining terms in the

24  specification.  *Phillips*, 415 F.3d at 1316.  Here, the specification common to both of

25  Google's patents expressly defines "commissioning":

26    For purposes of the present disclosure, "commissioning" is construed to
27    mean configuration of the other device 107 and the system 100 as a
      whole such that the other device 107 is enabled to function properly over
28

the WLAN 104 including, if required, access to the Internet 102. '790 Patent, 4:55-60; '608 Patent, 5:2-7.   This is textbook lexicography—the inventors introduce the definition by stating it is applicable "[f]or purposes of the present disclosure" and the term is set off by quotation marks and followed by "is construed to mean," clearly indicating the patentee's intent to define the term.   *See Sinorgchem Co., Shandong v. Int'l. Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007).   Because the patentee acted as its own lexicographer, the Court should reject Google's "plain and ordinary meaning" construction.   *See id.* ("[T]he patentee ***must be*** bound by the express definition" in the specification); *BookIT Oy v. Bank of Am. Corp.*, 817 F. App'x 990, 994 (Fed. Cir. 2020) ("There can be no clearer definitions than those expressly recited in the patent.").

But that does not end the inquiry.   The patents' chosen definition of "commissioning" renders the claims indefinite.   "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope."   *Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*, 785 F. App'x 858, 867 (Fed. Cir. 2019) (citation omitted).   This is true even where lexicography is employed.   A claim is invalid where the patentee takes "a perfectly good and easily understood word and define[s] it into indefiniteness."   *Exeltis USA, Inc. v. Lupin Ltd.*, No. CV 22-434-RGA, 2023 WL 2306736, at *6 (D. Del. Mar. 1, 2023).   That is the case here.

First, a POSITA[13] would be unable to discern the meaning and scope of "configuration of the other device 107 ***and the system 100 as a whole***."   While the claims recite steps for configuring a "target device," setting aside the lexicography definition, the claims do not recite any steps for configuring any other devices, let

---

[13] For Google's patents, a POSITA would have had a degree in computer engineering, computer science, or a similar discipline, along with 2 years of professional experience in the fields of networking and network-based systems or applications.

alone "system 100 as a whole."  In fact, the claims do not even use the term "system." Separately, the specification offers no clarity as to what constitutes "system 100 as a whole" in the context of the claims when "system 100" in the specification refers to a *prior art* commissioning system that includes, *inter alia*, special purpose commissioning equipment 108, a component that the patent expressly states is no longer required with the alleged invention. '790 Patent, FIG. 1, 4:17-67, 7:50-52.

Second, the phrase "function *properly* over the WLAN" lacks objective boundaries.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) ("[C]ase law is clear that the objective boundaries requirement applies to terms of degree."). The specification provides no explanation on what it means for a device to "function properly over the WLAN."  For example, a POSITA would not know whether "function properly" means the claimed "target device" must connect to the WLAN, pass traffic through the WLAN, communicate with other devices over the Internet, and/or something different.  The specification gives no test or metric to answer this question, so a POSITA cannot tell with reasonable certainty what is necessary for "commissioning."  As the Federal Circuit explained in *Halliburton*, a claim is indefinite where "nothing in the record suggests what degree of such capability is sufficient."  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1254 (Fed. Cir. 2008). Such is the case here.

Finally, the phrase "including, *if required*, access to the Internet" is the opposite of definite; that is, the conjunction "if" introduces a highly subjective conditional clause dependent on whether access to the internet is "required."  In *Interval Licensing LLC v. AOL, Inc.*, the Federal Circuit found a "highly subjective" term to be indefinite when "sufficient guidance [was] lacking in the written description[.]"  766 F.3d 1364, 1371 (Fed. Cir. 2014).  As in *Interval Licensing*, the patents at issue here do not explain what triggers the requirement for Internet access or whether it is always necessary.  Although the specification consistently describes the invention as "commissioning a target device *onto a wireless local area network* (WLAN)" ('790

Patent, Abstract; *see also, e.g.*, *id.*, 1:19-24, 2:14-16) and sometimes describes systems where the WLAN is connected to the Internet (*id.*, FIG. 3, 4:33-38), it fails to explain when access to the Internet is "required."  And setting aside the lexicography definition, the claims provide no clarity as they do not even mention the "Internet."

There can be no reasonable dispute that "commissioning" is expressly defined in the patents.  But the patentee's chosen definition renders the term—and with it all asserted claims—indefinite.

**F. '790/'608 Patents: "short-range signal transmission path" / "establishing a/the short-range signal transmission path"**

| Sonos | Google |
|---|---|
| "[establishing a/the] short-range signal transmission path": Plain and ordinary meaning; includes [establishing] a path that utilizes protocols based on 802.11 standards. | "establishing a short-range signal transmission path before joining the [WLAN / communication network]" |

"Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003).  Applying this doctrine, the "short-range signal transmission path" of the '608 Patent must include a path utilizing protocols based on IEEE 802.11 standards.  Moreover, "[t]he same term should be construed consistently throughout the same patent and any related patents sharing a common specification." *Cloud Farm Assocs. LP v. Volkswagen Grp. of Am., Inc.*, 674 F. App'x 1000, 1006 (Fed. Cir. 2017).  Thus, the "short-range signal transmission path" of the '790 Patent must also include protocols based on 802.11 standards.  *See Baxter Healthcare Corp. v. Mylan Lab'ys Ltd.*, 346 F. Supp. 3d 643, 659 (D.N.J. 2016) ("[T]he intrinsic record in a later-issued patent can be used to interpret the same term in the earlier-issued, related patent[.]").

Independent claim 1 of the '608 Patent recites a "short-range signal

transmission path" and does not place any limitation on the type of protocol the short-range signal transmission path utilizes.  Dependent claim 3[14] narrows claim 1 by specifying that "the short-range signal transmission path ***is not*** a wireless local area network that utilizes protocols based on IEEE 802.11 standards."  The express exclusion of IEEE 802.11 in claim 3 definitively means the "short-range signal transmission path" of claim 1 broadly covers paths based on IEEE 802.11 standards. *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim[.]").

This principle is well-established in the case law.  In *Halliburton*, the Federal Circuit invoked claim differentiation to reject a construction that would have read a negative limitation from a dependent claim into the independent claim.  514 F.3d at 1251.  The Federal Circuit explained that when a dependent claim recited "the fluid is '*substantially free* of organophilic clay,'" it would be improper to construe the independent claim as also having low or no organophilic clay. *Id.*  The same principle applies here, and Google can point to nothing in the intrinsic record that would overcome the presumption.  The doctrine of claim differentiation requires that the "short-range signal transmission path" of claim 1 in the '608 Patent encompasses protocols based on 802.11 standards.

In contrast, Google's construction is improper.  Instead of offering a proposed meaning, Google reads in a limitation indicating *when* the "establishing" step is performed.  However, the claim language is clear on its face and Google's attempt to rewrite it is improper. *See, e.g., Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647 (Fed. Cir. 1994) ("[A party] cannot, in effect, rewrite [] patent claims to suit its

---

[14] Dependent claim 3 depends on Claim 2, which depends on Claim 1.  Claim 2 is about the communication network that the target device is intended to join and is not relevant to the construction of the "short-range signal transmission path."

needs in [a] litigation.").

### G. '790/'608 Patents: "independently of the WLAN" / "independently of a/the communication network"

| Sonos | Google |
|---|---|
| Plain and ordinary meaning; does not depend on the WLAN / communication network. | "without traversing an access point defining the [WLAN / communication network]" |

These claim terms consist of well-understood words that jurors can readily understand. And there is neither lexicography nor disavowal that would require this Court to depart from that plain meaning. *E.g.*, *Phillips*, 415 F.3d at 1314; *Bella Summit*, 2022 WL 17882138, at *5.

This is not the first time this language in this patent family has been the subject of a claim construction proceeding. The ITC previously addressed the meaning of "independent" in the context of Google's setup patent family in ITC Investigation No. 337-TA-1330. Specifically, when evaluating U.S. 11,050,615 ("'615 Patent"), which is related to and shares near-identical claim language ("independently of the communication network") with the '790 and '608 Patents, the ITC determined:

> [I]n a plain and ordinary sense a communication path that is ***"independent" of a network*** would seem to include any path that functions without membership or connection to that network; i.e., no dependency. This fits with the basic premise of the invention, which is to place a newly activated device onto a controlled network from a position of having no network access of any kind[.]

Ex. S, p. 167. The "[p]lain and ordinary meaning" proposed by Sonos is consistent with the ITC's finding, and it should be adopted here for the same reasons it was endorsed by the ITC.

Google's construction, by contrast, improperly imports limitations into the claims. The Federal Circuit has cautioned that courts must "avoid improperly importing limitations [from the specification] into the claims[.]" *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (citing *Phillips*, 415 F.3d at 1323); *see*

*also Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364 (Fed. Cir. 2003) ("However, the written description is not a substitute for, nor can it be used to rewrite, the chosen claim language.").

First, Google attempts to import an entirely new claim element—an "access point"—into the claims. But the '790 and '608 Patent claims do not recite an "access point," nor do they require one. While access points are described in the specification, nothing in the intrinsic record justifies importing a brand-new structural component into the claims. *Id.*

Second, Google's "traversing an access point" language improperly adds a particular routing requirement that is neither required nor discussed in the specification. The plain and ordinary meaning of the claim language is clear. The claims recite being independent of, *i.e.*, not depending on, a network—not the physical path a communication takes or whether it passes through a particular device. By attempting to require that the communication path must avoid "traversing an access point," Google reads an extraneous, unsupported limitation into the claims. The Court should not rewrite the claims to require an access point, much less whether a communication **traverses** an access point, when neither the claims nor the specification impose such a limitation.

### H. '790 Patent, Cl. 9: "the transducer"

| Sonos | Google |
|---|---|
| Indefinite | Plain and ordinary meaning |

The term "the transducer" in the phrase, "commissioning logic that is coupled to the transducer," erroneously lacks antecedent basis. There is no recitation of "a transducer" in the claim, so it is unclear what the commissioning logic is intended to be coupled to. As the Federal Circuit has explained, "[a] claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable." *Halliburton*, 514 F.3d at 1249. That is the case here. The word "transducer" appears only once in

independent claim 9 (and not in any of its dependent claims)—in the phrase "the transducer." A POSITA reviewing the intrinsic record would encounter multiple reasonable interpretations for what the applicant intended "commissioning logic" to be coupled to and would not be able to determine which is correct.

A first reasonable interpretation is that the applicant simply intended to recite "commissioning logic that is coupled to *a transducer*." The specification repeatedly describes a transducer coupled to commissioning logic. '790 Patent, 2:23-24, 2:34-35, 2:43-45. Indeed, independent claim 16 of the '790 Patent recites "a transducer" (though it does not require that commissioning logic be coupled to that transducer). This interpretation, however, is not the only reasonable interpretation suggested by the intrinsic record.[15]

For example, another equally reasonable interpretation is that the applicant intended to recite "commissioning logic that is coupled to the *first wireless radio*." This interpretation most closely aligns with the patent's prosecution history. Claim 9, as originally filed, recited "a transducer that is configured to… receive… one or more WLAN configuration packets" and "commissioning logic that is coupled to the

---

[15] During a meet and confer, Google indicated it may change its construction to "a transducer." Despite multiple requests from Sonos, Google never confirmed this position in writing. Sonos therefore responds to Google's proposed construction, as submitted to the Court in the Joint Claim Construction Statement (Dkt. 141). To the extent that Google resurrects this position, it cannot satisfy the requirements to correct "the transducer" as a typographical error. *See Pavo*, 35 F.4th at 1373-75 (Court can correct a typo "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."); *Trusted Knight Corp. v. International Business Corp.*, 681 Fed. Appx. 898, 904 (Fed. Cir. 2017) (finding term indefinite where patentee's proposed correction "is subject to reasonable debate" by virtue of having multiple alternative interpretations); *Bella Summit*, 2022 WL 17882138, at *6-8 (finding term indefinite where patentee's proposed correction "is subject to reasonable debate" by virtue of having multiple alternative interpretations).

transducer." Ex. T, Claim 9.  But in its May 4, 2016 amendments, applicant replaced "a transducer" with "first wireless radio" as the component "configured to… receive… one or more WLAN configuration packets":



Ex. U, p. 4-5 (highlighting added).  Applicant also deleted the term "transducer" from claims 1, 3, 4, 12, 13, 17, and 18.  *Id.*, p. 3-7.  This suggests that applicant may have intended to replace all instances of "transducer" with "first wireless radio," but inadvertently left "the transducer" in claim 9.[16]  Claim 9 already introduces "a first wireless radio," so there would be no antecedent basis issue under this reading.

Yet another reasonable possibility is that the applicant intended to claim "commissioning logic that is coupled to *the microprocessor*."  "A microprocessor" is already recited in claim 9, so this read would not create an antecedent basis issue.  The specification supports this interpretation, explaining that "smart device 400 comprises a microcomputer 401 (e.g., *microprocessor*, central processing unit, processor, microcontroller, and etc.) *that is coupled to commissioning logic* 402."  *Id.*, 8:60-63.  Again, given that "the transducer" has no purpose in claim 9 other than to be coupled to commissioning logic, a POSITA could conclude that the applicant intended to refer

---

[16] Because the applicant amended the claim to recite that the "first wireless radio" is responsible for the functionality previously assigned to "a transducer," it is unclear what function "the transducer" is intended to supply.

1   to the microprocessor which (1) is already recited in the claim and (2) is described as
2   being coupled to commissioning logic in the specification.

3       Finally, another reasonable possibility is that the applicant intended to recite,
4   "commissioning logic that is coupled to **the memory storing programs**."  "A memory
5   storing programs" is already introduced in claim 9, so there would be no antecedent
6   basis issue. The specification also supports this reading: "the commissioning logic
7   502 comprises an existing memory element within the device 500." *Id.*, 10:9-11.

8       In *RetailMeNot, Inc. v. Honey Sci. Corp.*, the court found the term "the server,"
9   which lacked antecedent basis, to be indefinite.  No. CV 18-937-CFC-MPT, 2019 WL
10  6337719, at *22-23 (D. Del. Nov. 27, 2019).  Although "server" appeared in earlier
11  versions of claim 1 (in "a server system"), the applicant amended claim 1 to recite
12  only "a system," but failed to remove "the server" from the dependent claims,
13  resulting in ambiguity as to which component was intended.  *Id.* (the amendment
14  "altered the scope of focus of the claims.").  The court found there was "a reasonable
15  debate [] as to whether the applicant intended to remove 'the server' from the
16  dependent claims when he removed the term from the independent claims, and/or as
17  to which of the servers identified in the written description meet 'the server'
18  limitation." *Id.*  Similarly, here, it's unclear whether "the transducer" should have
19  been removed during prosecution and the specification recites several options for
20  what the commissioning logic is coupled to, without clarifying which one the claim
21  intends. Thus, the claim's scope cannot be determined with reasonable certainty.

22      Google argues this term should be given its "plain and ordinary meaning."  But
23  such a proposal does not solve the clear lack of antecedent basis or the fundamental
24  issue that the claim fails to recite what component needs to be coupled to the
25  commissioning logic.  Because multiple interpretations are reasonable and would
26  result in meaningfully different claim scope, the claim is indefinite.

27
28

## I.  '790 Patent, Cls. 1, 16: "executing an application… to decode and process by the commissioning logic"

| Sonos | Google |
|---|---|
| Indefinite | Plain and ordinary meaning |

The phrase "executing an application on the target device to decode and process by the commissioning logic" is inherently ambiguous.  On its face, the claim could be read in at least three ways: (1) the "commissioning logic" performs the decoding and processing; (2) the "application" performs the decoding and processing; or (3) both the "application" and the "commissioning logic" perform the decoding and processing together.  The intrinsic record does not resolve the ambiguity.

The specification provides no guidance as to *what* does the claimed "decod[ing] and process[ing]."  In some places, the specification describes an "application" that decodes and processes but with no mention of "commissioning logic."  *See* '790 Patent, 2:53-66.  In other places, the specification describes "commissioning logic" that decodes and processes but with no mention of an "application."  *See id.*, 10:7-9.  And the specification never discusses "application" and "commissioning logic" together in the context of decoding and processing.  In fact, the specification does not even explain whether these are two separate things, whether one comprises the other, and/or whether or how they are otherwise related.  "The ambiguous nature of the distinction between the two claim terms renders them incapable of construction."  *Icon Health & Fitness, Inc. v. Polar Electro Oy*, 656 F. App'x 1008, 1016 (Fed. Cir. 2016).[17]

The confusion is compounded by the recitation of additional claim elements— the "microcontroller," "processing circuits," and "program instructions"—that are also described in the specification as being involved in decoding and processing.  *See*

---

[17] Claim 16 introduces "one or more programs," which further blurs the line between "application," "commissioning logic," and "programs."

*id.*, 10:3-5 ("[T]he **microcontroller** 501 includes **processing circuits** that are employed to decode and process[.]"); *id.*, 10:7-9 ("The commissioning logic 502 includes **program instructions** that direct the microcontroller 501 to decode and process[.]").  Nowhere does the specification explain how these claim elements interact or relate to the claimed "application" and "commissioning logic" in performing the decoding and processing.

In light of the above-described ambiguity, a POSITA would not be able to determine, with reasonable certainty, the scope of this claim limitation.  The term is indefinite.  Tellingly, Google appears to have recognized the ambiguity in the '790 claims and attempted to resolve it in the '608 claims by changing the indefinite language "executing an application on the target device to decode and process by the commissioning logic" to just "executing ~~an application~~ the commissioning logic on the target <u>streaming</u> media device to decode and process ~~by the commissioning logic~~" (where strike-through indicates deletions and underlining indicates additions).

Dated:  November 12, 2025        Respectfully submitted,


ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP


By: */s/ Alyssa Caridis*
    Alyssa Caridis
    *Attorneys for Plaintiff Sonos, Inc.*