Clement S. Roberts (SBN 209203)
croberts@orrick.com
ORRICK HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700 / Fax: 415-773-5759

Alyssa M. Caridis (SBN 260103)
acaridis@orrick.com
ORRICK HERRINGTON & SUTCLIFFE LLP
355 South Grand Ave., Suite 2700
Los Angeles, CA 90071
Tel: 213-629-2020 / Fax: 213-612-2499

George I. Lee (*Pro Hac Vice*)
lee@ls3ip.com
Sean M. Sullivan (*Pro Hac Vice*)
sullivan@ls3ip.com
Rory P. Shea (*Pro Hac Vice*)
shea@ls3ip.com
J. Dan Smith (*Pro Hac Vice*)
smith@ls3ip.com
Cole B. Richter (*Pro Hac Vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W. Randolph Street, Floor 5W
Chicago, IL 60661
Tel: 312-754-0002 / Fax: 312-754-0003

*Attorneys for Plaintiff, SONOS, INC.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONOS, INC., | CASE NO. 2:20-cv-00169-JAK (DFMx) |
| *Plaintiff-Counterclaim Defendant,* | |
| vs. | **SUPPLEMENTAL MEMORANDUM OF SONOS, INC. PURSUANT TO LOCAL RULE 37-2** |
| GOOGLE LLC, | |
| *Defendant-Counterclaimant.* | |

Google's arguments against producing sales information for its foreign-sold products are rooted in a fundamental misunderstanding of Sonos's infringement and damages theories and rely on 2013 Federal Circuit law that was abrogated by the Supreme Court in 2018 and recognized in 2024 by the Federal Circuit as having been abrogated.

Sonos's infringement theory is grounded in § 271(a), namely, an act of "mak[ing]" an infringing article in the U.S.  The infringing articles are U.S. servers that contain the software builds for the accused speakers and the software packages for the accused apps.  The act of making these infringing articles is completed when Google loads these software builds onto these U.S. servers.  Google makes no argument that these CRMs are not a valid basis for domestic infringement.

For the accused players, Google's ██████████████████████ ██████████████████████████████████.  Google then sells these players around the world.  Google admits that ████████████████████ ██████████████████████████████████████████████████████.  For the Accused Apps, Sonos contends that Google █████████████████████ ████████████████████████████████████████████████ ███████.

Ignoring this set of facts, however, Google argues that its foreign sales are "wholly irrelevant" because there is no "casual connection" between Google's act of domestic infringement and Google's foreign sales.  But the casual connection is clear on its face:  Google has provisioned its foreign-sold players with the patented functionality by ████████████████████████████████████ ██████████████████████.  This is the exact the causal connection that *Brumfeld* explains would give rise to increased royalties.  *Brumfield*, 97 F.4th at 877 ("in the "hypothetical negotiation, the royalty for new domestic acts of making claimed CRMs . . . would have properly been increased to reflect the prospective making and sale of CRMs abroad for use abroad."). Simply put:  in the hypothetical negotiation,

Google would have been willing to pay an increased royalty to be permitted to create infringing U.S. CRMs because those infringing U.S. CRMs are used to provide the patented features to foreign-sold products.  Therefore, these U.S. CRMs are directly responsible for the foreign revenue and profits Google receives as a result of including the patented features in its foreign-sold products.

Google argues that "the accused making is entirely abroad."  This is incorrect. The accused making is entirely domestic (i.e., making infringing U.S.  CRMs).  But it is the foreign acts, which are directly and only enabled by the domestic infringement, that evidence the value of this domestic infringement.

Google argues that ████████████████████████████████ ████████████████████████████████████████████. But in so arguing, Google necessarily admits that ████████████ █████████████████████████████████. Naturally, you cannot create a copy of something without access to the original, which in this case is provided via an infringing U.S. CRM.  The fact that Google's ████████████████████████████ – albeit in a foreign country – is irrelevant.  The relevant act of "making" for purposes of infringement is the act of "making" an infringing CRM in the U.S., which is complete when the software builds are loaded onto the U.S. servers. This subsequent act of "making" in a foreign country does not erase the domestic "making" of the infringing U.S. CRM that has already occurred.

This is an important distinction that pervades Google's opposition. Specifically, Sonos is not relying on extraterritorial conduct for purposes of infringement *liability*.  Rather, Sonos is advancing a *damages* theory that attributes an increased royalty to Google's U.S. infringement that accounts for the portion of revenue and profits Google is able to make from its foreign-sold products because of its use of the infringing U.S. CRM.

Google's analysis of the caselaw is fundamentally flawed as a result of its

misunderstanding of Sonos's infringement and damages theories.  Google first relies on the Supreme Court's holding in *Microsoft* that copies of software made abroad do not result in *liability* even though a master disk containing that software was exported and used to make the copies.  *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 442 (2007) ("Does Microsoft's ***liability*** extend to computers made in another country when loaded with Windows software copied abroad from a master disk…dispatched by Microsoft from the United States? Our answer is 'No.'") (emphasis added).  *Microsoft* was analyzing liability under § 271(f), which provides for liability in the event that an infringer exports a component and then induces a combination of that component abroad such that if the combination was done in the U.S. it would infringe.  *See* 35 U.S.C. § 271(f)(1).  *Microsoft* holds that software in the abstract cannot constitute a component, but a master disk (e.g., a CD-ROM containing software) can.  Therefore, liability under § 271(f) must be predicated on utilizing that master disk to make infringing combinations rather than making copies of the master disk and then utilizing those copies to make infringing combinations. *Id.*  But this is inapposite because Sonos is not proceeding here under a § 271(f)-theory of *liability*.  Sonos's theory of liability here is based on § 271(a) acts of "making" domestic infringing CRMs – not § 271(f) theories of combining software components.  In this way, Sonos's liability theory is entirely based on domestic activity.  And its damages theory is based, in part, on the value Google derives from engaging in such activity, namely, a royalty rate that accounts for the value this domestic infringement provides to Google. Therefore, *Microsoft*'s §271(f)-holding does not provide any basis for Google to avoid foreign discovery relevant to § 271(a) infringement.

Google's analysis of *Columbia* is similarly flawed.  In *Columbia*, the patentee argued that the infringing articles were foreign-sold computer systems that were installed with software developed in the U.S.  *Trs. of Columbia Univ. in City of New York v. Gen Digital Inc.*, 169 F.4th 1320, 1337 (Fed. Cir. 2026).  The patentee

argued that these foreign-sold computers were *made* in the U.S. because they were installed with software that was developed in the U.S. *Id.* The Court held that the computers were not made in the U.S. because the software installation occurred outside the U.S. *Id.* at 1338.

By contrast, Sonos is not claiming that Google's foreign-sold players are made in the U.S. or that Google's ███████████████████████████████ constitutes liability. This is a nuanced, but important, distinction between liability and damages. Sonos contends that Google makes an infringing CRM in the U.S. (a fact that Google does not dispute for purposes of this motion) and then contends that this U.S. infringement is the proximate cause of additional damages because Google ████████████████████████████████████████████████████████ ████████████.

In *Columbia*, this type of causation theory was not presented to the jury. *Id.* at 1339. Instead, the patentee argued, after trial, that the jury could have granted foreign damages under such a theory for its CRM claims. *Id.* The Court acknowledged the argument and specifically that under *Brumfield*, "a finding of domestic infringement allows a patent owner to recover 'complete compensation,' including damages based on foreign activity shown to be caused by domestic infringement," but concluded that because the patentee did not present this theory to the jury, it could not sustain a verdict under this alternative legal theory "*even if the alternative would have been legally valid*." *Id.* (emphasis added) (quoting *Brumfield*, 97 F.4th at 872).

Thus, *Columbia* doesn't "undermine" Sonos's theory – it affirms it. Together with *Brumfield*, these cases demonstrate that Sonos is not pursuing a liability or damages theory that has been rejected by the Court as a basis for foreign damages. Instead, Sonos is pursuing precisely the theory that these cases identify as constituting a legitimate, valid, basis for recovering damages based on foreign conduct: an act of domestic infringement (liability) that "enables and is needed to

enable otherwise unavailable profits from conduct abroad." *Brumfield*, 97 F.4th at 877. Here, Google's U.S. infringement enables otherwise unavailable profits from foreign sales ████████████████████████████████████████████ ████████████████████████████████████████

Google's reliance on *Power Integrations*, 711 F.3d at 1371-72, for the proposition that "extraterritorial production . . . cuts off the chain of causation initiated by an act of domestic infringement," is no longer good law. *Brumfield* specifically recognized that the Supreme Court in *WesternGeco* abrogated this more restrictive framework, and that the correct framework now is an analysis of what damages are proximately caused by U.S. infringement. *Brumfield*, 97 F.4th at 870-71 ("[W]hether patent damages are properly awarded in a particular case based partly on conduct abroad, the decision in *WesternGeco* established a framework of analysis that necessarily supersedes the analysis set forth in…*Power Integrations*," noting "the Supreme Court reversed our decision, noting the reliance on *Power Integrations*…we must follow the Supreme Court's analysis, which now governs in place of the analysis of *Power Integrations*.")

In view of this, Google's argument that there is no "causal connection" fails to come to terms with the prevailing caselaw and the undisputed facts: (i) Google commits domestic infringement when it makes a U.S. CRM containing the infringing software, (ii) Google ████████████████████████████ ██████████████████████████, and (iii) Google reaps revenue and profits from including the patented features in its foreign-sold products, which but for the infringing U.S. CRM, Google would not have received. As *Brumfield* explains:

> in the "hypothetical negotiation, the royalty for new domestic acts of making claimed CRMs . . . would have properly been increased to reflect the prospective making and sale of CRMs abroad for use abroad

*Id.* at 877. Therefore, discovery of Google's foreign sales is appropriate in this case.

Dated:  May 12, 2026

ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP

By: */s/ Cole B. Richter*
    Cole B. Richter (admitted *pro hac*)

    *Attorneys for Sonos, Inc.*

SUPPLEMENTAL MEMORANDUM OF SONOS PURSUANT TO LOCAL RULE 37-2