UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES

| | | |
|---|---|---|
| SONOS, INC, | ) | CASE NO: 2:20-cv-00169-JAK-DFM |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Santa Ana, California |
| | ) | |
| GOOGLE, LLC, | ) | Tuesday, April 14, 2026 |
| | ) | |
| Defendant. | ) | (10:03 a.m. to 11:00 a.m.) |

HEARING RE:

MOTION TO COMPEL DISCOVERY [DKT.NO.168]

BEFORE THE HONORABLE DOUGLAS F. McCORMICK,
UNITED STATES MAGISTRATE JUDGE, PRESIDING

**APPEARANCES**:                SEE PAGE 2

Court Reporter:            Recorded; CourtSmart

Courtroom Deputy:          Nancy Boehme

Transcribed by:            Exceptional Reporting Services, Inc.
                           20079 Stone Oak Pkwy.
                           Suite 1105-237
                           San Antonio, TX 78258
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**


For Plaintiff:                          COLE B. RICHTER, ESQ.
                                        SYDNEY HECIMOVICH, ESQ.
                                        Lee Sullivan Shea & Smith
                                        656 W. Randolph St.
                                        Floor 5W
                                        Chicago, IL 60661

For Defendant:                          MELISSA J. BAILY, ESQ.
                                        Quinn Emanuel Urquhart & Sullivan
                                        50 California St.
                                        22nd Floor
                                        San Francisco, CA 94111

                                        HOWARD CHEN
                                        Google in-house counsel

**Santa Ana, California; Tuesday, April 14, 2026; 10:03 a.m.)**

**(Call to Order)**

THE CLERK:  We're on the record in case 2:20-cv-00169, it's Sonos, Inc. versus Google, LLC.

Counsel, your appearance, please.

MR. RICHTER:  Good morning, Your Honor, Cole Richter from Lee Sullivan Shea and Smith on behalf of plaintiff, Sonos. And with me my colleague, Sydney Hecimovich.

THE COURT:  All right, good morning.

MS. BAILY:  Good morning, Your Honor, Melissa Baily for Google.  And with me in the gallery is Howard Chen (phonetic) from in-house at Google.

THE COURT:  All right, good morning.

Ms. Boehme?

THE CLERK:  Yes, Your Honor.

THE COURT:  Our 11 o'clock is on the phone?  We expect them --

THE CLERK:  One more.

THE COURT:  One and one.  So we got one in person and one on the phone.  Okay.  Just trying to figure out how to keep the trains running on time.

You got to tentative?

MS. BAILY:  Yes, Your Honor.

MR. RICHTER:  Yes, Your Honor.

THE COURT:  I didn't want to put it on the internet

because you guys had a lot of redacted stuff in the joint filing, and I was -- tried to be circumspect, but you know, you say one wrong thing everyone gets upset.

Want to talk about the tentative?

**MR. RICHTER:**  Yeah, absolutely.

**THE COURT:**  Let's talk about the tentative.  Tell me why it's wrong.

**MR. RICHTER:**  Well I think you went with us on the first category, Your Honor --

**THE COURT:**  So you like that part.

**MR. RICHTER:**  I'm sorry?

**THE COURT:**  So you like that part.

**MR. RICHTER:**  Yeah, so I think that's correct.  And happy to talk about the second and third.

So the second category again is directed to revenue that Google makes through the accused products above and beyond sales of the products themselves.

And so I think one thing Your Honor had trouble with was that, one, Google had made a representation that there were no documents relevant to this revenue; and two, Sonos wasn't able to narrowly tailor its request.

So let me take the first issue, I think.

Google did represent that there were no documents responsive to this, and then they did produce an agreement that is directed to exactly the type of revenue that Sonos was

5



seeking here.

THE COURT:

MR. RICHTER:

THE COURT:

MR. RICHTER:  Okay.

THE COURT:  I don't think here there's anything --

MR. RICHTER:

THE COURT:

MR. RICHTER:  It's a great idea, they're entitled to that revenue for sure.

So those are examples of -- that are present in this

6

document which was produced after the briefing was closed so we couldn't address it, but those are the examples of the type of revenue that Google --

THE COURT: [redacted]

MR. RICHTER: [redacted]

So --

THE COURT: Well why did they produce this one and if there are others and why did they produce this one and why are they refusing to produce others if there are others? That doesn't -- that's not consistent with how most -- well it's not consistent with how people are supposed to behave, let's put it that way.

MR. RICHTER: Agreed, Your Honor, and obviously we don't have access to their files so we don't know which ones they have. We could only, you know, speculate, I guess for

lack of a better word.

I mean I call it just engaging in discovery, because at every -- at the outset of every case, Your Honor, the one party can make categorical requests for information on the other party not knowing whether they exist or not, and the other party will produce them if they exist and they're relevant.

So you know, we outlined in for instance request for production number 52, we started with a general categorical description of the type of documents we were seeking, and then, you know, enumerated very specific requests.

One of them was Romanette II which say, Google revenue associated with third-party subscription-based streaming media services, e.g., Spotify Premium, Apple Music, Pandora Plus, used to play media on the accused product.

So, you know, we feel like that's a specifically targeted request, I think it's narrowly tailored, and we don't know whether there's revenue that exists, but we think that there is, and that's why we made the request, and then this document produced last week or the week before confirms it does exist.

So this goes into a larger --

**THE COURT:** Again, I want to just make sure that I'm pinning you done a little bit, and we need to seal this transcript we can do that.

MR. RICHTER:  That's correct, it was entered into at a time prior to the infringement period --

THE COURT:  Yeah, okay.

MR. RICHTER:  -- but subsisted.

THE COURT:  I just want to make sure that I'm talking -- that we're talking -- when I hear you talking about something I understand what you're talking about.

MR. RICHTER:  Yeah, perfect.

THE COURT:  All right.

MR. RICHTER:  Yeah, thank you for the clarification, Your Honor --

THE COURT:  All right.

MR. RICHTER:  -- that is what I'm talking about, yes.

THE COURT:  All right.  Other comments?

MR. RICHTER:  Yeah.  And again, I think this -- it's important to place this within the context of the dispute, which is that, you know, what we have is again the revenue from the sales of the hardware products themselves, that's the accused players, but again that's just a piece of how Google makes money on these products.

And so what we think is happening is they're

presenting an incomplete picture about the profitability and the financial viability of these products.

One, they are substituting inadmissibility analysis and kind of pushing that to the forefront at the discovery stage.  They're presuming that we won't be able to appropriately apportion revenue that Google collects on the accused products in other ways.  That's false, we will be able to present an appropriate apportionment analysis, but they're not letting us do it because they're trying to cut us off at the discovery stage.

**THE COURT:**  So the classic actor six Georgia Pacific I think example that some people cite would be your -- we have one here, I just don't see it -- the printer, right, and the printer, you lose money on the printer, but then you make the money selling ink cartridges for the printer, and that would be

a sort of clear cut case, and I think I picked on Judge Kronstadt because I adopted his analysis, not just because I understood it best, but because he happens to also be the district judge here. But there it's not a printer, it's the spa, and the spa accessories, which maybe are a little less intuitive than the printer and the ink cartridges.

I understand your argument with respect to the first category, because it seems to me that that is -- that grafts the best onto the analogy of the ink cartridges, which is you're going to get these accused apps and you ought to be able to get some discovery into the subscription and advertising revenues of those accused apps, although I'm going -- suspect I'll hear from Google's counsel in a second about why that might be wrong, and that's fine.

But as we move away from there that functional relationship gets -- I think I might have said it here -- this word murky or fuzzy, and that becomes my concern.

Where -- at what point do we just not -- we have to have a point where we stop and say -- because Google is a -- I'm not sure I'll use the right term here -- an integrated company like Apple, or I had another example a minute ago -- where they're trying to provide the consumer with everything he or she could ever possibly want when dealing with technology. Where do we draw the line?

**MR. RICHTER:** Yeah, that becomes difficult. I think

the line is drawn at whether the revenue is connected to the product accused of infringement, and the product accused of infringement, if it has the patented features in it, then that revenue should be produced in discovery and you should let the full apportionment analysis play out.

And if they'd like to argue about the Daubert stage, at the summary judgment stage and failing that at trial that the apportionment should be zero, they're going to have a chance to do that, but they're -- again, they're substituting that at the discovery stage when we haven't had those issues played out, we haven't served expert reports yet, we haven't had the Daubert motions, and the district judge has not made a ruling on admissibility.

So again, we're here at the discovery stage, and I think what's going to happen, Your Honor, is it's become increasingly -- you know, with the advent of software, you know, now in the modern era, products don't -- aren't commercialized in the same way -- so like the apps, like Your Honor found, Google gives away those for free and they make money in other ways.

The same thing is true with the accused players.

12

So I think it's 100 percent fair to consider all of that in the hypothetical negotiation and engage in the appropriate apportionment analysis, which we will, and they will have plenty of full and fair opportunity to argue that that evidence should not be admissible because the apportionment is inappropriate.  But here at the discovery stage I think we just can't engage in that type of analysis when the revenue is connected to the accused product itself.

So I think that's where you draw the line circling back to Your Honor's question.

THE COURT:  All right.  Any other comments or may I turn the ball over to Google for some comments?

MR. RICHTER:  Let's turn it over.  Thank you, Your Honor.

THE COURT:  All right.  The ball has been turned over to you, counsel.

MS. BAILY:  Thank you, Your Honor.

THE COURT:  Take your time.  You heard we have 'til 11:00, you don't want me to take all of the time, but where would you like to start with the Court's tentative?  I suspect category one?

MS. BAILY:  Sure, we can start with category one, Your Honor.

So I just want to start by saying that I think it is important to actually think through what is accused of infringement in the case, because it is not the app that is accused of infringement.  Sonos is not accusing YouTube Music as a whole of infringing.

THE COURT:  It's one of the features that the app incorporates.

MS. BAILY:  That's right.

THE COURT:  Okay.

MS. BAILY:  It's a feature.

THE COURT:  And I understand it to be, if I'm a user in the app, I would have the opportunity use the app to control multiple speakers with a single volume slider.

MS. BAILY:  Correct.

THE COURT:  Have I described what I think it does correctly?

MS. BAILY:  That's the accused feature.

THE COURT:  Okay.  And that's a pretty cool feature.

MS. BAILY: It's a feature in the app.

THE COURT: Okay.

MS. BAILY: Now, when you're thinking through what revenue streams are relevant -- and I'm talking about discovery, so I'm talking about a low bar of relevance -- it has to be relevant in some way, some arguable way at least, to the accused feature. So there has to be some proffer that the revenue stream that Sonos is interested in is in some way relevant to the group volume slider.

THE COURT: All right, I'm with you.

MS. BAILY: And so I think it's important, because what Sonos is arguing is anything they can conjure up pertaining to the whole app is relevant, and that is not what the case law says with respect to relevance.

The -- whatever revenue streams or profits that Sonos is interested in, they have to make some showing that it's related to the accused functionality, and so there has to be a recognition that the accused functionality is the group volume slider and it's not everything else.

THE COURT: All right.

MS. BAILY: And so I think when you think of it from that perspective, even the information in category one does actually fail the district judge's test.

THE COURT: Tell me why.

MS. BAILY: And it's because first of all the revenue

EXCEPTIONAL REPORTING SERVICES, INC

stream that's being asked for has to be functionally related, not just to the app, but to the accused feature, and the revenue streams here are not functionally related to the volume slider, and we know that for a variety of reasons.

THE COURT:  Hard to image any revenue stream could be associated to the volume slider.

MS. BAILY:  Well we've produced revenue streams based on relevance arguments from Sonos related, for example, to the speakers, because speakers -- if you're looking at speakers and the purchase of speakers and the control of volume on groups of speakers, you can make a case that that revenue is relevant in some way to the groups volume slider.

Now, that revenue still has to be apportioned --

THE COURT:  Sure, well --

MS. BAILY:  -- and I can talk more about apportionment later.

THE COURT:  -- you can get to all that stuff later, but I'm just trying to understand your relevance concerns.

MS. BAILY:  Sure.  So here for there to be relevance on something related to the app as a whole, right, that's what they're arguing, but they have to tie it to -- somehow in some way they have to say the subscription revenue in some small part is related to the group volume slider.  And the reason why we know that that particular piece of revenue is not connected to the group volume slider as opposed to, for example, the

purchase of speakers, is because nothing about the group volume slider functionality changes whether you pay a subscription or not.

Now, there are all kinds of functionalities and features that do change when you pay a subscription fee, but that is not one of them, and it's --

THE COURT:  Let's --

MS. BAILY:  Sure.

THE COURT:  -- take Judge Kronstadt's example, and maybe I can dig around in my papers here and find the case.

But that involved a spa, and I don't know what the patent is -- patent was with respect to the spa -- but he found that spa accessories or discovery about spa accessories was relevant.  And they were things like umbrellas and drink holders.

Well it's hard to imagine that something that would hold my drink has any functional relationship to whatever this feature was of the spa, unless it was something as basic as a spa that holds water, but I don't know -- help me -- because it seems to me there he must have had a very, very loose definition of relevance to get from whatever that feature was in the spa to these spa accessories.

MS. BAILY:  Right.  I guess what I would say, Your Honor, is the -- let me say this.

So this case, I think the thing that's missing that

you just pointed out is that there actually isn't any analysis here, and it might have been because of the case and the way the case was argued, about the scope of what actually was patented.

THE COURT:  In *Intex*.

MS. BAILY:  In *Intex*.

THE COURT:  Okay.

MS. BAILY:  Right.  And so, you know, sometimes things are stipulated, something -- you know, I don't know why it was presented, argued, and ruled on this ways.

THE COURT:  So it was murky -- it was a little -- it's a little murky to us about what exactly was patented about the spa in *Intex* and so we're not quite sure why judge -- and he sets forth this analysis beautifully and then he just sort of says, to be sure these things are related.

MS. BAILY:  Right.  And I would suggest to Your Honor that if you look at some of the other cases that actually delve a little bit more into the details, you see that there actually is a requirement and that there be --

THE COURT:  Give me your best example of a case --

MS. BAILY:  Sure.

THE COURT:  -- like that.

MS. BAILY:  So even -- *Sound View*.  Okay.  So in *Sound View*, it's a great case --

THE COURT:  Hold on, I'll --

18

MS. BAILY: Sure.

THE COURT: -- find it here. I'm sure I have it. It's also a Judge Kronstadt case, but it was written by Judge Abrams, so go ahead.

MS. BAILY: So in *Sound View* it's interesting because the two categories of revenue are similar to the ones in category one here.

So one was subscription fees. And the reason, as far as I can tell -- again, some of these discovery orders don't get into as many details as one might like -- but the reason --

THE COURT: Hold on, I don't plan on writing anything either -- any bit as long as either of these, so they may even be murkier.

MS. BAILY: Right.

THE COURT: You guys have four pages, this is the longest discovery thing I've written in years. Every year I take a New Year's resolution, write shorter discovery orders.

MS. BAILY: Well we appreciate your efforts here.

The reason why a subscription revenue -- there was discovery about subscription revenue is because one of the patents related to one of the functions that was provided through the subscription fee, which was the live function.

So when you had a subscription to Hulu's live, limited commercials, and no commercials products, you got access to live functionality, and live functionality was an

EXCEPTIONAL REPORTING SERVICES, INC

19

accused feature with respect to one of the patents at issue. So you actually got some benefit from the patent by subscribing that you didn't get when you didn't subscribe.

Now here there is nothing related to group volume that changes from non-subscription to subscription, so that's one example of how *Sound View* can be thought of here.

Now, in *Sound View* there was also a question regarding advertising revenue, and as Sonos concedes in this case, some of the patents related to providing apps, the technology needed to provide app, and of course that has nothing to do with Sonos' patents, which are -- you know, Sonos is an audio company.

So if you look at *Sound View*, for example, there has to be a functional relationship between what is actually accused and alleged to be a patented feature and the revenue stream.

Now, the revenue stream of course might be related to lots of things.  Like the subscription wasn't just related to live, it was related the other things as well, and then you can apportion that, right, but that was kind of the smallest unit of revenue that included something that was attributable to something that was patented.

And so I realize that in an application there's lots of features, but you do --

**THE COURT:**  There's lots of features, I was going to

say bells and whistles.

MS. BAILY:  Yeah.

THE COURT:  Your app has a lot of bells and whistle, and this is maybe one bell or one whistle that are in a package of bells and whistles that are included in the app.

MS. BAILY:  Right.

THE COURT:  And maybe the consumer has an expectation that an app in the year 2000 and fill in the blank will be able to control group volume, you know, with a single slider, and if yours doesn't they'll get their product elsewhere.

MS. BAILY:  And that's a different kind of damages analysis that they can do, but that's not the damages analysis that they're doing here.

THE COURT:  Well but then it sort of becomes like you can't -- these are all clunky analogies, but this is what we do, right, we draw clunky analogies to other things -- then you're talking about like a car that doesn't have a drive shaft in it.

MS. BAILY:  Right, but that is not -- that's the entire market value rule, number 1.

And number 2, if you -- apologizes -- if you're looking at the --

THE COURT:  I should have picked something that wasn't a bell -- that was more of a bell and a whistle, then maybe -- because I was going to say tires and tires are also an

entire market value issue.

So let me think of something on a car that isn't going to stop it from moving, you know, heated seats, okay?

Maybe we're at the point in our life where we are so cushy as Americas we wouldn't buy a car without heated seats, but you don't need the heated seats to drive the car, so it's not going to -- it's a little bit more like our group volume slider here.  But you know, when you go and the list of things that the car has on it, one of the things that they put on that window sticker is heated seats.

**MS. BAILY:**  Right, Your Honor, but the -- I think when you're talking about convoyed sales, right, if the heated seats are -- when you're talking about convoyed sales you have to still have the functional relationship, and when you're talking about heated seats, if there's a revenue stream because there is a premium package, right, that includes access to the heated seats and a million other things, then maybe that is functionally related.

The problem here is that we know that the revenue stream from the premium service is not at all functionally related to the volume, because nobody is paying extra -- that extra delta is not related at all to the volume, right?  That payment that's being made doesn't get you the volume, you already had it, and so you know that that specific revenue stream is attributable to other things, to the premium package,

and so that particular revenue stream does not have a functional relationship.

Now, I think the case is even stronger under the functional relationship test that you set out for ads, so I just want to get to that briefly before I -- my voice wears thin on everyone.

THE COURT:  Ads as opposed to subscriptions.

MS. BAILY:  Yes.

THE COURT:  Okay.

MS. BAILY:  So still first category --

THE COURT:  But --

MS. BAILY:  -- but I've been talking a lot --

THE COURT:  -- I kind of view them as -- I don't want to say, maybe this is simplistic -- but I get a subscription so I don't have to listen to ads, if I don't pay for a subscription then I'm stuck with the ads.  They're two sets of the sameish coin.

MS. BAILY:  Sameish, but let me say this.

So if you're looking at the test, right, the sales have to be functionally related to what's patented and losses must be reasonably foreseeable.  Okay.  There has not been a proffer that there's going to be ad revenue lost or a theory that there's going to be ad revenue lost if we remove the group slider.  There's no  -- I mean not even functional relationship -- there's zero relationship there, and so the losses aren't

23

reasonably foreseeable, and the way that you test for functionality for functionally related is, is there a use independent of the patented device?  And I will tell you that advertising at Google is totally independent of the app or the functions within the app.

There is advertising technology that can be applied to any service that you can imagine, that use is vast and has nothing to do with this accused app at a whole -- as a whole or especially what's relevant, which is the accused functionality, which is a volume slider.

And so this ads revenue, at least the subscription revenue is tied to the app, right, so I still disagree that it falls within the test for convoyed sales, but at least the revenue subscription -- the subscription revenue is tied to the app.

Advertising is up here.  Advertising has uses in so many things that Google or Apple or others do, and it gets applied to any one of a number of those things.  And so in a case where the technology for serving apps is not at issue, it is way too far afield.

So I would suggest that at least the subscription revenue is tied to the app, advertising is not tied to the app, advertising is a completely different function that has thousands of independent uses at Google and otherwise that is not in any way -- that technology is not in any way connected

24

to the app or to what's accused within the app.

THE COURT:  All right.  So are you suggesting that there's a different -- are you suggesting there's a different analysis of the functional relationship, and are you also suggesting that there is some additional burden to Google of collecting the information if I disagree with you on the functional relationship?

MS. BAILY:  Yes to both.

THE COURT:  Okay.  So your papers don't really identify the second issue very clearly, so let's talk about that, because I can see that and I think I used the word -- one of the things that I went back through and said this is why I'm not going to put this on the internet -- I used the word massive, because I can imagine revenue streams with Google being a massive production.

MS. BAILY:  Right, and it depends --

THE COURT:  Advertising revenue stream with Google.

MS. BAILY:  Yes.  Yes.  ███████████████████
█████████  ███████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████

Again, advertising is up here and it's -- it can be pushed out and related to a lot of different things, it is not -- it does not reside within the app, if you can imagine it that way.  And so --

25

THE COURT:

MS. BAILY:          So --

THE COURT:  Okay.

MS. BAILY:

So --

THE COURT:

MS. BAILY:

And I guess what I'm saying is so that's a burden because how will we try to figure that out, you know, and you know, Google is a data company, maybe it can be figured out in some way, but I guess what I'm saying is burden wise it's not as easy as here's all the ad revenue from YouTube Music, but the reason why is I think the foundational reason, it's because

ads is something totally different that just gets funneled through different apps and different software and it's not functionally related to the other functionality in the apps, and it's definitely not -- you know, functionally related to a patent on group volume for speakers.

THE COURT:  All right.  So we're certainly identifying many problems, and I would at this point take myself out of the running to be an expert for purposes of the hypothetical negotiation, because you guys are way over my head, but that's not the problem -- that's not my problem today.

All right, did you want to make any comments about category two and three?

MS. BAILY:  Sure.  So I will just try -- obviously Your Honor is completely correct with respect to categories two and three, but let me just address some of the comments that were made.

So with respect to category two,

and it's not the case that we produced that one but we're somehow, you know, withholding other things in this same

27

category.  That's --

THE COURT:  Well and so one of the things we should talk about then is your obligation to say under 34(b)(2)(C), I'm not withholding any documents based on this objection, because there aren't any.

MS. BAILY:  So the problem is, is that category two is so vague and seems to have a lot permutations --

THE COURT:  Well that's where you and counsel kind of get together so you make sure that you're very precise about what you're saying you don't have.

MS. BAILY:  So there's that issue which we can do, but there's another issue, which is this super vague category creates its own burden because I don't know what I'm looking for, number 1.

Number 2, there is some examples that don't make any sense to me.  So I'll just take one.

They say that ███████████████████████████████████████████████████████████████████████ So I'm just sort of at a loss for what that is, for example.

Another example is --

THE COURT:  Well I think the request is ████████████████████████████████████████████████████

MS. BAILY:  ███████████████████

28

THE COURT:

MS. BAILY:  Right.  Well the issue I think is that the revenue that is generated is the [redacted] which we've provided.

THE COURT:  Got it.  I understand.

MS. BAILY:  So they're saying that's

THE COURT:  Right.

MS. BAILY:  -- we've provided all the revenues with respect to [redacted]

THE COURT:  Right.

MS. BAILY:  Now -- but then they get farther afield and they say, well if somebody uses Google's voice assistant to buy something at Target --

THE COURT:  Well put the target thing aside for a second, because that's -- I agree I don't want to -- that is I don't want to go down that path, that's -- that's too long of a hike, but let me go back to that [redacted] for a minute, because what I anticipate your colleagues from Sonos to say is [redacted]

29

then maybe we need to go back to your earlier discussion of the tether between that and the group slider button, but --

MS. BAILY: Right. So I guess what I would say, Your Honor, is first of all I don't want to lose track of the core here and I will move on from this in a second, but the core is that this second category is even more of things that they're requesting is even more far afield than the first category and the functional relatedness and the convoyed analysis sales I think just fails at the outset. So I don't want to lose that and then talking about --

THE COURT: No, I just told you I have that --

MS. BAILY: -- the specifics.

THE COURT: -- I still understand it.

MS. BAILY: Right.

So but in addition

THE COURT: ████████

MS. BAILY: Right.

THE COURT: Okay.

MS. BAILY: So if other -- now, I did not look for, you know, are we incurring other costs, I looked for revenue sharing in the best way that I could.  Now -- and I didn't find something that I then withheld on revenue sharing. ████████

THE COURT: So maybe what I need to do here is in addition to, from your standpoint, I'm ruling the way I'm ruling, is also ask you to clarify in discovery response that you are not withholding anything from, and I would probably direct the parties to meet and confer about the form of that discovery response so that it was satisfactory to both sides, and tell you candidly if you can't come to an agreement then I have an informal discovery conference process and then order you to bring that sort of granular dispute back to me through that process, and that would -- because if the answer is we don't have it, then I don't want to fight about it.

MS. BAILY: I agree, except that the principal remains, and I don't want the principal --

THE COURT: Oh, I don't principals, that's one of the great -- no, I'm dead serious -- that was one of the reasons in 2015 that 34(b)(2)(C) was amended to do that, and that's

31

because we were spending a lot of time -- and I wasn't here very long before 2015, but I was here -- we were spending a lot of time doing these like big long discussions and then at the end of the day the opposing party would say, yeah, we don't have any of those any way, and you're like, I'm going to throw a shoe at you, right?  And so that's why 34(b)(2)(C) was amended that way, because I don't want to do that discussion.

MS. BAILY:  And we are happy -- always happy to meet and confer with the other side.

THE COURT:  Okay.

MS. BAILY:  The only thing I would add is that there is at a company like Google burden associated with --

THE COURT:  No, I get it.  You don't --

MS. BAILY:  -- and now try to figure out --

THE COURT:  -- you don't have 100 employees, and you don't have, you know, a 1-person sales department, your client back there is probably one of several hundred lawyers, and it's -- you know, I get it.  I had a brief, brief time in private practice because I started working in this building many years ago and I do vaguely recall it.

Okay, please go ahead, we have a little more time.

MS. BAILY:  Sure.  So --

THE COURT:  And I want to give Mr. -- I want to give your colleague some sort of a chance to chime back in, Mr. Richter a chance to have the find word.

MS. BAILY: Absolutely.

And I guess I would just conclude on category two by saying -- and I think Your Honor understands it so I won't belabor it -- that it just -- it goes further and further on afield to places where, you know, it just shouldn't be that I now need to spend a lot of time and money looking for, you know, some e-commerce thing when the patents have nothing do with to, commerce at all.

And so I just think category two really starts to get further and further away, which is why we focused -- we don't think it's relevant, we don't think it satisfies convoyed sales -- but we focused on, you know, the streaming company revenue share --

THE COURT: All right.

MS. BAILY: -- in category two.

And then category three I'll just say, that's obviously the very furthest afield, but in terms of the practical considerations that we're now talking about, I will say that, right, there was this one email from before the products were, you know, released where, you know, somebody, you know, thought about something in a certain way, but you know, we have represented very clearly that

But what I will say is that to the extent the person

33

who wrote this email or others in his group were thinking about things in this way, it's in custodial ESI, right, the parties are negotiating search terms and custodial ESI, like that's where it would be.  You know, we're also producing, you know, business plans, et cetera, I think that reflect how people, you know, think and talk about these issues.  But you know, this again is so far afield, and as a practical matter, like there isn't anything there.

So I would just add that to Your Honor's analysis in the tentative with respect to category three.

**THE COURT:**  All right.  Thank you, I appreciate that.

Mr. Richter --

**MR. RICHTER:**  Yes.

**THE COURT:**  -- any additional comments, please.

**MR. RICHTER:**  Thank you, Your Honor, I'll try my best to respond to everything.

I think at the outset I want to be clear with Sonos' position.  These are not convoyed sales, so we don't believe the convoyed sales analysis is appropriate here.

A convoyed sale is very clearly a sale of a non-accused product that is or should be factored into the royalty or the lost profits analysis because there's an argument that those sales are connected in some way to the patented features.

So in this case, for example, Sonos might say well a convoyed sale would be the sale of headphones or the sale of

charging cords or the sale of some attachment you attach -- I'm just making this up -- but it's -- a convoyed sale is a sale of a non-patented feature.

So we are talking about revenue made through the accused products themselves, which means that the functional relationship is inherent in that the patented features are included in the accused product and therefore contribute, at least we would like to argue and we plan to argue, in some way to all of the revenue that Google gets, which will be apportioned.

Some revenue might be contributed to by the accused features in larger ways and some might be contributed to in smaller ways, but at this stage it's just inappropriate to allow Google to be the party to say, I get to decide which revenue is because of the accused features and which isn't, and that -- what they're saying to the Court today is it's the sales of the products and then I'll be the decider and it's not -- trust us, it's none of the other revenue.  That isn't because of any of the speakers -- or any of the patented features, which they can't say at this point.

The patented features are a large part of the accused products, they're features that enable users to play audio on multiple speakers, so they contribute greatly to users' desirability to purchase multiple speakers, and therefore increases Google's user base and therefore increases the

35

revenue that Google gets from other parties.

So let me try to take these in the reserve order with my remaining time, if that's okay with Your Honor.

It's -- you know, this is the first time that they've represented or been willing to represent that ███████████ ████████████████████████████████. I mean the issue was they were -- there's an interrogatory directed to it, they refused to answer it, they refused to search for documents, so Sonos has no way of knowing whether there are or aren't documents.

Again, I'm very practical, Your Honor, if they were to just come in here and say on the meet and confer or in the papers, hey, these don't exist, then the dispute is over, I'm -- you can't order them to produce something that doesn't exist, I fully agree with that, but the problem has been they've never been able or willing to represent that that's the case. ████████████████████████████████████████ ████████

So we showed you pictures in the papers, ████████

So I -- it seems perfectly reasonable and logical that these companies are paying Google to advertise for them.

EXCEPTIONAL REPORTING SERVICES, INC

36

, and if they are I think that revenue would be considered in the hypothetical negotiation because it's revenue connected to an accused product itself whose user base is influenced in some respect by the patented features, and the in some respect part is the apportionment analysis that these cases instruct us to do.

Let me go to the accused apps.  Again, I think *Sound View* is a case that supports Sonos.  I mean I looked at those accused patents, Your Honor, they weren't directly to advertising mechanisms, those were content streaming delivery mechanism patents, and yes, it's conceivable I suppose that -- and Sound View did argue -- that the banded technology was become used to play advertisements -- but the relevant analysis was they wanted that money for their economic and damages analysis.

The subscription -- again, the subscription -- there was a -- that was a no commercial product, so they were getting the subscription revenue because it factored into the damages, the economic value of the accused product itself.

So that's the relevant analysis I think for these accused apps, it's just simply not appropriate to be dividing the accused features and allow Google to say, well I think that

37

we would make exactly same revenue and exactly the same subscription fees if we took group volume out of the product. I don't -- first of all, that's not the right analysis, because that is an entire market value analysis where you would lose sales because of a future, where I think the correct analysis is users are using the features to in some proportion to be persuaded to purchase a product. So the economic analysis will account for that. But besides there's plenty of in evidence this case that when Google did remove that feature the users screamed bloody murder and said, this is now an inferior product.

So I think there's plenty of evidence in -- to require Google to produce the entire -- like to at least let us start with the economic value of the accused product and then apportion that down to account for the patented features.

I think the -- I'll close it on the third category I think is -- again, I just don't think it's appropriate to begin and end with what Google relies on for its financial reporting.

This is an economic analysis that we discovered that some of the executives were engaging in, and we're simply asking Google to tell us how much money it believes the accused products contribute to other revenue streams and what it --

That's all, we're just simply asking for what Google has done.

38

So this isn't Sonos coming out with some crazy theory that, wow so for every accused product purchaser there's -- it increases the value of Google's search engine or something, that's not what's happening here, this is a document that came from Google where Google is apparently saying there's ███████████████████████████████, we're simply asking Google to explain what that is and tell us ████████████████████████████ and that must all be considered in the hypothetical negotiation.

THE COURT:  All right.

MR. RICHTER:  So think I'll leave it there, Your Honor.

THE COURT:  Give me a couple guideposts here, because I didn't look them up or if I looked them up I forgot.  Where are you in the case, when is the discovery cut off, et cetera?

MR. RICHTER:  We are nearing the --

THE COURT:  Sometimes it's on the front of the papers here.

MR. RICHTER:  -- close of fact discovery, yes, it's July 20th I believe is the close of fact discovery, so we're --

THE COURT:  Fact discovery, July 20th?

MR. RICHTER:  I believe so, Your Honor.

THE COURT:  Okay.  You said nearing the close, you

have no idea.  Get parties in here all the time like the week the discovery cutoff ends.

**MR. RICHTER:**  Right.

**THE COURT:**  Okay.  July 20th is discovery cut off.  When is your trial date?

**MR. RICHTER:**  We have none -- we have no trial date, Your Honor.

**THE COURT:**  Okay.  You don't have a trial date from Judge Kronstadt?  Okay.

All right.  One last comment from me.  So I'll take the matter under submission, we'll have a meeting, we'll get to five pages, we'll have a final order shortly, and I'll consider everything.  Taken about five pages of notes on my four-page tentative here.

I invite you guys, if there are additional issues and you would like to discuss them with me, I'm not sure it would have made any difference here, but it might have, schedule an informal discovery conference and I'm happy to do that on the phone.  Where are you -- where's your office?

**MR. RICHTER:**  Our firm is in Chicago, Your Honor.

**THE COURT:**  Chicago, okay.  So yeah, we can do that by phone if you'd like.

If there's a lot of stuff, I did it with some parties in a far, far, far smaller case this week, but I'll -- you know, we'll do it very informally, do it off the record, and --

but if you want to come in person for a couple hours I'll take you back here in my jury room and we take notes of a whiteboard and keep track of what we're doing.  If we're setting briefing schedules on issues I can do that, et cetera, et cetera, et cetera.

I think -- I'm not saying this is going to happen -- but if this is going to be a situation for the next couple months where you're going to have four, five discovery disputes I'd rather be involved with them early and help you frame them in a way that I think will be better for me and less expensive for you and your clients.

MS. BAILY:  Thank you, Your Honor.

THE COURT:  I don't think that local Rule 37 process is that is all helpful.

And so reach out, I'm not going to order you to do it, sometimes in cases I do, but I won't order you to do it, but I'll invite you to do that.

And obviously I know that you guys don't need me to, you know, help you with like search terms and things like that, but if there are other things that are like this that are important, high-level things, I'm happy to get involved and help out.  All right?

MR. RICHTER:  Sounds great.

THE COURT:  Okay.

MR. RICHTER:  Yeah, and you're referring specifically

to the informal process, right?

THE COURT: Yes. Yes.

MR. RICHTER: Okay.

THE COURT: Just call Ms. Boehme up, we schedule a telephone conference usually the same week, if not within a couple days, and then I can just get couple page letter, but then that gives me something to talk to you about, and at the end of that process if we need to set up a briefing schedule or have you all come for a morning or whatever we decide to do we can do that then.

MR. RICHTER: That sounds great. I do think there are additional motions coming down the pike unfortunately.

THE COURT: And that's fine. And that's fine.

MR. RICHTER: So we'll keep that in mind for sure. Thank you.

THE COURT: Okay. All right. Thank you both very much.

MS. BAILY: Your Honor, just may we have the opportunity to review the transcript and the ruling before they get posted to the public just in that there's Google confidential information?

THE COURT: Was there anything in the tentative?

MS. BAILY: I didn't look at it with an eye towards that to be honest, Your Honor.

MS. BAILY: And I know I might have said things --

42

THE COURT:  When I do the ruling -- so the transcript you can review and then make a request.

For the ruling if there is something in the ruling, and I will probably try to be pretty -- I don't know what the right word is -- vague, and I'm -- you know, I'm doing that in part because I just don't want to go through the process -- but if there is something -- if I do put something in there and you do want it sealed just request it.  Actually first call Ms. Boehme and tell her you're going to request it and then request it, and if you guys actually agree and you can stipulate that's fine we'll just do it.

MS. BAILY:  Okay.  Thank you, Your Honor.

THE COURT:  I don't want to put anything in here that you're going to be concerned about.

MS. BAILY:  Thank you, Your Honor, we appreciate that.

THE COURT:  Yeah.  Okay.  Thank you.

MS. BAILY:  Thank you.

MR. RICHTER:  Thank you, Your Honor.

THE CLERK:  This court stands in recess.

(Proceeding adjourned at 11:00 a.m.)

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                          April 28, 2026

          Signed                                          Dated


                  *TONI HUDSON, TRANSCRIBER*