QUINN EMANUEL URQUHART & SULLIVAN, LLP
Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Melissa J. Baily (SBN 237649)
melissabaily@quinnemanuel.com
James D. Judah (SBN 257112)
jamesjudah@quinnemanuel.com
Ognjen Zivojnovic (SBN 307801)
ogizivojnovic@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
Fax: (415) 875-6700

Lance Yang (Bar No. 260705)
lanceyang@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendant and
Counter-Claimant Google LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SONOS, INC.,<br><br>              *Plaintiff*,<br><br>       v.<br><br>GOOGLE LLC,<br><br>              *Defendant*. | Case No. 2:20-cv-00169-JAK (DFMx)<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT: MEMORANDUM AND AUTHORITIES IN SUPPORT OF DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL**<br><br>Date:        July 16, 2026<br>Time:        8:30 a.m.<br>Location:    Courtroom 10C, 10th Floor<br>Judge:       Hon. John A. Kronstadt |

<span style="color:red">**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**</span>

NOTICE IS HEREBY GIVEN that on July 16, 2026 at 8:30 a.m. or as soon thereafter as the matter may be heard in the United States District Court for the Central District of California, located at the Felicitas and Gonzalo Mendez United States Courthouse, Los Angeles Courtroom 10C, 10th Floor, before the Honorable John A. Kronstadt, Defendant Google LLC ("Google") will and hereby do move for an order granting summary judgment in its favor.  This motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that there is no genuine dispute as to any material fact and, based on the uncontroverted facts, Google is entitled to judgment as a matter of law that the claims of Sonos, Inc.'s ("Sonos") U.S. Patent Nos. 10,439,896 and 10,541,883 are invalid under 35 U.S.C. § 112(a) for lack of written description.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 on June 10, 2026.  The parties were unable to reach a resolution, thus necessitating the filing of this motion.

This motion is based on this notice of motion; the accompanying memorandum of points and authorities; the accompanying statement of uncontroverted facts; the Declaration of Ognjen Zivojnovic and exhibits thereto; the records and files herein; and on such other evidence as may be presented at the hearing on this motion and is properly before the Court.

DATED:  June 17, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Ognjen Zivojnovic

*Attorney for Defendant*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................1

II.     FACTUAL BACKGROUND .........................................................................2

        A.      The Shared Specification ...................................................................2

                1.      The specification distinguishes Access Point networks and Ad-hoc networks....................................................................2

                2.      The specification only discloses adding a playback device to an Ad-hoc network, not an Access Point network. ..................5

                3.      The specification discloses a device on an Ad-hoc network that can be separately connected to an access point, but the access point is not part of and does not define the network. ........8

        B.      The 2004 Provisional Application..........................................................9

        C.      Sonos's Patent Prosecution History......................................................10

        D.      Sonos's Change In Prosecution Impermissibly Captured The Access Point Networks That Others Were Already Using...................11

        E.      Litigation History...............................................................................13

III.    LEGAL STANDARD....................................................................................13

IV.     ARGUMENT...............................................................................................14

        A.      The Claims Require Setting Up Devices On A Secure WLAN Defined By An Access Point Network, Whereas The Specification Exclusively Discloses Setting Up Devices On An Ad-hoc Network ...............................................................................16

        B.      The Specification Distinguishes Ad-hoc and Access Point Networks ............................................................................................18

        C.      Summary Judgment Is Appropriate Because Extrinsic Evidence Cannot Cure The Lack Of Written Description ..................................21

V.      CONCLUSION ............................................................................................22

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Agilent Techs., Inc. v. Affymetrix, Inc.*,
567 F.3d 1366 (Fed. Cir. 2009) ......................................................... 15, 18, 20

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ................................................................ 16, 21

*Atl. Rsch. Mktg. Sys., Inc. v. Troy*,
659 F.3d 1345 (Fed. Cir. 2011) ........................................................... 14, 15, 19

*B & S Plastics, Inc. v. Custom Molded Prods., Inc.*,
630 F. Supp. 3d 1225 (C.D. Cal. 2022) (Kronstadt, J.) .................................... 14

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858 (Fed. Cir. 2004) ................................................................................ 5

*In the Matter of Certain Audio Players and Controllers, Components
Thereof, and Products Containing the Same*,
Inv. No. 337-TA-1191, The '883 ....................................................................... 13

*Cisco Sys., Inc. v. Cirrex Sys., LLC*,
856 F.3d 997 (Fed. Cir. 2017) ......................................................................... 15, 18

*Driessen v. Sony Music Entm't*,
640 F. App'x 892 (Fed. Cir. 2016) ............................................................. 8, 18, 20

*Flash-Control, LLC v. Intel Corp.*,
2021 WL 2944592 (Fed. Cir. July 14, 2021) ................................................... 22

*Forest Labs., LLC v. Sigmapharm Labs., LLC*,
918 F.3d 928 (Fed. Cir. 2019) ............................................................................... 5

*ICU Med. Inc. v. Alaris Med. Sys., Inc.*,
558 F.3d 1368 (Fed. Cir. 2009) ...................................................................... 14, 21

*Impact Engine, Inc. v. Google LLC*,
2024 WL 3287126 (Fed. Cir. July 3, 2024) ................................................... 14, 22

*In re Katz Interactive Call Processing Patent Litig.*,
639 F.3d 1303 (Fed. Cir. 2011) ........................................................................... 14

*Kim Laube & Co., Inc. v. Wahl Clipper Corp.*,
2013 WL 12085352 (C.D. Cal. Mar. 8, 2013) (Kronstadt, J.)............................14

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997)................................................ 14, 21, 22

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*,
298 F.3d 1290 (Fed. Cir. 2002)..........................................................22

*Novozymes A/S v. DuPont Nutrition Bioscis. APS*,
723 F.3d 1336 (Fed. Cir. 2013)..........................................................20

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008)...................................................... 15, 21

*PureCircle USA Inc. v. SweeGen, Inc.*,
2022 WL 1769118 (C.D. Cal. May 23, 2022), *aff'd*, 2024 WL
20567 (Fed. Cir. Jan. 2, 2024)..........................................................14

*Rivera v. ITC*,
857 F.3d 1315 (Fed. Cir. 2017)....................................................8, 19, 21

*SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001)..........................................................19

*Seagen Inc. v. Daiichi Sankyo Co., Ltd.*,
160 F.4th 1322 (Fed. Cir. 2025).........................................................21

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998).....................................................14, 19

**Statutes**

35 U.S.C §§ 102 & 103...................................................................2

35 U.S.C. § 112 ..................................................................2, 15, 22

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................13

## I.    **<u>INTRODUCTION</u>**

The claims of Sonos, Inc.'s ("Sonos") U.S. Patent Nos. 10,439,896 ("'896 patent") and 10,541,883 ("'883 patent") (together, the "Asserted Patents") are invalid under 35 U.S.C. § 112(a) for lack of written description.  The asserted claims of the Asserted Patents are directed to using a "computing device," such as a personal computer, to add a "playback device," such as a speaker, to a specific type of network: "a secure wireless local area network (WLAN) ***that is defined by an access point***." Ex. A[1] ('896 patent) at claim 1 (emphasis added).  But the concept of adding a playback device to a network defined by an access point does not exist in the shared specification of the Asserted Patents.

The intrinsic record resolves these issues as a matter of law.  The shared specification presents two different types of prior art networks:  an Access Point network and an Ad-hoc network. *Id.* at 1:58-60.  "The distinction between these two types of network [sic] is a common knowledge to the IT professionals." *Id.* at 1:60-62.  "[A]n Ad-Hoc (or 'spontaneous') network is a local area network or other small network in which there is no one access point for all traffics.  With an established Ad-Hoc network, the devices … can all communicate with each other in 'peer-to-peer' style of communication." *Id.* at 9:6-11.  In contrast, an Access Point network is defined by an access point that acts as a central hub, and all communication traffic runs through this access point. *See* ECF No. 148-6 (Sonos's claim construction evidence).  Every embodiment in the specification addresses an allegedly inventive way to add playback devices to an Ad-hoc network, not an Access Point network.

For the first twelve years of prosecution based on the relevant 2005 specification, none of the claims issued in this patent family mentioned an "access point."  But in the continuation applications that became the Asserted Patents, Sonos

---

[1]  References to "Ex. __" refer to the exhibits attached to the Declaration of Ognjen Zivojnovic ("Zivojnovic Decl.") filed herewith.

amended the claims in July 2019 to require WLANs "defined by an access point." The mismatch between what the specification described (a way to add playback devices to an *Ad-hoc* network) and what Sonos later claimed (a way to add playback devices to *an Access Point* network) renders the Asserted Patents invalid under 35 U.S.C. § 112.

## II.    FACTUAL BACKGROUND

### A.    The Shared Specification

The Asserted Patents[2] share an identical specification and are continuations tracing their alleged priority back through a chain of applications to U.S. Application No. 11/147,116, filed June 6, 2005.  *See* Ex. A ('896 patent) at 2; Ex. B ('883 patent) at 2.  The Asserted Patents relate to techniques for setting up a playback device on a wireless network.

1.    *The specification distinguishes Access Point networks and Ad-hoc networks.*

According to the shared specification, in the prior art, the information required to connect a device to a wireless network was "relatively technical to the average consumers." Ex. A ('896 patent) at 1:55-60. "FIG. 5 shows an exemplary setting 500 for connecting a computer to a wireless network":

---

[2]   Google's motion addresses two of the ten patents that Sonos has asserted against Google.  Google moves for summary judgment based on written description because this issue is ripe for adjudication and would obviate the need to litigate Google's other defenses for these two patents, such as invalidity under 35 U.S.C §§ 102 & 103.

DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT

(Prior Art)   **FIG. 5**

*Id.* at Fig. 5 (annotated).

The user is presented with two mutually exclusive choices for "Network Type": "Access Point (infrastructure)" or "Computer-to-computer (Ad Hoc)." *Id.* (annotated in the red box); *id.* at 1:57-63 ("There are two choices 502, Access Point (infrastructure) and Computer-to-computer (Ad Hoc). The distinction between these two types of network is a common knowledge to the IT professionals yet can be a difficult question to the average consumers.").

***Access Point networks*** have an access point that "serves as the network hub," and "[e]ach computer on the wireless network communicate[s] … with the access point." ECF No. 148-6 (cited by Sonos during claim construction). ***Ad-hoc networks***, also called "peer-to-peer" or "mesh" networks, are decentralized networks in which devices communicate directly with each other without any central access point. The specification defines this network as one where "there is no one access point for all traffics" and the devices "all communicate with each other in 'peer-to-peer' style of communication." Ex. A ('896 patent) at 9:6-14; *see also* ECF No. 148-7 (peer-to-peer "allows devices … to connect directly to each other via Wi-Fi without an intermediate access point") (cited by Sonos in claim construction). Sonos itself

highlighted this "distinction" when it argued in claim construction that "ad hoc networks need not have access points." Ex. C (Feb. 23, 2026 Hearing Tr.) at 31:23-32:5; *see also* ECF No. 200 (adopting Sonos's construction in relevant part).

The Asserted Patents illustrate these defining characteristics of an Ad-hoc network in Figure 3A, reproduced below.



**FIG. 3A**

Ex. A ('896 patent) at Fig. 3A. Figure 3A shows that the Ad-hoc network 310 is made up of "three zone players 302, 304 and 306 and a controller 308." *Id.* at 9:1-3. The zone players are audio players. *Id.* at 5:48-50. The controller can be, for example, a handheld device that can be used to "select an audio source for playback" and "manage (e.g., add, delete, move, save, or modify) a playlist." *Id.* at 7:41-45. "With an established Ad-Hoc network, *the devices 302, 304, 306 and 308 can all communicate with each other in 'peer-to-peer' style of communication*." *Id.* at 9:8-11 (emphasis added). Unlike an Access Point network, the Ad-hoc network 310 lacks an access point to act as a hub for all communications. Figure 3A also shows the Ad-

hoc network 310 can be connected to other networks, which are shown as the cloud labeled "Internet or LAN." *Id.* at Fig. 3A.

> ### 2. *The specification only discloses adding a playback device to an Ad-hoc network, not an Access Point network.*

The "distinction" (Ex. A ('896 patent) at 1:57-63) between these two network types matters because the specification only describes adding playback devices to an Ad-hoc network. Sonos chose Ad-hoc networks because, according to Sonos, "[f]or home entertainment products, there is a clear need to create simple methods of setting up and maintaining a secure wireless/wired in-home network with minimum human interventions." *Id.* at 2:1-4. The specification exclusively discloses using Ad-hoc networks to "automatically configur[e] necessary parameters of a device to be coupled to a network with minimum human intervention." *Id.* at 4:65-67.

This focus on Ad-hoc networks begins in the Summary of the Invention:[3] "an Ad-hoc (wireless or wired) network is established to facilitate communications among a group of devices." *Id.* at 2:18-21. The Summary further describes that when a new device is added to the network, "a rudimentary communication path is initially established between one of the devices in the network ('first device') and the new

---

[3] Statements in the Summary of the Invention describing the patented invention carry particular weight in assessing the scope of what the inventors disclosed and possessed. *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term," and "are more likely to be found in certain sections of the specification, such as the Summary of the Invention."). And "[w]hen a patent … describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (citation omitted) (ellipsis in original) (limiting claims to "sublingual or buccal" formulations based on specification's statement that "[t]he invention relates to a sublingual or buccal pharmaceutical composition"). Here, the Summary of the Invention exclusively discusses the "the present invention" in connection with an Ad Hoc network. *See* Ex. A ('896 patent) at 2:8-4:32.

-5-

device ('second device') such that necessary parameters (e.g., SSID, WEP security, channel frequency) can be exchanged for the second device to function properly in the network." *Id.* at 2:22-30.  The Summary never discloses adding a playback device to an Access Point network, much less a secure WLAN defined by an access point.

The rest of the specification similarly describes the claimed invention solely in connection with "Ad-Hoc network 310," shown in Figure 3A.  In Figure 3A, Ad-hoc network 310 "is a local area network or other small network in which there is no one access point for all traffics." *Id.* at 9:6-9.  Rather, "the devices … can all communicate with each other in 'peer-to-peer' style of communication."  *Id*. at 9:9-11.  This is visible in Figure 3A, where each of three zone players (referred to as "ZP" and also "playback devices" in the claims) 302, 304, 306 and control point (referred to as "CP," though occasionally misspelled as "GP," and also "computing device" in the claims) 308 have a direct connection to every other device in Ad-hoc network 310, and no access point present.  *See id.* at Fig. 3A.

The specification goes on to explain that Ad-hoc network 310 "may be characterized by a unique HHID [Household ID] and a unique set of configuration variables or parameters, such as Channels (i.e., respective frequency bands), SSID (a sequence of alphanumeric characters as a name of a wireless network), and WEP keys (wired equivalent privacy, or simply security keys)." *Id.* at 9:28-35.  These "required network parameters" are "automatically generat[ed]" by the "Control Point." *Id.* at 9:44-47.  This is true for every single parameter (other than factory defaults that are overwritten during initial setup) that defines Ad-hoc network 310:

- "HHID":  "automatically generated by the CP"

- "SSID":  "automatically generated by the CP"

- "WEP Key":  "automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the [C]P)"

- "Channel":  "[C]P probes the network looking for an acceptable channel"

*Id.* at 14:15-31.

To add a new ZP to the Ad-hoc network 310, the specification describes a five-message exchange (depicted in Fig. 3B). *Id.* at 12:63-14:51.



*Id.* at Fig. 3B. When a user activates the configuration process (by pressing buttons on both the ZP and CP), the ZP periodically transmits an "Alive" message on available wireless channels indicating it is available for configuration. *Id.* at 13:10-13. The CP receives this message and sends a "QueryNetParams" request asking for the ZP's current network configuration. *Id.* at 13:14-18. The ZP responds with a "RespondNetParams" message containing its current configuration (if any) and its RSA public key. *Id.* at 13:19-28. The CP then determines the appropriate configuration and sends a "SetNetParams" command containing the new parameters, encrypted with the ZP's public key. *Id.* at 13:29-37. Finally, the ZP acknowledges with an "AckNetParams" message. *Id.* at 13:38-42.

The specification enumerates all four possible CP/ZP configuration scenarios in a matrix, copied and summarized below (with "GP" corrected to "CP"). *Id.* at 14:1-14. When the first "ZP" and "CP" are set up (i.e., both are "Not Configured"), the "CP generates new config parameters." *Id.* Thereafter, every new device receives those same "config parameters" from a previously set up "ZP" or "CP." *Id.* No scenario involves an access point defining parameters, or any device receiving parameters from an access point. *Id.*

|  | CP Already Configured | CP Not Configured |
|---|---|---|
| **ZP Already Configured** | CP sends SetNetParams to ZP containing CP's current net config. | CP sets its own config to match ZP's config; process terminates. |
| **ZP Not Configured** | CP sends SetNetParams to ZP containing CP's current net config. | CP generates new config parameters and sends them to ZP; CP sets its own config to match. |

> 3. *The specification discloses a device on an Ad-hoc network that can be separately connected to an access point, but the access point is not part of and does not define the network.*

The Detailed Description includes the words "access points," but the "mere presence of these words in isolation does not suffice" to provide written description support. *Driessen v. Sony Music Entm't*, 640 F. App'x 892, 896 (Fed. Cir. 2016). The specification only refers to "access points" that exist in networks that are outside of the Ad-hoc network that is the subject of the alleged invention. Ex. A ('896 patent) at 10:37-42.

To further emphasize that an "access point" is not part of the Ad-hoc network, the specification introduces a different device that couples an Ad-hoc network to an access point. *Id.* at 2:54-56. The specification calls this separate device an "access *device*" (also referred to as an "access zone player").[4] *Id.* at 2:54-56, 6:63-67 (emphasis added). The Summary of the Invention states that "either a handheld controller or a zone player (referred to as an ***access device***) is coupled to an ***access point*** of a LAN." *Id.* at 2:55-57 (emphases added). The Detailed Description also describes the access ***device*** as having "a wired interface 217" in addition to "wireless interface 216" that allows it to be "coupled to an access ***point*** of an LAN" in addition

---

[4] An "access point" is different from an "access device." *See Rivera v. ITC*, 857 F.3d 1315, 1321 (Fed. Cir. 2017) (where the intrinsic evidence distinguishes two terms, the specification's disclosure of only one cannot supply written description support for claims requiring the other).

to "communicat[ing] with other zone players wirelessly." *Id.* at 6:63-67, 10:4-8 (emphasis added).

While the specification discloses that an "Ad-hoc network can be thus formed *based on the access device*," there is no such disclosure for an access point. *Id.* at 2:57-60 (emphasis added). Even when the access device in the Ad-hoc network is connected to an access point, the Ad-hoc network is nevertheless "formed based on the access device," and not "defined by an access point," as claimed. *Id.* at 2:50-58. In other words, the specification discloses an Ad-hoc network coupled to an access point through an access device. The access device exists so that an Ad-hoc network can communicate with *other* networks outside of the Ad-hoc network. It does not disclose an Ad-hoc network "defined by an access point," as the claims require.

### B.     The 2004 Provisional Application

The shared specification claims priority to Provisional Application No. 60/577,284, filed June 5, 2004 (the "'284 provisional application"), which has similar disclosures to the shared specification and also never discloses adding a playback device to a network defined by an access point. The '284 provisional application discloses an invention that allegedly "solved" the problem of "discovery of new devices, available for configuration/initialization into *the ad hoc network*." Ex. D ('284 provisional application), App. at 2 (emphasis added). The inventors called their network the "Rincon ad hoc network." *Id.* Rincon was the original name for Sonos. Ex. S at 9. The '284 provisional application discloses the same steps for adding a playback device to an Ad-hoc network. *Compare* Ex. A at Fig. 3B, *and* Ex. D at Fig. 3. Just like the shared specification, the '284 provisional application mentions "access points" once and only in the context of setting up the Rincon Ad-hoc network to avoid traffic and noise from other networks and access points. Ex. D, App. at 4.

### C.      Sonos's Patent Prosecution History

Sonos filed the original provisional application for this patent family on June 5, 2004.  See Ex. A ('896 patent) at 2.  The first non-provisional application (No. 11/147,116) was filed on June 6, 2005 and matured into U.S. Pat. No. 8,326,951 (the "'951 patent"), which issued on December 4, 2012.  Ex. E ('951 patent).  The '951 patent is titled "Establishing a Secure Wireless Network with Minimum Human Intervention" and contains 37 claims, all of which are directed to setting up devices on a generic "secure network."  *See generally id.*  Not one of the 37 original claims recites an "access point" or any language requiring an access point network architecture.  *See id.* at claims 1-37.

In September 2014, Sonos filed yet another continuation with the same specification as the Asserted Patents, U.S. Patent Application No. 14/486,667 (the "'667 application").  *See* Ex. G (U.S. Patent No. 9,866,447).  During prosecution of the '667 application, Sonos for the first time on February 7, 2017, added a limitation specifying that the "wireless network" to which a playback device is added is "provided by a wireless access point."  Ex. F ('667 application, "Amendments to the Claims").  The '667 application then issued as U.S. Patent No. 9,866,447 in 2018 (the "'447 patent").  Ex. G ('447 patent).

After the '447 patent issued, Sonos doubled down on claiming Access Point networks.  The '896 and '883 patents were originally filed on March 11, 2019, with claims directed to a generic "secure wireless local area network (WLAN)."  Exs. H ('896 original claims) & I ('883 original claims).  On July 22, 2019, to overcome prior art rejections, Sonos amended both pending applications to specify that the playback device is added to "a secure wireless local area network (WLAN) that is defined by an access point."  Exs. J ('896 claim amendment) & K ('883 claim amendment).  ***The issued '896 patent claims*** are thus directed to a computing device that, "while operating on a secure wireless local area network (WLAN) that is defined by an access point," receives user input indicating a user wishes to set up a playback device to

-10-                    Case No. 2:20-cv-00169-JAK (DFMx)

operate on that same "secure WLAN," transmits "an identifier of the secure WLAN and a security key for the secure WLAN" to the playback device over an "initial communication path" that "does not traverse the access point," and then "transition[s] … to communicating with the given playback device via the secure WLAN that is defined by the access point." Ex. A ('896 patent) at claim 1. **The issued '883 patent claims** are substantively identical for purposes of this motion to the '896 patent claims but written from the perspective of the "playback device" that is being set up. *See* Ex. B ('883 patent) at claim 1.

### D.     Sonos's Change In Prosecution Impermissibly Captured The Access Point Networks That Others Were Already Using

The specification does not disclose adding a device to an Access Point network, much less a secure WLAN defined by an access point, because Sonos had not figured out how that worked until years later. From the outset, Sonos's original products used an Ad-hoc network. As the inventors disclose in the '284 provisional application, Sonos originally designed the "Rincon ad hoc network" (Ex. D ('284 provisional application), App. at 2), which Sonos rebranded as SonosNet. For "the ease of setup," Sonos made the "critical decision" to use an Ad-hoc network called SonosNet for setting up a new device:

> A second critical decision was to use a proprietary mesh network, SonosNet, rather than work with existing 802.11-based access points. The downside to the mesh is that at least one unit must be wired to the home network (now mitigated with the ZoneBridge). "But this is more than outweighed by the ease of setup, the increased range of the mesh and some other, more-minor changes that increase the robustness of the network," Schulert said.

Ex. L (SONOS-ITC-00376817) at 376818.

Due to the nature of being an Ad-hoc network, SonosNet required "that at least one unit must be wired to the home network." *Id.* As time passed, Sonos discovered that ███████████████████████████████████████████████████████████ ████ ██████. Ex. M (SONOS-ITC-00243535) at 243535. Sonos began investigating the possibility of switching to an Access Point network, but named

inventor, Nicholas ("Nick") Millington, recognized that ███████████████████████ ████████████████████████████████████████ " (*id.*), otherwise known as an Access Point network.  *See* Ex. A ('896 patent) at Fig. 5 ("Access Point (Infrastructure)").  ███████████████████████████████████



Ex. N (SONOS-ITC-00761062) at 761063 (annotated).

Unable to solve this problem, Sonos started falling behind.  By 2013, Google released its own Chromecast product, which could be added directly to a user's access-point-based home network without a first wired connection.  *See* Ex. O (SONOS-ITC-00446713).  It was not until April 2014 that Sonos finally announced that it had "found a way" to eliminate the "first wire" problem, and instead allowed users to wirelessly setup a speaker to a home network.  Ex. P (Sonos Blog).

Only after Google and others allowed users to connect products to their home Access Point networks did Sonos release its own solution, internally called ███  ████████    Ex. Q (SONOS-ITC-00249039).   ████████████████ ████████████████████████████████████████████ ████████████████████. *Id.* at 249039.   The user would " ███████████ ███████████████████████████." *Id.*   The speaker would then ████████ ██████████████████████████████████" and, once verified, " ██████████ ███████████" *Id.*   Once the ████████████ was completed, Sonos ██████ ████████████████████████████████████████████████ ██████████████████████████████████ Ex. R (Complainant's Fifth Supplemental Response and Objections to Respondents' First Set of Interrogatories) at 102.

Thus, Sonos finally added support for adding a playback device to a network "defined by an access point," as claimed in the '896 and '883 patents, in September 2014—***more than 10 years*** after filing the shared specification for the '896 and '883 patents.  Ex. D ('284 provisional application).

### E.    Litigation History

Google previously raised the lack of written description for the claims of the '896 patent in *In the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1191.[5]  Google voluntarily dropped the issue for reasons unrelated to the merits.  Therefore, no judge has ruled on this issue previously.

### III.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A patent's specification must "reasonably convey to one of skill in the

---

[5]  The '883 patent was not asserted in that action.

art that the inventor possessed the later-claimed subject matter" at the time of the original filing. *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997). The patentee shows possession "by such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention." *Lockwood*, 107 F.3d at 1572. Every limitation of the claim must actually be present in the specification; it is not enough that the claimed invention would have been an obvious variation of what is disclosed. *Id.* at 1571-72. The specification need not use identical language but "must contain an equivalent description of the claimed subject matter." *Id.* at 1572.

Although written description is a question of fact, courts, including this Court, frequently grant summary judgment of invalidity on this ground. *See, e.g.*, *Kim Laube & Co., Inc. v. Wahl Clipper Corp.*, 2013 WL 12085352, at *5-6 (C.D. Cal. Mar. 8, 2013) (Kronstadt, J.); *B & S Plastics, Inc. v. Custom Molded Prods., Inc.*, 630 F. Supp. 3d 1225, 1232-34 (C.D. Cal. 2022) (Kronstadt, J.) (granting summary judgment that certain asserted claims are not entitled to priority date of the provisional application based on lack of written description); *PureCircle USA Inc. v. SweeGen, Inc.*, 2022 WL 1769118, at *11 (C.D. Cal. May 23, 2022), *aff'd*, 2024 WL 20567 (Fed. Cir. Jan. 2, 2024); *ICU Med. Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376-79 (Fed. Cir. 2009); *Impact Engine, Inc. v. Google LLC*, 2024 WL 3287126, at *10 (Fed. Cir. July 3, 2024).

## IV. <u>ARGUMENT</u>

"The purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1354 (Fed. Cir. 2011) (quoting *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1319 (Fed. Cir. 2011)). The '896 and '883 patent claims are directed to adding a playback device to "a secure wireless local area network (WLAN) that is defined by an access point." Ex. A ('896

patent) at claim 1; *see also* Ex. B ('883 patent) at claim 1.  But the specification does not describe adding a playback device to an Access Point network.  *See generally* Ex. A ('896 patent); Ex. B ('883 patent).  Instead, the specification only discloses adding a playback device to an Ad-hoc network, which is a network the specification itself treats as a mutually exclusive alternative to a network "defined by an access point." *See generally* Ex. A ('896 patent); Ex. B ('883 patent).  The asserted claims exemplify those that are prohibited by 35 U.S.C. § 112.

"The written description doctrine prohibits new matter from entering into claim amendments, particularly during the continuation process." *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1379 (Fed. Cir. 2009).  For example, in *Atlantic Research Marketing Systems, Inc.*, the Federal Circuit invalidated a patent because the specification disclosed a two-attachment handguard, but the claims newly added in a reissue patent were directed to a single-attachment design.  659 F.3d at 1356.  The Federal Circuit held:

> Put differently, claims 31–36 exceed in scope the subject matter that inventor Mr. Swan chose to disclose to the public in the written description.  Therefore, we hold that the district court properly granted summary judgment invalidating claims 31–36 for failing to satisfy the written description requirement of 35 U.S.C. § 112.  Mr. Swan used the reissue process to impermissibly obtain claims unsupported by the written description.

*Id.* at 1355.

Sonos should be prevented from trying to capture technology it did not disclose in its specification.  This is not merely the case of a specification that does not provide written description support for a broader claim (which would also be invalid).  *Cf. Cisco Sys., Inc. v. Cirrex Sys., LLC*, 856 F.3d 997, 1003-10 (Fed. Cir. 2017) ("a broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope").  Here, the claims specifically require a network "that is defined by an access point" that is different from the Ad-hoc network disclosed in the specification.  That is not allowed.  *See, e.g., PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1308-11 (Fed. Cir. 2008) (affirming invalidity

Case No. 2:20-cv-00169-JAK (DFMx)
DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT

where all "embodiments that include the user interface describe a physical display that is a part of the vending machine," such that later claims reciting an interface located remotely from the machine were not supported).

**A.    The Claims Require Setting Up Devices On A Secure WLAN Defined By An Access Point Network, Whereas The Specification Exclusively Discloses Setting Up Devices On An Ad-hoc Network**

The written description inquiry is "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). The claims require a different architecture from what is described in the specification. Whereas the claims demand a WLAN defined by an access point, the specification teaches Ad-hoc networking and presents the two networks as mutually exclusive choices.

Claim 1 of the '896 patent requires the computing device to operate on "a secure wireless local area network (WLAN) that is defined by an access point"—*i.e.*, an Access Point network—to transmit the WLAN's identifier and security key to a playback device over an "initial communication path" that "does not traverse the access point," and then to "transition" from that initial path to "communicating with the given playback device via the ***secure WLAN that is defined by the access point***." Ex. A ('896 patent) at claim 1 (emphasis added). Claim 1 of the '883 patent requires "wherein the computing device is operating on ***a secure wireless local area network (WLAN) that is defined by an access point***, wherein the initial communication path with the computing device does not traverse the access point." Ex. B ('883 patent) at claim 1 (emphasis added). The other '896 patent and '883 patent independent claims include the same limitations. *See* Ex. A ('896 patent) at claims 13 & 20; Ex. B ('883 patent) at claims 14 & 20.

On the other hand, from start to finish, the specification describes adding a playback device to an Ad-hoc network, not a secure WLAN "defined by an access point," as claimed. *See generally* Ex. A ('896 patent); Ex. B ('883 patent). As

-16-                                    Case No. 2:20-cv-00169-JAK (DFMx)
DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT

established in Section II.A *supra*, the specification presents "Access Point" and "Ad Hoc" as different "choices" for network type and is clear that "[t]he distinction between these two types of network is a common knowledge to the IT professionals." Ex. A ('896 patent) at 1:57-63 & Fig. 5.  Sonos itself repeatedly emphasized this point during claim construction that these are distinct types of networks.  *See* Ex. C (Feb. 23, 2026 Hearing Tr.) at 31:23-32:5 ("ad hoc networks need not have access points"); *see also* ECF No. 200 (adopting Sonos's construction in relevant part).  After presenting these two choices in the Background section, the specification goes on to exclusively describe its invention in connection with Ad-hoc networking.  This exclusive focus on Ad-hoc networking pervades every level of the specification's disclosure.  The Summary of the Invention states that "an Ad-hoc (wireless or wired) network is established to facilitate communications among a group of devices."  *Id.* at 2:18-21.  The Detailed Description opens its technical discussion by stating, "a wired and/or wireless Ad-hoc network is established to facilitate communications among a group of devices."  *Id.* at 5:1-3.  It then defines its network—"Ad-Hoc network 310"—as one in which "there is no one access point for all traffics" and in which devices "all communicate with each other in 'peer-to-peer' style of communication."  *Id.* at 9:6-14.  And the specification concludes by characterizing its own invention in the same terms:  "the present invention provides techniques for automatically configuring parameters of a device to be coupled to an Ad-hoc network, where the Ad-hoc network forming by a group of devices can be wireless, wired or a combination of both."  *Id.* at 17:39-43.

All the embodiments in the specification describe adding devices exclusively to "Ad-Hoc network 310."  *See generally* Ex. A ('896 patent).  The sole network topology (*id.* at Fig.. 3A), the Control Point's self-generation of every parameter, the four-scenario configuration matrix, and the peer-to-peer five-message bootstrap exchange (*see* Section II.A *supra*) all operate without any access point.

There is no corresponding description, at any level of the specification, of

Case No. 2:20-cv-00169-JAK (DFMx)
DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT

adding a device to a network "defined by an access point," as claimed. No embodiment involves an access point defining any network to which a playback device is added. Indeed, the embodiments in the specification are incompatible with the claims. In the embodiments, the devices are on "Ad-hoc network 310" after setup is complete (*see, e.g.*, Ex. A ('896 patent) at 9:1-41); in the claims, both the computing device and the playback device "transition" to communicating via a secure WLAN defined by an access point (Ex. A ('896 patent) at claim 1; Ex. B ('883 patent) at claim 1). In the embodiments, no access point is relevant to the setup process at all (*see generally* Ex. A ('896 patent)); in the claims, the access point is the entity whose secure network both devices ultimately join (Ex. A ('896 patent) at claim 1; Ex. B ('883 patent) at claim 1).

For this reason alone, the Asserted Patents are invalid for lack of written description. *See, e.g.*, *Cisco*, 856 F.3d at 1003-10 (holding claims invalid where specification described performing the claimed functions outside the planar lightguide circuit but claims required performing them inside it).

**B.    The Specification Distinguishes Ad-hoc and Access Point Networks**

The specification's references to an "access point" to describe a separate network do not provide written description support for the claims. *See Driessen*, 640 F. App'x at 896 ("mere presence of these words in isolation does not suffice" to provide written description support); *Cisco*, 856 F.3d at 1003-10 (missing disclosure could not be supplied by specification's references to the same functions in a different context); *Agilent Techs.*, 567 F.3d at 1382 (specification's references to "bubbles" did not support claim where bubbles were disclosed only in embodiments "inextricably wedded" to and "inconsistent with" the claimed method). Indeed, far from describing adding devices to a secure WLAN defined by an access point, the specification's references to an "access point" only distinguish Access Point networks from Ad-hoc networks. Ex. A ('896 patent) at 1:58-62 ("There are two choices 502, Access Point (infrastructure) and Computer-to-computer (Ad Hoc). The distinction between these

two types of network is a common knowledge to the IT professionals….”).  The specification also touts the benefits of using an Ad-hoc network:

> In general, an Ad-Hoc (or “spontaneous”) network is a local area network or other small network in which there is no one access point for all traffics.  With an established Ad-Hoc network, the devices 302, 304, 306 and 308 can all communicate with each other in ‘peer-to-peer’ style of communication.  Furthermore, any device may come/go from the network and the network will automatically reconfigure itself without needing the user to reconfigure the network.

*Id.* at 9:6-14.  Sonos itself confirmed the beneficial distinction between these two networks during claim construction, arguing that “ad hoc networks need not have access points.”  Ex. C (Feb. 23, 2026 Hearing Tr.) at 31:23-32:5; *see also* ECF No. 200 (adopting Sonos’s construction in relevant part).

Such statements make clear that the specification discloses only adding playback devices to Ad-hoc network and nothing more.  *See*, *e.g.*, *Tronzo*, 156 F.3d at 1158-59 (finding an early application lacked written description support for the claims because “the only reference in the ’589 patent’s specification to different shapes is a recitation of the prior art” and “[i]nstead of suggesting that the ’589 patent encompasses additional shapes, the specification specifically distinguishes the prior art as inferior and touts the advantages of the conical shape” disclosed in the specification); *Atl. Rsch. Mktg. Sys., Inc.*, 659 F.3d at 1354-55 (affirming summary judgment where specification disclosed two-attachment handguard but reissue claims generically covered single-attachment design); *SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001) (finding lack of written description where specification described coaxial lumen as “the basic sleeve structure for all embodiments of the present invention” and distinguished prior-art dual-lumen configurations).

The specification’s references to an “access device” fare no better.  The ’896 and ’883 patent specification consistently describes “access device” and “access point” as different components with different purposes.  *See Rivera*, 857 F.3d at 1321 (finding no written description where “[t]he disclosure of the ’320 patent consistently

describes an invention in which the 'pod' and the receptacle or container are distinct components. … Whatever a 'pod' is, the specification indicates that it is distinct from the receptacle ….").  The "access point" in the claims "define[s]" the network to which devices are added.  That is because the "access point" is the "hub" for all communication on that network.  ECF No. 148-6.  The "access device" in the specification is a bridge between an access point and the Ad-hoc network to which additional devices are added.  It does not "define[]" the Ad-hoc network.  Nor is there any disclosure that the access device meets the requirements the claims attribute to the "access point," including "defin[ing]" the secure WLAN without subsequently participating in providing network configuration parameters to a new playback device—the same requirements that Sonos relied upon to obtain the '896 and '883 patents in the first instance.  Exs. J ('896 claim amendments) & K ('883 claim amendments); *see also Agilent Techs.*, 567 F.3d at 1382 (specification's references to a claimed element could not supply written description support where those references appeared only in a context incompatible with the claim's other limitations); *Driessen*, 640 F. App'x at 896 (newly claimed terms not "implicitly present in the application's references to [] distinct concepts" already disclosed).  Indeed, the fact that the specification requires such an "access device" to bridge the gap from the Ad-hoc network to an access point outside that network only further underscores that the specification lacks disclosure of adding playback devices directly to a network "defined by an access point," as claimed.

Finally, even if the specification were agnostic to the type of network to which a playback device is added, that does not support the '896 and '883 patent claims directed more specifically to adding a playback device to a network "defined by an access point."  Ex. A ('896 patent) at claim 1; Ex. B ('883 patent) at claim 1; *see Novozymes A/S v. DuPont Nutrition Bioscis. APS*, 723 F.3d 1336, 1346 & 1349 (Fed. Cir. 2013) (specification providing only "generalized guidance listing several variables that might, in some combination, lead to a useful result" does not support

narrower claim to specific combination, even where each individual limitation was literally disclosed); *Seagen Inc. v. Daiichi Sankyo Co., Ltd.*, 160 F.4th 1322, 1330 (Fed. Cir. 2025) ("As we have consistently held, a patent's disclosure of a 'broad genus,' without more, is inadequate to satisfy the written description requirement for claims directed to a 'particular subgenus or species contained therein.'").

### C.   Summary Judgment Is Appropriate Because Extrinsic Evidence Cannot Cure The Lack Of Written Description

"The knowledge of ordinary artisans may be used to inform what is actually in the specification, but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure." *Rivera*, 857 F.3d at 1322 (internal citation omitted); *see also Ariad Phams.*, 598 F.3d at 1352 ("a description that merely renders the invention obvious does not satisfy the requirement"); *see also PowerOasis*, 522 F.3d at 1310 ("Obviousness simply is not enough; the subject matter must be disclosed to establish possession."); *ICU Med.*, 558 F.3d at 1379 ("It is not enough that it would have been obvious to a person of ordinary skill that a preslit trampoline seal could be used without a spike."). Courts focus not on what is permissible, but what is actually disclosed. *Lockwood*, 107 F.3d at 1572. Here, the specification only discloses using Ad-hoc networks. The asserted claims require what the specification does not describe: a system in which an access point defines the secure WLAN network, the computing device communicates over a path that bypasses the access point, and both the computing device and the playback device transition to communicating via the access-point-defined secure WLAN. Ex. A ('896 patent) at claim 1; Ex. B ('883 patent) at claim 1.

The written description deficiency also cannot be cured by expert testimony. Written description is an "objective inquiry into the four corners of the specification," *Ariad Pharms.*, 598 F.3d at 1351, and an expert cannot make the specification say what it does not say. In *Impact Engine*, for example, the Federal Circuit affirmed a written description invalidity finding on summary judgment even where the

patentee's expert offered testimony supporting the patentee's reading of the specification. 2024 WL 3287126, at *9-10. The court explained that such testimony "does not mean that the written description itself demonstrates to a relevant artisan that the inventors possessed the invention." *Id.* at *10. The court was explicit that the expert's testimony about what a skilled artisan "would have understood" did not alter the objective inquiry into what the specification actually discloses. *Id.*; *see also Flash-Control, LLC v. Intel Corp.*, 2021 WL 2944592, at *3-4 (Fed. Cir. July 14, 2021) ("pointing to an 'amalgam of disclosures' from which an artisan could have created the claimed invention does not satisfy this requirement"; the specification must present the claimed invention as an "integrated whole"); *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294-95 (Fed. Cir. 2002) (testimony created no genuine issue where provisional application did not describe the claimed invention); *Lockwood*, 107 F.3d at 1572.

## V.    CONCLUSION

Google requests that the Court enter summary judgment that the Asserted Patents are invalid under 35 U.S.C. § 112(a).

DATED: June 17, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By      */s/ Ognjen Zivojnovic*
Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Melissa J. Baily (SBN 237649)
melissabaily@quinnemanuel.com
James D. Judah (SBN 257112)
jamesjudah@quinnemanuel.com
Ognjen Zivojnovic (SBN 307801)
ogizivojnovic@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
Fax: (415) 875-6700

Lance Yang (Bar No. 260705)
lanceyang@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: (213) 443-3000
Fax: (213) 443-3100

*Attorneys for Defendant Google LLC*

# CERTIFICATE OF COMPLIANCE

I, Ognjen Zivojnovic, counsel of record for Defendant Google LLC, certifies that this brief contains 6,998 words, which complies with the word limit of L.R. 11-6.1.

DATED: June 17, 2026

Respectfully submitted,

By: /s/ *Ognjen Zivojnovic*
Ognjen Zivojnovic (SBN 307801)
QUINN EMANUEL URQUHART & SULLIVAN, LLP

## CERTIFICATE OF SERVICE

I, Ognjen Zivojnovic, certify that pursuant to Local Rule 5-3, counsel of record who have consented to electronic service are being served on June 17, 2026 with copies of the attached document(s) via the Court's CM/ECF system, which will send notification of such filing to counsel of record.

DATED: June 17, 2026

Respectfully submitted,

By: /s/ *Ognjen Zivojnovic*
Ognjen Zivojnovic (SBN 307801)
QUINN EMANUEL URQUHART & SULLIVAN, LLP