Clement S. Roberts (SBN 209203)
croberts@orrick.com
ORRICK HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700 / Fax: 415-773-5759

Alyssa M. Caridis (SBN 260103)
acaridis@orrick.com
ORRICK HERRINGTON & SUTCLIFFE LLP
355 South Grand Ave., Suite 2700
Los Angeles, CA 90071
Tel: 213-629-2020 / Fax: 213-612-2499

George I. Lee (*Pro Hac Vice*)
lee@ls3ip.com
Sean M. Sullivan (*Pro Hac Vice*)
sullivan@ls3ip.com
Rory P. Shea (*Pro Hac Vice*)
shea@ls3ip.com
J. Dan Smith (*Pro Hac Vice*)
smith@ls3ip.com
Cole B. Richter (*Pro Hac Vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W. Randolph Street, Floor 5W
Chicago, IL 60661
Tel: 312-754-0002 / Fax: 312-754-0003

*Attorneys for Plaintiff, SONOS, INC.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONOS, INC.,<br><br>    *Plaintiff-Counterclaim Defendant,*<br><br>    vs.<br><br>GOOGLE LLC,<br><br>    *Defendant-Counterclaimant*. | CASE NO. 2:20-cv-00169-JAK (DFMx)<br><br>**SONOS INC.'S OPPOSITION TO GOOGLE LLC's MOTION FOR SUMMARY JUDGMENT RE WRITTEN DESCRIPTION** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    RELEVANT BACKGROUND....................................................................... 3

III.   LEGAL STANDARD ..................................................................................... 4

IV.    THE '896 AND '883 PATENTS ADEQUATELY DESCRIBE ADDING A PLAYBACK DEVICE TO AN ACCESS POINT NETWORK. ...................................................................................................... 6

    A.     The patents disclose adding a device to a variety of network types, including infrastructure networks................................................. 6

    B.     The patents disclose an ad-hoc network defined by an access point........................................................................................................ 10

    C.     Google's resort to irrelevant extrinsic evidence does not warrant summary judgment................................................................... 16

V.     CONCLUSION ............................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) (en banc) ..........................................................5

*B & S Plastics, Inc. v. Custom Molded Prods., Inc.*,
    630 F. Supp. 3d 1225 (C.D. Cal. 2022) ...............................................................5

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004) .............................................................................7

*Centrak, Inc. v. Sonitor Techs., Inc.*,
    915 F.3d 1360 (Fed. Cir. 2019) ...........................................................................9

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
    657 F.3d 936 (9th Cir. 2011) ...............................................................................4

*Cordis Corp. v. Medtronic AVE, Inc.*,
    339 F.3d 1352 (Fed. Cir. 2003) .........................................................................16

*Falkner v. Inglis*,
    448 F.3d 1357 (Fed. Cir. 2006) ...........................................................................4

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*,
    918 F.3d 928 (Fed. Cir. 2019) ...........................................................................16

*Fujikawa v. Wattanasin*,
    93 F.3d 1559 (Fed. Cir. 1996) ...........................................................................16

*Hologic, Inc. v. Smith & Nephew, Inc.*,
    884 F.3d 1357 (Fed. Cir. 2018) ...................................................................10, 16

*Impact Engine, Inc. v. Google LLC*,
    No. 2022-2291, 2024 WL 3287126 (Fed. Cir. July 3, 2024) ...............................5

*Invitrogen Corp. v. Clontech Lab'ys.*,
    429 F.3d 1052 (Fed. Cir. 2005) ...........................................................................4

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999) ..................................................................... 10, 15

*Lampi Corp. v. Am. Power Prods., Inc.*,
  228 F.3d 1365 (Fed. Cir. 2000) ............................................................................. 8

*Lockwood v. Am. Airlines, Inc.*,
  107 F.3d 1565 (Fed. Cir. 1997) ........................................................................ 5, 8

*Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*,
  69 F.4th 1341 (Fed. Cir. 2023) ........................................................................... 15

*Nalpropion Pharms., Inc. v. Actavis Lab'ys FL, Inc.*,
  934 F.3d 1344 (Fed. Cir. 2019) ............................................................................. 5

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*,
  298 F.3d 1290 (Fed. Cir. 2002) ....................................................................... 5, 18

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) .......................................................................... 4, 11

*In re Rasmussen*,
  650 F.2d 1212 (C.C.P.A. 1981) ........................................................................... 15

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001) ........................................................................... 15

*Rivera v. ITC*,
  857 F.3d 1315 (Fed. Cir. 2017) ........................................................................... 14

*ScriptPro LLC v. Innovation Assocs., Inc.*,
  833 F.3d 1336 (Fed. Cir. 2016) ............................................................................. 9

*Source Search Techs., LLC v. LendingTree, LLC*,
  588 F.3d 1063 (Fed. Cir. 2009) ........................................................................ 4, 8

*Space Sys./Loral, Inc. v. Lockheed Martin Corp.*,
  405 F.3d 985 (Fed. Cir. 2005) ............................................................................. 17

*Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*,
  665 F.3d 1269 (Fed. Cir. 2012) ................................................................. 4, 17, 18

*Thorner v. Sony Comput. Entm't Am. LLC*,

669 F.3d 1362 (Fed. Cir. 2012) ...................................................................................14

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,

782 F.3d 671 (Fed. Cir. 2015) .......................................................................................5

**Court Rules**

Fed. R. Civ. P. 56(a) .........................................................................................................4

**Other Authorities**

U.S. Patent & Trademark Office, Manual of Patent Examining

Procedure § 2163 (9th ed. 2023) ..............................................................................3, 4

## I.    INTRODUCTION

Google seeks summary judgment of invalidity for lack of written description—a question of fact on which Google bears the burden of proof by clear and convincing evidence.  Google cannot show that a reasonable juror could only find in its favor, so summary judgment must be denied.  Alternatively, the Court can grant summary judgment of no invalidity for lack of written description because no reasonable juror could find that U.S. Patent Nos. 10,439,896 ("'896 patent") and 10,541,883 ("'883 patent") lack adequate written description for the limitation adding a playback device to "a secure wireless local area network (WLAN) that is defined by an access point."

The '896 and '883 patents describe various ways for adding a playback device (e.g., a smart speaker) to a secure wireless local area network (WLAN).  The shared specification discusses several types of networks and explains that the invention can be used with any of these networks.  For example, Figure 5 (a screen shot of a prior art interface) offers two choices of well-known networks, "Access Point (infrastructure)" and "Computer-to-computer (Ad Hoc)," with the "distinction between these two types of network [being] common knowledge to the IT professional[]." Google Ex. A ('896 patent) at 1:58-62.

The patents also disclose a third type of network that is a combination of these two well-known networks or a particular implementation of an ad-hoc network:  an ad-hoc network "coupled to an access point of a LAN."  *Id.* at 2:52-56.  Figure 3A and its corresponding disclosure provide more details of such an ad-hoc network defined by an access point. *Id.* at 9:1-10:8.

The patents then provide several examples of configuration processes for a playback device, including processes on infrastructure networks and ad-hoc networks defined by access points.  The specification thus describes, in multiple ways, the process of adding a playback device to a secure wireless local area network (WLAN) that is defined by an access point.  And, given that both ad-hoc and infrastructure networks were "common knowledge" to "IT professionals," the person of ordinary

-1-                          Case No. 2:20-cv-00169-JAK (DFMx)

skill in the art would understand that the specification teaches implementing its configuration process on any of those disclosed networks.

Google's motion largely ignores the breadth of these disclosures and does not view the specification from the perspective of a person of ordinary skill in the art, as is required in evaluating whether the patents comply with the written description requirement. As explained in the accompanying declaration of Mr. Chris Thompson, Sonos's technical expert on these patents, a person of ordinary skill in the art would understand that the specification discloses adding a playback device to a secure wireless local area network (WLAN) that is defined by an access point in at least two ways. *See* Declaration of Chris Thompson (Thompson Decl.) filed herewith.

First, even under Google's incorrect interpretation of the patents as only disclosing infrastructure networks with access points and ad-hoc networks without access points, the patents teach configuration processes that can be used with infrastructure networks. And Google does not dispute that an infrastructure network is "a secure wireless local area network (WLAN) that is defined by an access point," as recited by the asserted claims of the patents.

Second, contrary to Google's assertion, a person of ordinary skill in the art would understand that the patents also teach that their configuration processes can be used with an ad-hoc network defined by an access point, such as the exemplary network depicted in Figure 3A, which also constitutes "a wireless local area network (WLAN) that is defined by an access point." Either of those disclosures independently provides written description support for the claims, or at minimum creates a dispute of fact as to whether Google can prove, by clear and convincing evidence, that the patents are invalid.

Google's resort to extrinsic evidence that does not illuminate how a person of ordinary skill would understand the specifications is irrelevant and cannot neutralize the disputes of fact that would prevent a grant of summary judgment in favor of

Google.  Accordingly, the Court should deny Google's motion, or alternatively grant summary judgment in favor of Sonos.

## II.    RELEVANT BACKGROUND

The '896 and '883 patents share a specification.  ECF No. 216.01 (Google's Mot.) at 2; Google Ex. A ('896 patent); Google Ex. B ('883 patent). They claim priority to an application filed in 2005 (and to a provisional application filed in 2004) and describe methods for adding a playback device to a wireless network.  *Id.*  The specification provides examples of prior-art networks: "Access Point (infrastructure)" or "Computer-to-computer (Ad Hoc)."  '896 patent, Fig. 5.  The patent then describes methods of adding devices to a generic "data network," as in Fig. 1, or an ad-hoc network with an access point, as in Figure 3A, or using a controller "coupled to an access point of a network," as in Figure 4A.

The Patent Office examined the claims filed with Sonos's 2005 application, and ultimately issued claims to adding a playback device to a generic "secure network," which would encompass multiple types of networks.  *See* Google Ex. E, U.S. Pat. No. 8,326,951.  When Sonos filed and prosecuted those claims, the patent examiner was required to evaluate whether the claims had adequate written description support.  Manual of Patent Examining Procedure (MPEP) § 2163 (9th ed. 2023).  During examination, the examiner did not issue any written description rejection based on the "secure network" term.  Thompson Decl. ¶ 9.  In a later continuation application, Sonos filed claims to adding a playback device to a network "provided by a wireless access point."  Google Ex. F ('667 application, "Amendments to the Claims").  Here again, the examiner was required to evaluate the written description support for the claims and did not issue any rejections on based on "access point."  MPEP § 2163; Thompson Decl. ¶ 9.  Finally, when Sonos filed the claims that issued in the '896 and '883 patents, including the "wireless local area network (WLAN) that is defined by an access point," the examiner was once more required to evaluate whether the claims were supported by the specification.  MPEP § 2163.  The

-3-

examiner issued no written description rejections for "access point" this time either. Thompson Decl. ¶ 8.

Sonos sued Google for infringement of the '896 and '883 patents in district court, ECF No. 1, and on the '896 patent in the International Trade Commission, *see In the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1191.  Google argued that the '896 patent lacked adequate written description before the ITC.  Mot. at 13.  After the ITC trial on the merits, Google elected not to further pursue its written description defense in the ITC investigation.  *Id.*

## III.    LEGAL STANDARD

In the Ninth Circuit, summary judgment is appropriate when, "draw[ing] all reasonable inferences in favor of the non-moving party," there is no "genuine issue of material fact."  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (citing Fed. R. Civ. P. 56(a)).  "As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case."  *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (collecting cases).

Whether the specification complies with the written description requirement is a question of fact judged from the perspective of a person of ordinary skill.  *Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006).  Lack of written description must be established by clear and convincing evidence.  *Invitrogen Corp. v. Clontech Lab'ys.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).  In evaluating a motion for summary judgment of invalidity, the Court must "recognize[] the movant's burden to prove invalidity by clear and convincing evidence."  *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1069 (Fed. Cir. 2009) (reversing grant of summary judgment of invalidity).  Summary judgment that a patent contains an adequate written description is proper where the patent challenge cannot show a lack of adequate written description by clear and convincing evidence.  *See, e.g., Streck, Inc. v. Rsch. &*

*Diagnostic Sys., Inc.*, 665 F.3d 1269, 1284 (Fed. Cir. 2012) (affirming grant of summary judgment).

To satisfy the written description requirement, "the specification must describe an invention understandable to [a] skilled artisan and show that the inventor actually invented the invention claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). The necessary written description may be provided through the "words, structures, figures, diagrams, formulas, etc." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).

Expert testimony may be considered in evaluating the written description and may create a genuine dispute of material fact over the adequacy of the disclosure in favor of the patentee. *B & S Plastics, Inc. v. Custom Molded Prods., Inc.*, 630 F. Supp. 3d 1225, 1233 (C.D. Cal. 2022) (denying summary judgment of invalidity for lack of adequate written description and citing testimony from patentee's expert). *See also, e.g., Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 683 (Fed. Cir. 2015) (reversing grant of summary judgment of invalidity based on written description were patentee's expert "opinion, which was not challenged by any contrary expert testimony, at least raises a genuine issue of material fact regarding whether the patents-in-suit disclose how to access disparate databases."); *Ariad*, 598 F.3d at 1355-56 (crediting expert testimony regarding satisfaction of the written description requirement); *Nalpropion Pharms., Inc. v. Actavis Lab'ys FL, Inc.*, 934 F.3d 1344, 1349 (Fed. Cir. 2019) (same).[1]

_____

[1] Google's citations to *Impact Engine* and *New Railhead* do not foreclose consideration of expert testimony. Mot. at 21-22. In *Impact Engine*, the Court rejected expert testimony that conflated the enablement and written description requirements. *Impact Engine, Inc. v. Google LLC*, No. 2022-2291, 2024 WL 3287126, at *10 (Fed. Cir. July 3, 2024). And in *New Railhead* the Court rejected inventor testimony that was self-contradictory and also "conflates the concepts of written description and enablement." *New Railhead Mfg., L.L.C. v. Vermeer Mfg.*
(footnote continued)

## IV. THE '896 AND '883 PATENTS ADEQUATELY DESCRIBE ADDING A PLAYBACK DEVICE TO AN ACCESS POINT NETWORK.

The '896 and '883 patents disclose adding a playback device to an access point network for two independent reasons. First, the patents teach that their configuration processes can be used with a variety of network types, including infrastructure networks, which are undisputedly defined by an access point. *Infra* § A. Second, the patents teach that their configuration processes can be used with an ad-hoc network defined by an access point, such as the exemplary network of Figure 3A. *Infra* § B. Google's resort to irrelevant extrinsic evidence does not negate the intrinsic evidence demonstrating adequate support for the claims. *Infra* § C.

### A. The patents disclose adding a device to a variety of network types, including infrastructure networks.

The patents provide written description support for "a secure wireless local area network (WLAN) that is defined by an access point" through their broad disclosure of configuring playback devices with any secure WLAN, including networks configured for infrastructure mode (access point networks). While Google does not dispute that the patents disclose infrastructure networks and that an infrastructure network is "a secure wireless local area network (WLAN) that is defined by an access point," Google does dispute that the patents disclose configuration processes for an infrastructure network. Google is wrong.

The patents explain that there are typically two types of networks in the prior art, infrastructure (access point) and ad-hoc. '896 Patent, 1:57-60; Fig. 5 (prior art). Google does not dispute this. Instead, Google argues that only infrastructure networks have access points and that the patents' configuration processes are limited to ad-hoc

---

*Co.*, 298 F.3d 1290, 1295 (Fed. Cir. 2002). None of Google's remaining citations support exclusion of expert testimony on written description; on the contrary, *Ariad* considered expert testimony on this issue.

networks without access points. Even if Google were correct that the patents only disclose these two types of networks and that only infrastructure networks have access points, which both pure attorney argument and is not the case as explained below in § B, Google is incorrect that the patents' configuration processes are limited to ad-hoc networks without access points. The patents disclose that their configuration processes can be used with infrastructure networks.

The patents describe their invention as "related to techniques for connecting various devices to *a network* for secure communications," '896 Patent, 1:29-31, emphasis added, and "the present invention pertains to techniques for automatically configuring necessary parameters of a device to be coupled to *a network,*" *id.* at 2:16-18, emphasis added. These statements come *before* the statement that "According to *one aspect* of the present invention, an Ad-hoc (wireless or wired) network is established to facilitate communications among a group of devices." *Id.* at 2:18-21 (emphasis added). While Google highlights this "aspect" of the present invention as purportedly limiting, Mot. at 5 n.3, the Summary of Invention refers to set up on an ad-hoc network as merely an embodiment of the invention and set up on the generic network as "the present invention." So, if the Court gives special weight to statements in the Summary of Invention, the broader statement describing "the present invention" as relating the networks generally would take precedence over "one aspect of the present invention" relating to ad-hoc networks. *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term.").

The patents also depict networks that are not limited to ad-hoc networks, such as the generic "data network 108" shown in Figure 1. By describing the invention as applying to networks generally and providing multiple examples of types of networks, including at least infrastructure and ad-hoc networks, a person of ordinary skill in the art would have understood that the invention could be used with at least those

disclosed networks.  Thompson Decl. ¶¶11-16.  *See also Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000) (written description describing two-piece plastic shell casing was sufficient to support half-shells that are not identical, even when the detailed embodiments only showed identical half-shells.).[2]

Having described at least infrastructure and ad-hoc networks, networks, the patent does not limit itself to ad-hoc networks to the exclusion of other types of networks.  Instead, the patents explain, in the context of Figure 1, that "network 108 may be a wired network, a wireless network or a combination of both" and further that "[i]n one example, all devices including the zone players 102, 104 and 106 are coupled to the network 108 by wireless means based on an industry standard such as IEEE 802.11" and that "all devices including the zone players 102, 104 and 106 are part of a local area network that communicates with a wide area network (e.g., the Internet)."  '896 patent at 5:66-6:5.  A person of ordinary skill would understand that the generic network 108 may be any type of network disclosed in the patents, including an infrastructure network defined by an access point network.  Thompson Decl. ¶_14.  At a minimum, these disclosures show that there are disputes of fact as to whether Google can carry its burden of providing invalidity by clear and convincing evidence.  *Source Search*, 588 F.3d at 1069.

Further confirming that the generic network in Figure 1 can be any of the disclosed types of networks, when the specification describes an exemplary process of adding a device to a household in Figure 4A, it describes determining "whether the controller itself is *coupled to an access point of a network*, at least a member of the

---

[2] Even accepting Google's false dichotomy of ad hoc versus access point networks, the specification's disclosure of two options and the claim's selection of one of the two options does not implicate genus-species cases. Mot. at 20-21. The specification discloses both species, and does not leave a person of ordinary skill "to speculate as to modifications that the inventor might have envisioned, but failed to disclose." *Lockwood*, 107 F.3d at 1572.

HOUSEHOLD (e.g., one zone player) is coupled thereto *or an Ad-Hoc network.*" '896 patent at 16:11-15 (emphasis added). That express disclosure shows that the inventive configuration processes could be carried out with respect to a network that is defined by an access point, such as an infrastructure network. Moreover, the remainder of the description of process 400, depicted by FIG. 4A, can apply to multiple types of network and never requires that the controller is initially coupled to an ad-hoc network; rather, the description of process 400 goes on to refer to the remainder of the setup process broadly. *Id.* at 16:60-17:6; Thompson Decl. ¶ 15.

The disclosure here is analogous to the adequate disclosures in *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360 (Fed. Cir. 2019). In *Centrak*, the claims recited "ultrasonic" components but "the vast majority of the specification focuses on infrared (IR) or RF components." *Id.* at 1363. The specification contained "[o]nly two sentences … discuss[ing] ultrasonic technology." *Id.* As the Federal Circuit explained in vacating the district court's grant of summary judgment of invalidity, "the fact that the bulk of the specification discusses a system with infrared components does not necessarily mean that the inventors did not also constructively reduce to practice a system with ultrasonic components." *Id.* at 1366. Instead, minimal express disclosure of ultrasonic components coupled with "testimony from CenTrak's expert" created disputes of facts necessitating denial of summary judgment. *Id.* at 1367-68. Here again, the disclosures in the specification and the testimony from Mr. Thompson also create disputes of fact that preclude summary judgment, particularly in light of the clear and convincing burden of proof.

The specification's inclusion of examples of ad-hoc networks does not negate the breadth of the surrounding disclosure of other types of networks. *ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016) ("[A] specification's focus on one particular embodiment or purpose cannot limit the described invention where that specification expressly contemplates other embodiments or purposes."). Because the patent discloses multiple possibilities and "does not 'unambiguously

limit[ ]' the meaning" of network to ad-hoc networks, the specification adequately supports the claims. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 993 (Fed. Cir. 1999) (disclosure of "heading" as encompassing two directions adequate; "the patent disclosure provides ample support for the breadth of the term 'heading'; it does not 'unambiguously limit[ ]' the meaning of 'heading' to the direction of the motor." (alteration in original). Instead, because a "network" can be an ad-hoc or an infrastructure network, examples of configuration processes for a generic network would be understood by a person of ordinary skill in the art to encompass both types of networks. Thompson Decl. ¶ 12.

Google has not identified any special feature of an ad-hoc network that requires the inventive configuration process to be carried out with respect to an ad-hoc network or that the process is somehow unique to ad-hoc networks. Thompson Decl. ¶ 16. Instead, given the patent discloses as a first step checking whether a controller is connected to an access point or ad-hoc network, the patent teaches a person of ordinary skill that either network can be used. *See* Fig. 4A. Furthermore, the patent explains that access point networks were well-known in the art. Where the art is predictable and involves well-known configurations, "a lower level of detail is required to satisfy the written description requirement than for unpredictable arts." *Hologic, Inc. v. Smith & Nephew, Inc.*, 884 F.3d 1357, 1361 (Fed. Cir. 2018).

**B.     The patents disclose an ad-hoc network defined by an access point.**

A second independent reason for denying Google's motion and finding that there is adequate written description is that the patents teach an ad-hoc network defined by an access point, such as the exemplary network depicted in Figure 3A. Google's motion is premised on a false dichotomy between ad-hoc networks and access point networks. There is no mutual exclusivity between ad-hoc and access point networks. Thompson Decl. ¶ 20; Ex. 4 to Thompson Decl., U.S. Patent Pub. No. 2005/0131558 at ¶ [0034] ("This wireless access point embodiment includes the components of embodiment 100B with additional components added for wireless-

wired bridging, such as dual mode ad-hoc to infrastructure mode."). The patents themselves teach ad-hoc networks "coupled to an access point of a LAN." '896 patent at 2:54-58. And a person of ordinary skill in the art would understand that such a network, which is also described with reference to the "ad-hoc network 310" shown in Figure 3A is an ad-hoc network defined by an access point. Thompson Decl. ¶ 17. In this regard, a person of ordinary skill in the art would understand that the network depicted in Figure 3A is a hybrid network that combines aspects of infrastructure and ad-hoc networks. Thompson Decl. ¶¶ 17, 20. Notably, Google offers no contrary expert testimony, but merely attorney argument as to what these disclosures mean to a person of ordinary skill in the art. The Court should not grant summary judgment on a factual issue on which Google bears a clear and convincing burden of proof, particularly in the face of unrebutted expert evidence from Sonos. *Provenz*, 102 F.3d at 1490.

The '896 and '883 patents explain that "an Ad-hoc network is formed among the controller and the zone players" and "either a handheld controller or a zone player (referred to as an *access device*) is *coupled to an access point of a LAN*. An Ad-hoc network can be thus formed *based on the access device*. … As a result, any one of the zone players may communicate with each other to share or distribute audio sources available on the Internet …." '896 Patent, 2:50-63 (emphasis added). In this regard, a person of ordinary skill in the art would understand that the "access device" in this embodiment is serving as an access point that defines the ad-hoc network and connects the ad-hoc network to the Internet. Thompson Decl. ¶¶ 17-18.

The specification elaborates on such an embodiment with reference to Figure 3A, in which zone player 306 serves as the access device and thus the access point for the ad-hoc network 310 and its connection to the wider Internet 312. '896 Patent, 9:1-10:8; *see also id*. at 6:63-7:2. In this way, the ad-hoc network 310 disclosed by the '896 and '883 patents has an access point (or access device) that could be used to

communicate some traffics, while other traffics could be communicated directly between the zone players in a "peer-to-peer" style.  Thompson Decl. ¶ 17.



**FIG. 3A**

Fig. 3A (red box added).

Google states, without citation, that "the Ad-hoc network 310 lacks an access point to act as a hub for all communications," Mot. at 4, and resists that a person of skill in the art would have understood that the "access device" disclosed in the patents is an access point that defines an ad-hoc network.  This argument is inconsistent with how a person of ordinary skill would understand the patents' disclosure.  Thompson Decl. ¶ 17-21.

First, there is no requirement that an access point act as a hub for "all communications" over the network.  Instead, relevant dictionaries from around the priority dates of the patents explain that an access point "[i]s the interface between the wireless network and a wired one. It acts as the method by which wireless computers communicate with the wired network infrastructure."  Ex. 2 to Thompson

Decl., Information Security Dictionary (2004); Thompson Decl. ¶ 18.   Another dictionary defines access point as a "Network Device that interconnects a wireless radio network to a wired LAN." Ex. 3 to Thompson Decl., Newton's Telecom Dictionary (2001); Thompson Decl. ¶ 18.   In other words, communications between two networks should go through the access point, but communications *within* a network need not.

That is exactly the role of Zone Player 306 in Figure 3A:  it provides "bridging services between wired/wireless networks" for zone players and is shown in Figure 3A "to be connected to both networks, for example, the connectivity to the network 312 is based on Ethernet while the connectivity to other devices 302, 304 and 308 is based on Wireless."   '896 patent at 10:3-8.   In other words, the Zone Player 306 provides the other zone players in the ad-hoc network 310 with the access point needed to communicate with other entities on the Internet or LAN 312 and thereby, for instance, retrieve audio sources that may be accessible via the Internet. *See, e.g., id.*; *id.* at 6:63-7:2 ("In one embodiment, a zone player, referred to as an access zone player, including both of the interfaces 216 and 217 is coupled to an access point of an LAN and communicates with other zone players wirelessly.  Thus these other zone players may communicate with other devices on a network or retrieve audio sources *via the access zone player.*") (emphasis added).

This understanding is also consistent with the claim construction evidence Google cites (*e.g.,* Mot. at 3), which explains that "[u]sually there is a network access point" that "serves as the network hub" and that "[e]ach computer" on the network "can communicate with the access point."   ECF No. 148.06.   So too in Figure 3A, where zone player 306 acts as the access point and each other device can communicate with the access point through the ad-hoc network 310.

Because the patents teach forming a network "based on the access device," '896 at 2:57-58, and using the access device to access another network, *id.* at 2:60-63, 6:63-7:2, 10:3-8, a person of ordinary skill would have understood that the access device

-13-                                           Case No. 2:20-cv-00169-JAK (DFMx)

serves as an access point and defines the ad-hoc network Thompson Decl. ¶ 17. Google's contention that an "access device" must be different from an "access point" is not supported by the specification or Federal Circuit caselaw. Merely using different terms to refer to different devices does not mean that the devices have mutually exclusive functionality. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012) (rejecting argument that using two different terms in the specification required a finding that the terms were mutually exclusive). And here, the specification describes the access device serving as an access point for the ad-hoc network: "In one case, either a handheld controller or a zone player (referred to as an access device) is coupled to an access point of a LAN. An Ad-hoc network can be thus formed based on the access device." '896 patent at 2:54-57; *see also id*. at 6:63-7:2, 9:1-10:8; Mot. at 9 (agreeing that "the specification discloses an Ad-hoc network coupled to an access point through an access device."). This is therefore not a case where the specification distinguishes between or suggests to a person of ordinary skill in the art that an access device cannot serve as an access point. *See Rivera v. ITC*, 857 F.3d 1315, 1321 (Fed. Cir. 2017) ("Whatever a 'pod' is, the specification indicates that it is distinct from the receptacle" and "consistently describes an invention in which the 'pod' and the receptacle or container are distinct components.").[3]

The patents' explanations of ad-hoc networks further supports this understanding. The '896 and '883 patents explain that "an Ad-Hoc (or 'spontaneous') network is a local area network or other small network in which there is no ***one access point*** for all traffics." '896 Patent, 9:6-8 (emphasis added). This does not mean that

---

[3] Moreover, the patents disclose that an access device has functionality in addition to serving as an access point, such as the ability to play back audio content. Thus, it makes sense that the patent uses the term "access device" and not "access point" for a device that can serve as both an access point and a playback device.

ad-hoc networks exclude access points. Thompson Decl. ¶ 21.[4]  Rather, it discloses to a person of ordinary skill in the art that the '896 and '883 patents specifically contemplated an ad-hoc network that has an access point for some (but not all) traffic or that may have multiple access points. *Id*.  And that is consistent with Figure 3A, where traffic amongst the devices may take place outside the access point 306 in a peer-to-peer fashion (e.g., from controller 308 to player 304 or from player 302 to player 304), and other traffic goes through the access point 306 (e.g., traffic to or from the Internet 312).

Even if the Court were to agree with Google that Figure 3A shows only an ad hoc network, it is simply one embodiment and does not limit the claims or the scope of the disclosure as whole. *Johnson Worldwide Associates*, 175 F.3d at 993 (where the patent disclosure provides support for the breadth of the term, examples will not "unambiguously limit the meaning of [the term]" to a narrower embodiment). The "absence of embodiments" specifically limited to access point networks does "not preclude written description." *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 69 F.4th 1341, 1354 (Fed. Cir. 2023); *see also In re Rasmussen,* 650 F.2d 1212, 1215 (C.C.P.A. 1981) ("[T]hat a claim may be broader than the specific embodiment disclosed in a specification is in itself of no moment."). Sonos was "not required to describe in the specification every conceivable and possible future embodiment of his invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001). Instead, written description requires only that a skilled artisan would reasonably conclude, based on the patent's disclosures and the knowledge of a person skilled in

---

[4] Similarly, ad-hoc networks are not *required* to have access points, as Sonos explained at the *Markman* hearing.  Google Ex. C (Feb. 23, 2026 Hearing Tr.) at 31:23-32:5.  That is irrelevant to whether Figure 3A discloses an ad-hoc network defined by an access point, which would simply be a specific implementation of ad-hoc that *does* include an access point.

the art, that Sonos's inventors possessed a method of adding devices to access point networks in addition to ad hoc networks.

Moreover, the specification does not have to provide *in haec verba* support for the claimed subject matter at issue. *See Fujikawa v. Wattanasin*, 93 F.3d 1559, 1570 (Fed. Cir. 1996). Here, the patents describe multiple types of networks, disclose beginning a device set-up process through a controller that may be connected to a generic network, and never expressly limited themselves to either type of network. A person of ordinary skill in the art would "clearly conclude that the inventor invented what is claimed." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1364 (Fed. Cir. 2003) (finding adequate support for "slots" that went beyond particular embodiments detailed in the specification). That is particularly true here, where infrastructure and ad-hoc networks were well-known to a person of ordinary skill. *See Hologic*, 884 F.3d at 1361.

## C.    Google's resort to irrelevant extrinsic evidence does not warrant summary judgment.

Google cites Sonos's commercial product literature, internal emails from several years after the priority date of the patents, and company presentations describing various features engineering teams were considering implementing in Sonos's commercial products to argue that Sonos did not "possess" a method of adding devices to an access point network. Mot. at 11-13. Citation to this extrinsic evidence, which is not about what a person of ordinary skill in the art would understand from the patents' disclosure, is both irrelevant and also does not support Google's motion.

Evidence that goes to what a person of ordinary skill would understand from the specification—like the declaration of Mr. Thompson—may be relevant to evaluating whether the written description is adequate. *Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 937-38 (Fed. Cir. 2019) (affirming sufficient written description based on expert testimony about how a specification's disclosure

would have been understood in view of what was known in the art); *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 405 F.3d 985, 988-90 (Fed. Cir. 2005) (considering expert testimony regarding how the disclosure of the patent specification would have been interpreted by a skilled artisan). But other evidence, like whether or when Sonos introduced commercial embodiments of its claims, is not. *Streck*, 665 F.3d at 1286 ("the mere fact that Ryan chose to reduce his invention to practice using a reticulocyte analog rather than a true reticulocyte is not relevant to the written description inquiry"). Google cannot rely on this irrelevant evidence to show that it would necessarily carry its clear and convincing burden of proof at trial.

Moreover, Google is simply wrong to suggest that Sonos did not commercialize the inventions claimed in the '896 and '883 Patents until 2014. Google's citations to SonosNet or the "Rincon ad hoc network," which was commercially released in 2005, only supports the written description because, like network 310 in Fig. 3A, SonosNet was configured as a secure WLAN defined by a playback device (e.g., a ZonePlayer/ZP 100) serving as an access point, with the access point connecting an ad-hoc network to the broader Internet. Thompson Decl. ¶ 22. For the same reasons that Figure 3A supports the claims, the disclosure of SonosNet in the provisional application does as well. And Google knows this—Sonos charted its Digital Music System User Guide from 2005 and source code from 2005 against the claims of the '896 and '883 patents in response to Google's Interrogatory No. 3, which asked Sonos to "Identify each product, service, or software known to You that You contend practices, practiced, embodies, or embodied any Asserted Claim." *See* Ex. A to Caridis Declaration, Sonos's Fourth Suppl. Obj. and Resps. to Google's First Set of Interrogatories dated June 25, 2026 (ROG No. 3 and response at 46-59). Sonos explained that its 2005 products used "a secure 'SonosNet' mesh network," and that a "zone player that is a member of an ad-hoc network and is also connected to a user's home network and/or the Internet via an Ethernet cable, thereby providing access for the other devices in the ad-hoc network to and from the user's home network and/or

-17-    Case No. 2:20-cv-00169-JAK (DFMx)

the Internet, is an access point that defines the ad-hoc network." *Id.* at 47-48. The takeaway is that Sonos has consistently described and reduced to practice the invention as claimed in the '896 and '883 patents: a process for adding a device to an ad-hoc network that is defined by an access point.

The timing of Sonos's commercial launch of certain features also has nothing to do with what the specification disclosed to a person of ordinary skill. As just explained, Sonos first introduced a commercial embodiment of the claims in 2005. So Sonos's 2014 work, Mot. at 13, was not its first commercial embodiment, but rather a *new* commercial embodiment. Any purported delay in Sonos introducing new versions of its software does not indicate that Sonos had trouble implementing these claims—because Sonos had already implemented them. Ultimately, the written description requirement looks to what the specification teaches, not what the patentee's commercial embodiments contained. *Streck*, 665 F.3d at 1286. There is no requirement that Sonos "prove an actual reduction to practice as to all disclosures," instead the "relevant inquiry … is whether a person of ordinary skill in the art would reasonably find that the patent sufficiently described the invention." *Id.*

## V.    CONCLUSION

The Court should deny Google's motion for summary judgment, or grant Sonos summary judgment of no invalidity for lack of adequate written description.

Dated: July 31, 2026                    Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP


By: */s/ Alyssa Caridis*
     Alyssa Caridis
     *Attorneys for Plaintiff Sonos, Inc.*